UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REAL VIEW, LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>20-20 TECHNOLOGIES, INC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 07-12157<br>) |
| 20-20 TECHNOLOGIES, INC.,<br><br>        Counterclaim Plaintiff,<br><br>        v.<br><br>REAL VIEW, LLC<br><br>        Counterclaim Defendant, and<br><br>BORIS ZELDIN AND LEONID PERLOV<br><br>        Additional Party Defendants<br>        in Counterclaim. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REALVIEW LLC, BORIS ZELDIN AND LEONID PERLOV'S
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Realview, LLC  brought this action seeking declaratory judgment of non-infringement under copyright law.  20-20 Technologies, Inc. ("20-20"), responded with substantive copyright infringement counterclaims, and added Boris Zeldin and Leonid Perlov the two founders and owners of Real View as defendants-in-counterclaim (Real View, Zeldin and Perlov are referred to collectively as "Real View").  This motion for summary judgment addresses Real View's claim that it did not engage in copyright infringement, and also seeks dismissal of 20-20's claims of trade dress infringement, violation of M.G.L. c. 93A, unfair competition and interference with advantageous relations.[1]

As shown in the Affidavit of Boris Zeldin and discussed below, 20-20's claims of copyright infringement disregard the most basic precepts of copyright law.  Real View should be granted final judgment and awarded its attorney's fees and costs under 17 U.S.C. § 505.

## INTRODUCTION

As described in the Concise Statement of Materials Facts submitted herewith, the central issue in this case is 20-20's claim that Real View, the developer and publisher of the "ProKitchen" software program, has infringed 20-20's copyright in the user interface of "20-20 Design."  The two companies have never had a business relationship, and Real View has never seen or accessed the source code to 20-20 Design; thus, the copyright issues are limited to the user interface of the programs.

20-20 is the market leader in the market for kitchen design software (a "niche" market within the broader field of computer aided design, or "CAD").  Real View is a very small start-up that has challenged 20-20 in its established market.  Real View, recognizing that it would be

---

[1]      In support of this motion Real View has filed the **Affidavit of Boris Zeldin in Support of Motion for Summary Judgment**.  Attached to that affidavit are: the 20-20 Expert Report (**Ex. A**); 20-20's Interrogatory Responses (**Ex. B**); a list of the alleged similarities contained in the 20-20 Expert Report (**Ex. C**); and a detailed comparison, with screen shots, of ProKitchen, 20-20 Design and numerous third-party products (**Ex. D**).

competing against an established company, studied 20-20 Design in order to ensure that

ProKitchen contained the key features and functionalities of 20-20 Design.  20-20 claims that

Real View went too far, and has infringed 20-20's copyright in the user interface of its software.

During discovery Real View asked 20-20 to identify all similarities between ProKitchen

and 20-20 Design.  20-20's interrogatory responses identified thirty-six similarities.  (Zeldin Aff.,

Ex. B, Response No. 6).  In addition to claiming similarities based on menu commands, the

responses identified features, methods and "possibilities" (another word for features) which on

their face are uncopyrightable under 17 U.S.C. § 102(b).[2]

20-20's Expert Report dated May 5, 2009 (the "Expert Report"; Zeldin Aff. Ex. A)

describes many of the same items with more specificity, and includes screenshots, so that Real

View and the Court can see the alleged similarities in the user interfaces of the two programs.

To make it as easy as possible for the Court and the parties to refer to the similarities identified

in the Expert Report, Real View has created a list of the alleged similarities.  This list is attached

to the Zeldin Affidavit as Exhibit C, and identifies 46 similarities.

Static screen shots may not provide the context that the Court needs to decide this

motion, and therefore Real View is prepared to either provide an in-court tutorial/demonstration

of ProKitchen, or provide the Court with a copy of the Real View's software.  In the alternative

(or in addition), Real View will pay the cost of having a computer consultant install ProKitchen

on a computer accessible to the Court.

---

[2]      These interrogatory responses were evidence of 20-20's true motive in this case, which can only be to use litigation to drive a small competitor out of business.  Examples from the list of similarities which illustrate the frivolous nature of 20-20's claims are: "3D and Isometric output" (item 35), "save as image" feature (item 2), "elevation feature" (item 7), "concept of view tabs (item 9); toolbar both on top and on the left of the screen (item 18); "possibility to change angles of walls through mouse right-clicks" (Item 26); "'wall groups' concept" (item 27); list of bill of materials (item 33).  (Zeldin Aff., Ex. B, response to interrogatory no. 6). Each of these items is, on its face and without question, a basic functionality of CAD software, and is, as well, expressed differently in ProKitchen and 20-20 Design.

## ARGUMENT

**I.      The Standard of Review**

This Court recently set forth the standard for summary judgment in <u>Foley v. Town of Randolph</u>, 601 F. Supp. 2d 379 (D. Mass. 2009).  Under Fed. R. Civ. P. 56 the moving party must show there is an absence of evidence to support the non-moving parties' position.  <u>Rogers v. Fair</u>, 902 F.2d 140, 143 (1st Cir. 1990).  If the moving party properly supports its motion the burden shifts to the nonmoving party to demonstrate that a trier of fact reasonably could find in its favor. <u>DeNovellis v. Shalala</u>, 124 F.3d 298, 306 (1st Cir. 1997)

In copyright cases summary judgment is appropriate if the district court concludes that no reasonable juror could conclude that the defendant's product is "substantially similar" to the plaintiff's product.  <u>Yankee Candle Co., Inc. v. Bridgewater Candle Co., Inc.</u>, 259 F.3d 25, 32 (1st Cir. 2001).  <u>See</u> <u>also</u> <u>Herzog v. Castle Rock Entertainment</u>, 193 F.3d 1241, 1247 (11th Cir. 1999)("non-infringement may be determined as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar"); <u>Matthew Bender & Co., Inc. v. West Pub. Co.</u>, 158 F.3d 693, 705 (2d Cir. 1998)(summary judgment for non-infringement is appropriate "[i]f the similarity concerns only noncopyrightable elements of [a copyright holder's] work, or no reasonable trier of fact could find the works substantially similar").

**II.      The Legal Framework to Evaluate Alleged Copyright Infringement of the User Interface of a Software Program**

In the roughly 20 years after Congress amended the Copyright Act in 1980 to expressly bring computer software within copyright protection there was an explosion of litigation and debate over how best to apply the principles of copyright law to  the components of software:

source code and object code (the "literal elements" of computer programs) and the "user

interface" (the "non-literal elements").  By the mid-1990s cases such as <u>Apple v. Microsoft</u>

(1994)[3] in the Ninth Circuit, <u>Computer Associates v. Altai</u> (1992)[4] in the Second Circuit, <u>Mitek</u>

<u>v. Arce</u> (1996)[5] in the Eleventh Circuit, and <u>Lotus v. Borland</u> (1995)[6] in the First Circuit, had

largely resolved these issues.   Based on these cases, the following principles apply in this case.

(i)  **Lotus v. Borland – Menu Command Hierarchies are a "Method of Operation"** .

While copyright law applies to source code, object code and the user interface of computer

software, protection of user interfaces is "thin," especially in utilitarian programs (such as the

architectural design software in this case ) as opposed to highly creative or artistic programs (for

example, computer games).  The First Circuit has taken the most conservative approach among

all the Circuits with respect to the protection of user interfaces.  In <u>Lotus v. Borland</u> the First

Circuit held that the menu command hierarchy of a software interface is a "method of operation"

under Section 102(b) of the Copyright Act, and therefore is not copyrightable subject matter;

this, notwithstanding that the menu commands may reflect expressive aspects separable from

their functionality.  Although other Circuits have applied this doctrine in specific cases,  none

has gone as far as the First Circuit and held menu commands <u>per se</u> uncopyrightable. As

discussed below, <u>Lotus v. Borland</u> is crucial to the disposition of this case – the vast majority of

20-20's allegations of illegal copying involve menu commands that are uncopyrightable

"methods of operation."

---

[3]        35 F.3d 1435 (9th Cir. 1994).
[4]        982 F.2d 693 (2d Cir. 1992).
[5]        89 F.3d 1548 (11th Cir. 1996)
[6]        49 F.3d 807, 816 (1st Cir. 1995), <u>aff'd by an equally divided court</u>, 516 U.S. 233 (1996).

        The effect of affirmance by a divided Supreme Court is that the decision below stands in full force, as if
the appeal had never occurred.   <u>Neil v. Biggers</u>, 409 U.S. 188,192 (1972); <u>Durant v. Essex Co.</u>, 7 Wall. 107, 112,
19 L. Ed. 154 (1869).  Thus, <u>Lotus v. Borland</u> is controlling precedent in the First Circuit.

(ii) **The Altai Test - "Abstraction, Filtration and Comparison"**.  Almost every court to have considered the issue has applied some variation of the "abstraction, filtration and comparison" test adopted by the Second Circuit in Computer Associates v. Altai, where the defendant was alleged to have copied the structure and organize of the plaintiff's source code.[7] "Filtration" is the process of "filtering out" unprotectable elements of the interface.  Some Circuits refer to this as "analytic dissection," a term that long preceded Altai in copyright law. All courts presented with the issue have held that where, as here, the copyright owner has listed or enumerated the items and features that it believes constitute the infringement, "abstraction" is unnecessary.[8]  Since 20-20 has provided a list of alleged similarities as the basis for its allegations of infringement the Court may limit itself to filtration and (if necessary) comparison of the programs.

(iii)  **"Filtration" or "Analytic Dissection"**.  "Filtration," or "analytic dissection," requires the trial judge[9] to "dissect" the program or, as Judge Young described it in Ilog v. Bell

---

[7]       Although the First Circuit has not expressly adopted Altai as the appropriate method for test for evaluating non-literal copying of non-literal elements of a computer program, the Altai test has been widely adopted. See, e.g., MiTek Holdings, Inc. v. Arce Eng'g Co., Inc., 89 F.3d 1548, 1555-56 nn. 15-16 (11th Cir. 1996); Eng'g Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1343 (5th Cir. 1994); Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 834 (10th Cir. 1993).  Judge Young adopted Altai as the test for analyzing non-literal copying in iLog, Inc. v. Bell Logic, Inc., 181 F. Supp. 2d 3 (D. Mass. 2002).

[8]       See, e.g., Baystate Techs., Inc. v. Bentley Sys., Inc., 946 F. Supp. 1079, 1089 (D. Mass. 1996) (abstraction step skipped when only certain elements of the program were allegedly copied); iLog, supra, (no need to perform "abstraction" step when copyright owner has identified features allegedly infringed); eScholar, LLC v. Otis Educational Systems, Inc., 2005 WL 2977569 (S.D.N.Y. 2005)(same); MiTek Holdings, Inc. v. Arce Engineering Co., Inc., 89 F.3d 1548 (11th Cir. 1996)("if the copyright holder presents the court with a list of features that it believes to be protectable (i.e., original and outside of 17 U.S.C. § 102(b)), the court need not abstract further such features").

In Mitek, supra, the Eleventh Circuit panel suggested that "perhaps the best approach is for a district court in any computer program infringement case, . . . is … to require the copyright owner to inform the court as to what aspects or elements of its computer program it considers to be protectable.  This will serve as the starting point for the court's copyright infringement analysis."  Real View asked 20-20 Technologies to provide this information in its interrogatory responses (Zeldin Aff., Ex. B, response no. 6).  20-20 Technologies expanded on, and superseded, its interrogatory responses in its Expert Report.  (Zeldin Aff., Ex. A).

[9]       This process of filtration or analytical dissection is analogous to claim construction under patent law.  The judge, not the jury, determines which elements of the copyright owners' software are "filtered out".  See, e.g.,

Logic,  "reverse engineer" the software.  Once the dissection is performed the judge must apply the "limiting doctrines" of copyright law to the dissected remains.  The limiting doctrines are the exclusions set forth in 17 U.S.C. 102(b)[10], as well as the doctrines of merger, lack of originality, public domain, scènes à faire, words and short phrases, standard techniques or practices, market/industry demands, considerations of efficiency and compatibility.  As shown in this motion, after filtration every similarity that 20-20 has identified as the basis of infringement will have been "filtered out," with the exception the "icons" used in the two programs, which are dissimilar.

(iv)  **Comparison Under "Substantial Similarity"**.  Once the interface of the allegedly infringed work has been dissected and properly filtered, whatever is left (the "kernel", as the court termed it in Altai) is compared against the allegedly infringing work to determine "substantial similarity."  Filtered elements are ignored in this process.   In determining whether any copying is "substantial," the court must compare the elements that survive filtration against the entirety of the defendant's program.  The court must apply (or instruct the jury) on the doctrine of de minimus copying, in which the amount copied is so small as to not justify a finding of infringement.

(v)  **Comparison Under "Substantial Identicality" in Cases Involving Compilations**.  The final question is how the courts have responded when a plaintiff claims protection of its interface as a "compilation."  That is, although the individual elements may not be protected, they may be protected as a "selection and arrangement" of unprotected elements.  The answer, in

---

Harbor Software, Inc. v. Applied Systems, Inc., 925 F. Supp. 1042 (S.D.N.Y. 1996)(analogizing filtration to a Markman Hearing); TMVT Corp. v. Mass Productions, Inc., 245 F. Supp. 2d 196, 211 (D. P.R. 2004)(same); Newton v. Diamond, 204 F. Supp. 2d 1244, 1253 (C.D. Cal. 2002) (citing Feist Publ'ns, 499 U.S. at 348-51) ("The protectability of elements of a copyrighted work is a question of law for the court").

[10]      17 U.S.C. § 102(b) states: "In no case does copyright protection ... extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work"

the Ninth and Eleventh Circuits is that if the plaintiff asserts infringement of a compilation of

unprotected elements it must prove "virtual identicality" or, as it is put in the alternative, "bodily

appropriation of expression."   However, the First Circuit has answered this question differently–

the First Circuit's holding in <u>Lotus</u> makes it clear that in this Circuit a compilation of menu

commands contained in a software interface is unprotectable, even as a compilation.  The First

Circuit's decision that menu command hierarchies are uncopyrightable, even as a compilation,

was affirmed by the Supreme Court on a divided vote, and therefore is binding law in this

Circuit.  (<u>See</u> note 6, <u>supra</u>).

## III.   Application of Copyright Principles to 20-20's Claims of Infringement

In order to prove copyright infringement, a plaintiff must show "(1) ownership of a valid

copyright, and (2) copying of constituent elements of the work that are original." <u>Feist</u>

<u>Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991).  For purposes of this motion

only the Court may assume, without objection from Real View, that 20-20 has ownership of a

valid copyright for version 6.1 of 20-20 Design (the version that 20-20's Expert Report is based

upon) and that 20-20 Technology will be able to establish "probative copying."[11]  This will

allow the Court to proceed to what Real View believes to be the "heart of the matter" in this

case: a determination by the Court of which elements of the 20-20 Design interface are protected

by copyright law (using filtration/dissection), and then performing comparison, either under the

"substantial similarity" or "identicality" standards.

Further, as noted above, there is no need for the Court to engage in the <u>Altai</u> "abstraction"

step in this case, since 20-20 has provided the Court and Real View with a detailed list of alleged

---

[11]   In a copyright case the party asserting infringement must demonstrate that copying "as a factual matter," actually took place.  <u>Lotus</u>, <u>supra</u>, 49 F.3d at 81.  A court may infer that there was "factual copying" if "the alleged infringer had access to the copyrighted work" and there is "probative similarity" between "the offending and copyrighted works." <u>Lotus</u>, 49 F.3d at 813.

similarities that form the basis of its claim of copyright infringement.  See n. 8, supra; (Zeldin

Aff., Exs. A and B).

    **A.**    **Filtration/Analytic Dissection of 20-20 Design**

        **1.**    **The Menu Command Structure of 20-20 Design is Uncopyrightable**

        20-20's Expert Report shows that the vast majority of the allegations of illegal copying in

this case involve the 20-20 Design and ProKitchen menu command structure.  As demonstrated

in detail in Mr. Zeldin's Affidavit the menu commands in the two programs are not at all alike.

20-20's Expert Report takes the approach of, "if I say it's so, then so it must be."  However, in

case after case the Expert Report is simply wrong.  See, e.g., Zeldin Aff., par. 32, for an example

of how far the 20-20 Expert Report has gone to misstate the facts – the Report assert that the

main menus of the two programs are similar when in fact, after common Windows commands

are removed, only one out of twelve commands in 20-20 Design is present in ProKitchen.

        However, even if the menus were the same or similar, under the First Circuit decision in

Lotus v. Borland they are not protected by copyright law.

        The Lotus case involved copyright infringement in the context of computer spreadsheets

– the Lotus "1-2-3" and Borland "Quattro Pro" spreadsheets.  49 F.3d at 810.   The issue was

whether Borland infringed Lotus's copyright in its "menu command hierarchy."  Id. at 809.   The

menu command hierarchy was the system of menus and commands used to operate the program.

Id.  Borland did not dispute that it had "factually copied the words and arrangement of the Lotus

menu command hierarchy" for use in a program it designed to compete with the plaintiff's

program.  Id. at 812-13.  In fact, Borland engaged in wholesale, verbatim copying of hundreds of

commands (so-called "literal" copying, as contrasted with "non-literal," or partial, copying).  As

here, Borland did not copy the underlying source code.  Id. at 810.

Reversing the lower court judge's finding of infringement, the First Circuit held that the words used in Lotus 1-2-3's menu command hierarchy were not protectable because they were the very means by which functions were performed, and therefore constituted an unprotectable "method of operation."  Importantly, the First Circuit observed that even though the authors of Lotus 1-2-3 made some "expressive choices" in choosing and arranging the Lotus command terms, "the 'expressive' choices of what to name the command terms and how to arrange them do not magically change the uncopyrightable menu command hierarchy into copyrightable subject matter."  <u>Lotus</u>, 49 F.3d at 816.  The Court held:

> [T]he Lotus menu command hierarchy is an uncopyrightable "method of operation." The Lotus menu command hierarchy provides <u>the means by which users control and operate Lotus 1-2-3</u>. If users wish to copy material, for example, they use the "Copy" command. If users wish to print material, they use the "Print" command. Users must use the command terms to tell the computer what to do. Without the menu command hierarchy, users would not be able to access and control, or indeed make use of, Lotus 1-2-3's functional capabilities. (Emphasis added).

<u>See</u> <u>also</u> <u>iLog, Inc. v. Bell Logic, Inc.</u>, 181 F. Supp. 2d 3, 10 (D. Mass. 2002)("While Bell Logic may have made some expressive choices in developing its editors, the expressive choices are wholly embraced in the operation of the software program itself, and hence are unprotectable. Thus, to the extent that any of the particular areas of copying are asserted to be expressive, those areas are bound up in a method of operation that is not protected by the Copyright Act.").

<u>Lotus v. Borland</u> is dispositive of 20-20's allegations of illegal copying of its menu commands in this case.  As discussed in the Zeldin Affidavit, the commands in 20-20 Design's design program are the means by which the users of 20-20 Design and ProKitchen control and operate the programs. (Zeldin Aff., pars. 34, 35).  "Drag" tells the computer to use the mouse to drag an object; "Place" tells the computer to move an object to a location on the screen; "Move" tells the computer to move an object.  The entire list of commands in the menus identified by 20-

20 are listed in the Zeldin Affidavit at par. 34 and, under <u>Lotus</u>, these menu commands are uncopyrightable.[12]

Once the menu commands are "filtered" out of 20-20 Design, there is little left that is not a non-copyrightable function or feature. The remaining alleged similarities, such as they are, are discussed below.

> **2.      Most of the Remaining Similarities Identified by 20-20 Must be Filtered Based on § 102(b) and the Limiting Doctrines of Merger, Scènes à Faire, Public Domain, Efficiency, Words and Short Phrases, Standard Techniques or Practices, and Market Demands**

It is axiomatic, and statutorily explicit, that copyright law does not protect an idea, but only a particular expression of the idea. 17 U.S.C. § 102(b). "[C]opyright does not protect the technologic process independent of the program that carries it out . . .." <u>Hutchins v. Zoll Medical Corp.</u>, 492 F.3d 1377 (Fed. Cir. 2007), <u>affirming</u>, 430 F. Supp. 2d 24 (D. Mass 2006)(Ponsor, J.). However, 20-20 has ignored this fundamental principle of copyright law by claiming infringement of a number of claimed similarities that are pure functionalities that are barred from copyright protection under 17 U.S.C. §102(b). Moreover, many of the similarities claimed by 20-20 are uncopyrightable under the limiting doctrines of merger, scènes à faire, public domain, efficiency, words and short phrases, standard techniques or practices, and market demands. Most of the alleged similarities are covered by two or more of these doctrines. Each must be filtered out under the second step of the <u>Altai</u> test.

**Display of floor plan and elevation on the same screen, which are updated mutually and simultaneously (Item 2, Expert Report par. 23)**. The 20-20 Expert Report identifies as a

---

[12]      It is worth noting how far 20-20 Technologies has gone in claiming similarities based on menu commands. For example, the Expert Report identifies the "attributes" dialog boxes as a similarity. (Expert Report, par. 29). However, the court in <u>Apple v. Microsoft</u> held, as far back as 1994 that "a dialog box that shows the attributes of an object is merely an idea." <u>Apple v. Microsoft</u>, 799 F. Supp. 1006 (N.D. Cal 1992), aff'd, 35 F.3d 1435 (9th Cir. 1994). Another similarity in menu commands identified in the Expert Report is the command "save as image." A Google search on this command reveals hundreds of thousands of "hits" on this common software command. (Zeldin Aff., par. 40).

similarity that in both programs "the main window is subdivided into a plan and elevation view" and a change in one view is reflected in the other. (Expert Report, par. 23). This is clearly a functionality of 20-20 Design. As Mr. Zeldin shows, this feature, which is sometimes called "multiview," is common to many CAD programs. (Zeldin Aff., par. 23-32). Moreover, there is only one way to present this feature (a horizontal screen split). (Zeldin Aff., Ex. D, p. 25).

Apple v. Microsoft, 799 F. Supp. 1006 (N.D. Cal 1992), aff'd, 35 F.3d 1435 (9th Cir. 1994), is instructive on this issue. There, the District Court noted that because a programmer "must choose between switching images or splitting the screen, the means of expression are limited, and merger applies …." The same is true in this case with respect to the ability to show architectural perspectives by "switching screens" or "splitting the screen." 20-20 has no more right to prevent Real View from giving users the option to see two design views at once than Apple did to prevent Microsoft using a split view in 1994.

The "split screen" feature is uncopyrightable under 102(b), merger, scènes à faire and standard practices, and should be filtered out.

**Tabbed Views, and the Ability to Rename Tabs (Item 4, Expert Report par. 24)**

"Tabbed views" are a standard feature in both general purpose and CAD programs. The ability to create and name tabs has long been part of the Windows graphical user interface. Tabs allow the software user to open multiple documents within a single window, and switch between them by clicking on the "tabs." The "tabs" appear on the top or bottom of the screen and, consistent with the Windows "desktop metaphor," appear similar to "file tabs" that might be used in a traditional filing cabinet. It is also standard to allow the user to rename tabs to suit the user's needs. The tabs in 20-20 Design and ProKitchen (which are different in appearance) and other products that use this feature are shown on the Zeldin Aff., par. 27 and Ex. D, pp. 21, 22 and 33. And, with only two locations to place the tabs (top or bottom), this similarity is sharply restricted

by merger and §102(b), as well as the limiting doctrines of scènes à faire, public domain and market demands.

**The Ability to Search for Items in the Product Catalogs (Item 16, 20-20 Expert Report par. 37).**  As explained in the Zeldin Affidavit, both ProKitchen and 20-20 Design include tens of thousands of manufacturer catalog items.  (Zeldin Aff., par. 46).  Both programs allow the user to perform an "incremental find" (or "incremental search"), where as the user types text into a simple search field, one or more possible matches for text are found and presented to the user.  This search method, which has become standard in applications from Google to iTunes, has the benefit of either shortening the process of typing the search, or suggesting results the user might not have considered.

The search feature in ProKitchen and 20-20 Design is purely functional – it permits the user to perform a search more quickly, and perhaps more efficiently, than would be the case if it were not present.  It is implemented in the most simple way possible: an empty, unadorned box into which the user types the search.  (Zeldin Aff., Ex. D, p. 2).  Thus, the expression is inseparable from the idea.  In addition, ProKitchen implements the feature differently (and far more effectively) than 20-20 Design.  (Zeldin Aff., Ex. D, p. 59).  This similarity is uncopyrightable under §102(b), public domain, merger and standard techniques.

**Construction Line as a Type of Wall (Items 23, 24, 20-20 Expert Report pars. 45-46.**
The 20-20 Expert Report appears to challenge ProKitchen's use of the idea of a  "construction line," asserting that this is not a "standard term of art."  As Mr. Zeldin proves, this is a common term in CAD design software, for which a definition can easily be located on the Internet.  (Zeldin Aff., Ex. D, page 51).  A "construction line" is an imaginary line in a blueprint that does not represent a wall or other physical part of the plan, but is used for reference geometry.  This

concept, common to many CAD programs, is uncopyrightable under §102(b), scènes à faire, merger and market demands.

The 20-20 Expert Report also asserts that both programs use the "same, slightly confusing idea" by treating a construction line as a "kind of wall."  (20-20 Report, par. 46). However, copyright law doesn't protect "ideas," confusing or otherwise, and therefore ProKitchen's allegedly similar treatment of this feature is not copyrightable.  And, as discussed below, even if the phrase "construction line" were in some way novel in the context of the 20-20 software, it falls under the "short phrases" doctrine, and therefore is not protected by copyright.

Mitek Holding, Inc. v. Arce Engineering Co., 864 F. Supp. 1568 (S.D. Fla 1994), aff'd, 89 F.3d 1548 (11th Cir. 1996), is instructive on the "construction line" issue.  There, the court was faced with a software program and copyright claims similar to this case.  The suit involved the user interface of "layout program" that drew "architectural blueprints" – in other words, a CAD program.  In evaluating a list of 18 alleged similarities submitted by the plaintiff, the District Court held that the "expression of work places without reference to the real walls, the roof , or the ceilings" (which sounds like a "construction line," although the court did not use that term) was an unprotectible idea. 864 F. Supp. at 1583.

**The "Placement Zone" Feature (Item 26, 20-20 Expert Report par. 49).**  As explained in the Zeldin Affidavit, 20-20 uses the idea of a "placement zone" in 20-20 Design. (Zeldin Aff., par. 64).  In brief, a "placement zone" is a zone in front of a wall where an object's behavior is restricted.  Specifically, within the zone an object (a cabinet or appliance, for example) must be located against a wall, and may be moved only in the two dimensions defined by the wall.  If a user wanted to place a free-standing object (such as a kitchen island), she would place the object outside the "zone," to avoid it being forced against a wall.  Id.

As explained in more detail in the Zeldin Affidavit, a "placement zone" is pure functional - the software controls the attributes of the object, and the object behaves accordingly. (Zeldin Aff., pars. 64-66). Moreover, there is minimal visual manifestation to this feature. ProKitchen represents the feature by placing a thin line against the wall to outline the "zone." 20-20 Design, in contrast, gives the user a choice: a variety of different line styles to outline the zone, or a solid or transparent color to accomplish the same thing. 20-20 has left others (including Real View) no alternatives as to how to represent this feature. (Zeldin Aff., par. 67).

This similarity is uncopyrightable under §102(b) and merger.

**Sequence of Mouse Clicks to Draw a Wall (Item 27, 20-20 Expert Report par. 50).**
The proposition that one may own the copyright to a pattern of mouse clicks used to manipulate on-screen objects in an architectural design program is remarkable, but this is what 20-20 claims in this case. The 20-20 Expert Report asserts that both programs use the same sequence of mouse clicks to draw a wall on the computer screen. As explained in the Zeldin Affidavit this is incorrect – the functions are not identical. (Zeldin Ex. D, p. 53). More fundamentally, if the menu commands utilized by the programs are "the means by which a person operates something" (Lotus, supra 49 F.3d at 815), the same conclusion must hold true as well (or more so) for the user's movement of the mouse and right/left mouse clicks. The computer mouse is a tool used by the user to instruct the computer how to function. And, since there are only two "mouse buttons" no one software publisher can claim copyright rights in a combination of "right click/left click," as 20-20 purports to do here. A combination of mouse clicks is no more copyrightable than the buttons used to operate a VCR which, as the First Circuit noted in Lotus, is an "unprotectable method of operation." Lotus, 49 F.3d. at 817.

**Rotating a Wall With the Mouse (Item 30, 20-20 Expert Report par. 53)**. The same observations hold true with respect to the methodology for rotating an existing wall. This is a

purely functional process whereby the user uses the computer mouse to "select" the wall she wishes to move, clicks on the intersection of lines that will be the point of rotation, and then drags the wall end to the termination point.   (Zeldin Aff., Ex. D, p. 53).   This is clearly a functionality of both programs, and not protectable by reason of § 102(b) and merger, given the limitations of a two button computer mouse.  As the First Circuit noted, "forcing the user to cause the computer to perform the same operation in a different way ignores Congress's direction in § 102(b) that 'methods of operation' are not copyrightable." <u>Lotus</u>, 49 F.3d at 818.   20-20's apparent attempt to force Real View to use a computer mouse in a "different way" to rotate a wall runs afoul of this doctrine, and should be filtered out.

**Collision Detection (Item 34, 20-20 Expert Report par. 58).**  In yet another example of 20-20's bizarre understanding of copyright law it 20-20 Expert Report observes that in both programs, once an item is placed on a design, it can be put against a wall or left free standing. A computer software expert is not necessary to observe that these choices are obvious, and are present in all CAD software – where else would one put a cabinet or table if not against a wall or free-standing?  The Report also states that both programs will warn the user if two objects overlap (in other words, collision detection). However, collision detection is a functionality of the programs, as well as many CAD programs.  The Expert Report states nothing about how this collision threat is displayed to the user, and therefore 20-20 appears to be focusing solely on the feature itself.  The similarity in features is uncopyrightable under §102(b), merger, scènes à faire, standard techniques and market demands.

*       *       *       *

Given space constraints and the desire to be brief, Real View points out that other similarities identified in the Expert Report are obvious functionalities.  These include the ability to "drag and drop" items onto a design (a standard and common Windows feature), the ability to

rotate a group of objects, such as a group of walls (a common CAD function), and the ability to switch back and forth between a wall and a construction line (a function of the software that has no expressive characteristics).

Real View wishes to emphasize its alarm over the fact that 20-20 could assert copyright protection for such basic aspects of CAD software.  Legally, each is an unprotectable idea or process, and should never have been raised by 20-20 as an actionable similarity.  As the Second Circuit stated in <u>Altai</u>, "[s]ection 102(b) is intended . . . to make clear that the <u>expression</u> adopted by the programmer is the copyrightable element in a computer program, and that the actual <u>processes or methods</u> embodied in the program are not with the scope of copyright law."  982 F.2d at 703 (emphasis added).  The Court should take careful note that in the case of every one of these similarities 20-20 has failed to describe any artistic or separable expression whatsoever – it seems to simply claim the elements as "idea *qua* idea."   What 20-20 seeks to protect is not actual expression, but rather concepts and ideas.  In its apparent enthusiasm to use the courts to stamp out a competitor 20-20 has forgotten the basic principles of copyright law.   If 20-20 were able to prevent Real View's customers from using a tabbed interface, seeing multiple plan views at the same time, searching for products, utilizing placement zones and construction lines, using the mouse to draw lines and walls, and providing collision detection, Real View would be severely hobbled in its ability to compete (if not forced out of business altogether), and 20-20's market dominance would be vastly strengthened.

### 3.      "Short Phrases" are Not Protected by Copyright Law

The Expert Report identifies as similarities several "short phrases."  For example, the terms "construction line" (par. 45), "placement zone" (par. 49) and "non-plan item" (par. 67) are singled out for mention.

Just as ideas and facts are not protected by copyright, so too words and short phrases are not protected.  The Copyright Office will not register short phrases (37 C.F.R. Section 202.1). See also Compendium of Copyright Office Practices II, §305 ("short phrases or expressions are not copyrightable, even if such expressions are novel"); CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc., 97 F.3d 1504, 1519 (1st Cir. 1996) ("It is axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection.")

> **4.     There are No Similarities Between the Icons Used by the Two Programs, Except Where Industry Practice Mandates the "Idea" Underlying the Icon**

The Expert Report asserts that the icons used in 20-20 Design and ProKitchen are similar in appearance.  Exhibit D to the Zeldin Affidavit compares the various icons in detail, and provides examples from other programs: other than the standard Windows icons found in countless programs, none of the icons in ProKitchen and 20-20 Design are identical; many are iconic representations of standard actions and features, and therefore the underlying "idea" is the same, but the expression is different.  For example, both programs have an icon that represents a countertop, but they are completely different. (Zeldin Ex. D, p. 37).  Both programs have an icon to represent a window, but they are different. (Zeldin Ex. D, p. 44).  All CAD programs use "magnifying glass" icons to represent zoom features, but the actual icons are different in ProKitchen and 20-20 Design.  Each program has dozens of icons, and this observation is true throughout.

Continuing its approach of "if I say it's so, then so it must be," in many places the Expert Report states that icons in the two programs are similar, when even the most casual examination shows that they are not.   (See Zeldin Aff., Ex. D, p. 37 for one of many examples of this).

**5.      The Use of "Panels" to Display Information Is a Standard Feature in CAD Software**

The 20-20 Expert Report claims similarities based on the use of "sub-windows" or "panels" on the left side of the screens of the two programs when the program is first installed ("out of the box").  (Item 14, Expert Report par. 34, 35).  As shown in the Zeldin Affidavit, many CAD programs use panels from which the user can select objects necessary to the creation of a design.  (Zeldin Aff., Ex. D, pp. 4-17).  Thus, the "look" of the two programs is industry standard for computer aided design software.  There are only two places that these panels may be located on the screen (left or right), and under the merger doctrine 20-20 cannot claim copyright protection because it selected one side or the other.  See, e.g., Productivity Software Int'l, Inc. v. Healthcare Technologies, Inc., 1995 WL 437526 (S.D. N.Y. 1995)( because there are only two locations where a menu bar may logically be placed on a computer screen, the top and bottom, the copyright owner can not claim copyright protection for its placement of the menu bar); Mitek, supra, 864 F. Supp. at 1584 (the "four-box screen organization" (analogous to the "panels" 20-20 claims rights in here) held to be "common among a wide variety of programs," and therefore unprotectible).

As the Ninth Circuit noted in Apple, "the similarity of functional elements of a user interface or their arrangement in products of like kind does not suggest unlawful copying, but standardization across competing products for functional considerations."  Apple Computer, 799 F. Supp. at 1023.  The ubiquitous use of panels in CAD software to present a file structure from which a product can be selected, viewed before it is placed, and placed using screen coordinates, shows that this arrangement is based upon "standardization … for functional considerations," and is not entitled to copyright protection.

Moreover, the 20-20 Expert Report failed to note that the location of the panels, and their presence on the screen at all, is completely up to the user.  These panels can be closed entirely in ProKitchen, and either closed or moved around the screen in 20-20 Design, further undercutting any argument that this feature is copyrightable.  To top it off, the content of the panels is different in the two programs.  Zeldin Aff., par. 45 and Ex. D pp.  2, 3.  The idea that the panels are copyrightable wherever 20-20 first chooses to locate them would frustrate the very goal of copyright law by permitting 20-20 to claim ownership of the very idea of placing panels on the screen.  This alleged similarity should be filtered out of 20-20's claims.

## IV.    20-20's Remaining Counts Should be Dismissed

In addition to copyright infringement, 20-20 has stated claims under M.G.L. c. 93A, the Lanham Act, state unfair competition and interference with contract.

**Chapter 93A.**  In Count III of its Counterclaim, 20-20 has asserted a claim for violation of Massachusetts General Laws, Chapter 93A. However, 20-20 provides no independent factual allegations in support of this claim.  To the extent that 20-20's Chapter 93A claim simply restates its copyright claim, it may not stand as a separate count.  See Rubin v. Brooks/Cole Publ'g Co., 836 F. Supp 909, 923 (D. Mass. 1993) (holding that a 93A claim may survive preemption only where it "include[s] the `extra element' necessary qualitatively to differentiate [it] from [a] claim of copyright infringement.").

To the extent that 20-20 relies on the allegations in its Interrogatory Response No. 17 ((Zeldin Aff., Ex. B), these allegations do not  state a violation of law, and provide further evidence of 20-20's bad faith use of litigation.  20-20 complains of Real View's "pricing structure," its license exchange program, the fact that Real View updates it product to follow design changes to 20-20 Design and the fact that Real View mentions experience with 20-20 Design as a positive factor when advertising for employees.  (In fact, Real View has never hired

a 20-20 employee (Zeldin Aff., par. 70)).   These are all normal aspects of competition that occur in every industry every day. The only possible allegation that could support this count, that Real View has held out its software as a "less expensive version" of 20-20 Design, is denied by Real View.  (Zeldin Aff., par. 70).

**Lanham Act**. To prevail on a trade dress claim under Section 43(a) of the Lanham Act, a plaintiff must prove two elements: (1) that its dress is entitled to protection under the Act (*i.e.,* that it either is "inherently distinctive" or has acquired secondary meaning), and (2) that confusion exists between its product and the defendant's product. functional packaging and product designs are unprotected, and the functionality of a design may be raised as a defense to an action for trade dress infringement. LeSportsac, Inc. v. K. Mart Corp., 754 F.2d 71, 79 (2d Cir. 1985).

As demonstrated in Mr. Zeldin 's affidavit, far from being inherently distinctive, 20-20 Design it is similar to countless other Windows-based CAD programs that provide a work area for creation of the architectural design, menus and icons around the margin of the screen, and sub-windows that the user may access to locate and select files and preview products before placing them in the active design.  (Zeldin Aff., Ex. D, pages 4 – 17).  In its interrogatory responses 20-20 was unable to show customer confusion, asserting only that one customer (who was not even identified) has ever expressed confusion between the two products.  (20-20 Interrogatory Response No. 9, Zeldin Aff., Ex. B).  And, since 20-20 has not identified an expert witness to testify on secondary meaning it is apparent that it has not conducted a survey to attempt to establish secondary meaning.  This count is frivolous, is unsupported by any evidence whatsoever, and should be dismissed.

**Unfair Competition and Interference With Contract**.  20-20's state law unfair competition claim is duplicative of its Lanham Act claim.  And, 20-20 has failed to identify any

"contract" with which Real View has interfered, or identify any damages associated with this claim.  These counts should, therefore, be dismissed.

Respectfully submitted,

/s/ Lee T. Gesmer
Lee T. Gesmer, BBO #190260
Gesmer Updegrove LLP
40 Broad Street
Boston, Massachusetts 02109
Telephone:  (617) 350-6800
Facsimile:  (617) 350-6878

Dated:  June 3, 2009

## Certificate of Service

I hereby certify that on June 3, 2009 I electronically filed the foregoing with the Clerk for the United States District Court for the District of Massachusetts by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Lee T. Gesmer
Lee T. Gesmer

482077.1

21