UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REAL VIEW, LLC<br><br>        Plaintiff,<br><br>   v.<br><br>20-20 TECHNOLOGIES, INC.,<br><br>        Defendant. | CIVIL ACTION NO. 07-12157 |
| 20-20 TECHNOLOGIES, INC.,<br><br>        Counterclaim Plaintiff<br><br>   v.<br><br>REAL VIEW, LLC<br><br>        Counterclaim Defendant, and<br><br>BORIS ZELDIN and LEONID PERLOV<br><br>        Additional Party Defendants<br>        in Counterclaim | |

# TRIAL BRIEF OF 20-20 TECHNOLOGIES, INC.

# TABLE OF CONTENTS

I.      Nature of Dispute ............................................................................................. 4

II.     Summary of Case ............................................................................................. 5

        a. Real View Unlawfully Downloaded and Copied 20-20's Software. ............... 5

        b. Real View's Conduct is Unlawful under the Applicable Legal
           Standards............................................................................................... 6

III.    Facts to Be Proven at Trial.............................................................................. 7

        a. 20-20 Technologies, Inc. ................................................................................ 7

        b. 20-20 Develops Its Industry Leading 20-20 Design Product........................... 8

        c. 20-20 Owns Valid Copyrights in 20-20 Design............................................... 9

IV.     Real View ........................................................................................................... 9

        a. Real View Has Copied Virtually Every Element of 20-20 Design Into
           ProKitchen........................................................................................................ 9

        b. Real View Engages in Unfair Marketing and Sales Practices ...................... 10

        c. Real View Admits to Copying ...................................................................... 10

V.      Legal Proceedings ............................................................................................ 10

VI.     Real View Has Infringed 20-20's Copyright in 20-20 Design ........................... 11

        a. Non-Literal Aspects of Computer Software Programs are Protected by
           Copyright.......................................................................................................... 13

VII.    20-20 Design and ProKitchen Should be Examined Under *Altai*'s
        Abstraction-Filtration-Comparison Test........................................................... 14

VIII.   A Careful and Detailed Analysis of the 20-20 Design and ProKitchen
        Under *Altai's* Abstraction-Filtration-Comparison Test Shows Substantial
        Copying of Protected Expression....................................................................... 15

        a. Abstraction of 20-20 Design………………………........................................... 17

        b. Filtration of Unprotected Elements of 20-20 Design………………………...18

        c. A Comparison of The Expression of 20-20 Design to the Corresponding

           Elements of ProKitchen Show Substantial Similarity and Copying ………...20

IX.     In an Effort to Excuse Its Unlawful Conduct, Real View Claims It Only
        Copied Unprotectable Elements ....................................................................... 21

        a. Real View Fails to Address the Similarities in Creative Expression
           Identified by Dr. Davis. ................................................................................... 21

        b. Real View Misapplies the Doctrines of Merger and Scenes a Faire in its
           "Filtration" Analysis Under the *Altai* Test.................................................. 21

        c. Real View Misreads Lotus ............................................................................. 22

        d. Real View Mischaracterizes Elements as "Menu Commands" ...................... 23

X.      Real View Has Infringed on 20-20's Trade Dress................................................. 24

XI.     Real View Has Engaged in Unfair and Deceptive Trade Practices in
        Violation of Mass. Gen. Laws ch. 93A and Unfair Competition ........................ 25

XII.    Real View Has Intentionally Interfered with 20-20's Advantageous
        Relations ............................................................................................................. 25

XIII.   Damages............................................................................................................... 26

XIV.    Conclusion ........................................................................................................... 29

## TRIAL BRIEF OF 20-20 TECHNOLOGIES, INC.

20-20 Technologies, Inc. ("20-20") respectfully submits this trial brief in support of its claims in this action against Real View, LLC, and its founders Boris Zeldin and Leonid Perlov (collectively, "Real View").[1]

## I.     Nature of Dispute

1.   This dispute arises out Real View's willful and unlawful copying of 20-20's industry leading 20-20 Design software program.  20-20 claims: (1) Real View has infringed on 20-20's copyrights by willfully and unlawfully copying the protected expression of 20-20 Design into its infringing product ProKitchen; (2) Real View has infringed on 20-20's trade dress; (3) Real View has made false and damaging statements regarding the financial stability of 20-20 to potential customers and current 20-20 customers in an effort to lure customers into purchasing ProKitchen; and (4) Real View's sales representatives and/or agents have represented and insinuated that ProKitchen is "the same software as 20-20 Design".  As detailed below, 20-20 seeks injunctive and monetary relief for Real View's copyright infringement, trade dress infringement, unfair and deceptive trade practices, unfair competition and intentional interference with advantageous relations.  20-20 also seeks its costs and attorneys' fees in bringing this action.

2.   This has been an unusual case in that Real View has produced virtually <u>no</u> discovery in this case.  While Real View did acknowledge copying in its interrogatory responses, it has refused to produce documents or present the defendants Mr. Zeldin and Mr. Perolov for deposition, despite requests from 20-20 to do so.

---

[1] 20-20 submits this Trial Brief pursuant to the April 14, 2009 Pre-Trial Order.  In light of today's hearing postponing trial, 20-20 will supplement the Trial Brief closer to trial.

II.      **Summary of Case**

   a.   **Real View Unlawfully Downloaded and Copied 20-20's Software.**

   3.      The trial evidence will show that because Real View was unable to compete

fairly in the marketplace for kitchen design software, Real View downloaded an

unauthorized version of 20-20 Design in July 2003 and purposely copied virtually every

element of 20-20 Design in an effort to target and steal customers away from 20-20.

   4.      The trial evidence will further show that the amount of copying done by Real

View is extraordinary and brazen.

   5.      After copying 20-20 Design, Real View began marketing its infringing

product, called "ProKitchen," sometime in 2006.

   6.      Because Real View, by virtue of its copying, had incurred none of the

significant development costs associated with bringing a software product to market, Real

View began offering its infringing product at a cut-rate price and made a targeted effort

to steal away 20-20's customers.

   7.      Real View's campaign to steal customers from 20-20 is reflected in its

marketing philosophy – "ProKitchen is the same as 20-20 – except for the price!"

   8.      After being caught, Real View has now admitted its copying.  Real View

supplies an array of excuses for its copying, but they no longer deny that such copying

took place.

   9.      As a result of Real View's unlawful conduct, 20-20 Design has suffered

significant damages in the nature of lost sales and substantial price erosion, and is entitled

to recover such damages, as well as the profits of Real View attributable to the

infringement.  20-20 is also entitled to permanent injunctive relief barring Real View from selling its infringing product.

**b. Real View's Conduct is Unlawful under the Applicable Legal Standards.**

10.     An abstraction-filtration-comparison test, as articulated by <u>Computer Assocs. Int'l, Inc. v. Altai, Inc.</u>, 982 F.2d 693, 702 (2d Cir.1992), has been completed by 20-20's expert Dr. Randall Davis, in which he finds that protectable expression has been copied from 20-20 Design into ProKitchen, and that the two programs are substantially similar.[2]

11.     On May 5, 2009, Dr. Davis submitted his initial report examining 20-20 Design and ProKitchen ("Davis Report").  In his report, Dr. Davis concludes unequivocally that the 20-20 Design product contains protectable expression in its user interface, and that the user interface of ProKitchen is substantially similar to that of 20-20 Design.  Specifically, he states that "the similarities range from the selection and organization of elements of the overall layout of the screen, down to selection and arrangement of minor details of both programs."  <u>See</u> Davis Report, ¶10(b).

12.     Dr. Davis further concludes that the similarities between the two programs are extensive enough that "familiarity with one program is sufficient to enable facile use of the second with almost no additional training," and "ProKitchen might easily be thought of by a user as a different version of 20-20 Design … the two programs share as much of their user interface design as is routinely found between two subsequent versions of the same program produced by one company (e.g., the difference between Microsoft's Word 2000 and Word 2003)."  <u>See</u> Davis Report, ¶10(d-e).

---

[2] Dr. Davis testified as the court appointed expert in the <u>Altai</u> case.

13.     Dr. Davis also has submitted a rebuttal report ("Davis Rebuttal"), in which he further articulates his abstraction, filtration and comparison analysis.  He concludes, as he did in his original report, that there is "substantial unfiltered expression in 20-20 Design that has been copied by ProKitchen."  See Davis Rebuttal, ¶81.

14.     Dr. Davis concludes: "the detailed expression common to the two programs … goes much beyond menu commands, and concerns among other things, issue of choice, selection, and arrangement of expressive elements of the screen layout, display, and appearance."  See Davis Rebuttal, ¶90.

## III.     Facts to Be Proven at Trial

### a.  20-20 Technologies, Inc.

15.     20-20 is a Canadian corporation, founded in 1987, with its principal place of business in Laval, Quebec.  20-20 will present testimony to show that from a small start up company with a limited number of employees, 20-20 has grown into a global company with approximately 620 employees, approximately 140 of which are US based employees.

16.     The trial testimony will also show that over the past two decades, 20-20 has become the world's leading provider of computer aided design, sales and manufacturing software solutions for residential and commercial markets.  It is the largest company offering a single integrated software platform for industry-wide use – from showroom to factory floor – that is tailored specifically to the interior design business and employed across all environments, desktop and web.

17.     20-20's software applications serve individual customers, retail and online dealers, and furniture manufacturers, bringing greater efficiency to design, ordering,

production and delivery.  20-20's software applications serve every link along the interior

deign, sales, supply and manufacturing chain.

### b.  20-20 Develops Its Industry Leading 20-20 Design Product

18.     One of the company's leading products is its 20-20 Design software.

Recognized around the world as the state-of-the-art product for kitchen design,

specifications, photo-realistic rendering and three-D visualization capabilities, 20-20

Design is a significant part of 20-20's proprietary end-to-end solution for clients who do

interior design work in residential and commercial structures.

19.     20-20 Design was first developed beginning in 1984 by a team of 20-20

developers, and was an entirely original creation not based on or copied from any other

software product.  The overall selection and arrangement of 20-20 Design's components

and the "look and feel" of its user interface has been designed specifically to serve

customers in the kitchen and bath industry.

20.     20-20 has invested thousands of man-hours and millions of dollars in

developing its 20-20 Design software, and its developers made thousands of choices from

virtually limitless options in creating the original expression contained in the product.  It

is that original expression that creates the value in the product.

21.     20-20 continues to invest substantial resources to maintain, develop and

promote the sale and use of 20-20 Design so that it can build on its position as one of the

most recognized and widely used products in the kitchen design field.

22.     The design and overall appearance of 20-20 Design are unique in the industry

and constitute an inherently distinctive trade dress which customers identify with 20-20.

### c. 20-20 Owns Valid Copyrights in 20-20 Design

23.     20-20 has duly registered its copyright in 20-20 Design, including

Registration Number TX 6-836-379 for version 6.0, and Registration Number TX 6-834-

799 for version 8.1.  Although 20-20's copyright in version 8.1 incorporates all prior

versions, 20-20 has submitted version 6.1 for copyright registration and is currently

awaiting its acceptance by the Copyright Office.  20-20's copyright registrations claims

protection over the entire 20-20 Design program, including its source code and screen

displays.

## IV.   Real View

24.     Real View is a Massachusetts company founded by Boris Zeldin and Leonid

Perlov in 1999.  Since its inception in 1999, Real View has developed a string of

unsuccessful software programs, including e-Design in 2000, Furniture World in 2002,

and ProQuote in 2004.  When it came time for a new product, Real View decided against

investing its own time and resources to develop a new software program, instead

choosing to copy the industry leading software program 20-20 Design.

### a. Real View Has Copied Virtually Every Element of 20-20 Design Into ProKitchen.

25.     After initially denying that they copied, Real View has now admitted

downloading an unauthorized copy of 20-20 Design version 6.1 from a internet file-

sharing website called "e-donkey" in July 2003.

26.     After several months of thoroughly studying the user interface and every

element of 20-20 Design, Real View began developing ProKitchen with a team of

developers in the Ukraine.

27.     Real View released ProKitchen version 1.0 in January 2006.  ProKitchen was strikingly similar to 20-20 Design in every way, from the user interface down to the individual creative choices within sub-windows and information boxes.

28.     With each successive new version release of 20-20 Design (v. 6.4 released September 2003, v. 8.0 released May 2006 and v. 8.1 released spring 2008), Real View continues to copy any changes and updates 20-20 makes to the user interface or individual creative choices within elements of 20-20 Design.

**b.  Real View Engages in Unfair Marketing and Sales Practices.**

29.     In its marketing and sales of ProKitchen, Real View has made false and damaging statements regarding the financial stability of 20-20 to potential customers and current 20-20 customers.  Real View holds its software out as a "cheaper version" of 20-20 Design, and its only difference is the price.

30.     Given the fact that Real View has copied 20-20 Design and has not incurred the cost of developing its own product, Real View is offering ProKitchen at a cut rate price, contributing to considerable price erosion of 20-20 Design.

**c.  Real View Admits to Copying.**

31.     Real View admits to copying elements of 20-20 Design into its ProKitchen, but submits a long list of excuses for its conduct.  Real View's primary excuse is that it only copied the unprotectable elements.  Real View's contention is utterly unsupportable, as the evidence will show at trial.

**V.     Legal Proceedings**

32.     On November 6, 2007, 20-20's Canadian counsel Stikeman Elliot, LLP, sent a letter to Real View asserting copyright infringement of 20-20 Design in their product

ProKitchen.  20-20 requested that Real View "immediately cease and desist from any and all further copying, manufacturing, distributing, offering for sale and selling Real View's ProKitchen software in the United States".

33.     On December 17, 2007, in response to 20-20's letter, Real View filed for declaratory judgment on the issue of copyright infringement in U.S. District Court in Massachusetts.

34.     On April 28, 2008, 20-20 filed counterclaims of copyright infringement, trade dress infringement, Mass. Gen. Laws ch. 93A, unfair competition and intentional interference with advantageous relations.

## VI.    Real View Has Infringed 20-20's Copyright in 20-20 Design.

35.     To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).

36.     To satisfy the first prong of Feist, "a certificate of copyright registration constitutes *prima facie* evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid."  Bibbero Sys., Inc. v. Colwell Sys., Inc., 893 F.2d 1104, 1006 (9th Cir.1990).

37.     To satisfy the second prong of Feist, a plaintiff must first prove that the alleged infringer copied the plaintiff's copyrighted work as a factual matter; to do this he or she may either present direct evidence of factual copying, or if that is unavailable, evidence that the alleged infringer had access to the copyrighted work and that the offending and copyrighted works are so similar that the court may infer that there was factual copying (i.e. probative similarity).  See Lotus Development Corp. v. Borland

Int'l., Inc., 49 F.3d 807, 813 (1st Cir.1995), citing Eng'g Dynamics, Inc. v. Structural

Software, Inc., 26 F.3d 1335, 1340 (5th Cir.1994).  The plaintiff must then prove that

copying of the copyrighted material was so extensive that it rendered the offending and

copyrighted works substantially similar.  Id.

38.     The selection, arrangement and coordination of *protectable* elements, as

opposed to compilations of factual data, is protectable under copyright law and examined

under the substantial similarity standard.

39.     As stated above, 20-20 holds certificates of copyright registration to versions

6.0 and 8.1 of 20-20 Design.  20-20's registered copyrights in versions 6.0 and 8.1

incorporate all of the elements copied by Real View.  Because Real View has now

admitted that it copied version 6.1, 20-20 has submitted version 6.1 for copyright

registration and is currently awaiting its acceptance by the Copyright Office.

40.     Real View acknowledged that it accessed 20-20 Design through its

unauthorized download of version 6.1 off of the internet website "e-donkey" and

proceeded to copy virtually every element of 20-20 Design into ProKitchen.  The

extensive similarities of protectable expression in the two products renders them

substantially similar, and entitles 20-20 to the relief it seeks.

41.     Finally, Real View infringed on 20-20's copyright in 20-20 Design through its

unauthorized download off of the internet.  See Arista Records LLC v. Does 1-19, 551

F.Supp.2d 1, 10 (D.D.C. 2008), citing MGM Studios, Inc. v. Grokster, Ltd., 545 U.S.

913, 923 (2005) (describing file sharing as copyright infringement); BMG Music v.

Gonzalez, 430 F.3d 888, 891 (7th Cir.2005) (explaining that the act of downloading

unauthorized copies of a copyrighted work may constitute infringement where it "undermines the means by which authors seek to profit").

42.    20-20 did not learn of Real View's unauthorized download in 2003 of 20-20 Design until receipt of Real View's Responses to 20-20's Interrogatories, submitted on September 15, 2008.  The statute of limitations for copyright infringement claims accrues when a plaintiff "knows or has reason to know of the act which is the basis for the claim."  Camrbidge Literary Props., Ltd. v. W. Goebel Porzellanfabrik, 510 F.3d 77, 88 (1st Cir.2007), quoting Santa-Rosa v. Combo Records, 471 F.3d 224, 227 (1st Cir.2006). 20-20 filed its copyright infringement claim on April 25, 2008, well within the statute of limitations.

### a. Non-Literal Aspects of Computer Software Programs are Protected by Copyright

43.    Courts have defined copying using the terms "literal" and "non-literal" – literal copying as the verbatim copying of original expression, while non-literal copying as paraphrasing.  Lotus, 49 F.3d at 814.

44.    Courts have also used the terms "literal" and "non-literal" to describe the elements of a computer software program – literal elements as a program's source code or object code, while non-literal elements include a software program's structure, user interface and "fundamental essence".  See e.g. ILOG, Inc. v. Bell Logic, LLC, 181 F.Supp.2d 3, 6-7 (D. Mass. 2002), citing Lotus, 49 F.3d at 814; Altai, 982 F.2d at 702.

45.    It is well settled law that "non-literal" elements of computer programs are protected by copyright.  See Lotus, 39 F.3d at 813; ILOG, 181 F.Supp.2d at 6-7; Altai, 982 F.2d at 702; Gates Rubber Co. v. Bando Chemical Indus., 9 F.3d 823 (10th Cir.1993); Lotus Development Corp. v. Paperback Software Int'l., 740 F. Supp. 37 (D.

Mass.1990); <u>Kepner-Tregoe, Inc. v. Leadership Software Inc.</u>, 12 F.3d 527, 536 n.20 (5th

Cir.1994) ("[a]ll that we do here is embrace the general, noncontroversial proposition that

non-literal aspects of copyrighted works -- like structure, sequence, and organization --

may be protected under copyright law: a proposition that has been approved by Supreme

Court precedent"), citing <u>Feist</u>, 499 U.S. 340(indicating that the organization of facts may

be protected under copyright).

46.     Non-literal elements are protected by copyright if the "component in question

qualifies as an expression of an idea, rather than an idea itself." <u>Johnson Controls, Inc. v.</u>

<u>Phoenix Control Sys., Inc.</u>, 886 F.2d 1173, 1175 (9th Cir. 1989) (non-literal aspects such

as "structure, sequence and/or organization of the program, the user interface, and the

function or purpose of the program" are copyrightable to the extent that they are

expression).

## VII.    20-20 Design and ProKitchen Should be Examined Under *Altai*'s Abstraction-Filtration-Comparison Test

47.     *Altai*'s Abstraction-Filtration-Comparison Test or a variation thereof has been

applied by almost every court dealing with non-literal copying of a computer software

program.  <u>See</u> <u>e.g.</u>, <u>MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.</u>, 89 F.3d 1548 (11th

Cir.1996); <u>Eng'g Dynamics</u>, 26 F.3d 1335; <u>Gates Rubber</u>, 9 F.3d at 834; <u>Baystate</u>

<u>Technologies, Inc. v. Bentley Systems, Inc.</u>, 946 F.Supp. 1079, 1087 (D.Mass. 1996);

<u>ILOG</u>, 181 F.Supp.2d 3 (D. Mass. 2002); <u>Maddog Software, Inc. v. Sklader</u>, 382

F.Supp.2d 268, 278 (D. N.H. 2005).

48.     Several district courts within the First Circuit have applied the *Altai* test when

analyzing non-literal copying of the non-literal elements of a computer program.  <u>See</u>

e.g., <u>Baystate Technologies</u>, 946 F.Supp. at 1087 (D.Mass. 1996); <u>ILOG</u>, 181 F.Supp.2d

at 10 (D.Mass. 2002); <u>Maddog Software</u>, 382 F.Supp.2d at 278 (D. N.H. 2005).

     49.     In <u>ILOG</u>, Judge Young adopted the *Altai* test as the "appropriate means by

which to analyze non-literal copying." <u>ILOG</u>, 181 F.Supp.2d at 10.  The court based its

decision on widespread adoption of the *Altai* test and the fact that the First Circuit in

<u>Lotus</u> suggested that "the *Altai* test may provide a useful framework for assessing the

alleged nonliteral copying of computer code …" <u>Id.</u> quoting <u>Lotus</u>, 49 F.3d at 815.

Accordingly, the Court stated that "depending on whether literal or nonliteral copying is

alleged, *Lotus* or *Altai* will provide an appropriate analytic framework." <u>ILOG</u>, 181

F.Supp.2d at 8.

     50.     Real View has engaged in both literal and non-literal copying of the elements

of 20-20 Design into its infringing product ProKitchen.  The non-literal elements of 20-

20 Design copied by Real View touch upon all aspects of the program, including but not

limited to: overall layout and interface design; sequence, appearance and layout of sub-

windows, tabs and information boxes; icons and terminology; drawing and modifying

walls; placing and modification of kitchen products; catalog navigation; legal disclaimer,

etc.

**VIII.   A Careful and Detailed Analysis of the 20-20 Design and ProKitchen Under**
**      *Altai's* Abstraction-Filtration-Comparison Test Shows Substantial Copying**
**      of Protected Expression.**

     51.     20-20's expert Dr. Randall Davis has submitted an analysis of the two

programs under *Altai's* Abstraction-Filtration-Comparison test, in which he concludes

there was substantial copying of the protected expression of 20-20 Design by Real View

into its infringing product ProKitchen.

52.     The *Altai* test consists of three parts: abstraction, filtration and comparison.

53.     The abstraction step requires courts to break a computer program down into its component parts and "isolate each level of abstraction contained within it."  Altai, 982 F.2d at 707.

54.     Then, during filtration the courts determine whether the structural components identified in the first step are copyrightable.  Id.  Here, the courts may "filter out" elements that are unprotectable under the doctrines of merger and scenes a faire, efficiency concerns or elements taken from the public domain.  Id. at 707-710.

55.     The merger doctrine provides that copyright protection may not be available when there is essentially only one way to express a particular idea.  Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 606 (1st Cir.1988).  On the other hand, the scenes a faire doctrine "denies copyright protection to elements of a work that are for all practical purposes indispensable, or at least customary, in the treatment of a given subject matter.  Coquico, Inc. v. Rodqiguez-Miranda, 562 F.3d 62, 68 (1st Cir.2009).

56.     In deciding whether the doctrines of merger and scenes a faire apply during the filtration analysis, courts must "focus on whether the idea is capable of various modes of expression," and focus particularly on "whether other options practically exist under the circumstances."  Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 558 (6th Cir.2004).  The filtration step "enables courts to identify the appropriate framework within which to separate protectable expression from unprotected ideas."  Lotus, 49 F.3d at 814.

57.     The final step, comparison, requires the courts to "compare the protected elements of the infringed work to the corresponding elements of the allegedly infringing work to determine whether there was sufficient copying of protected material to constitute infringement." Id., citing Altai, 982 F.2d at 710.

58.     Dr. Davis' findings from his analysis of the two programs under the abstraction-filtration-comparison test are summarized below, and are explained in detail in both the Davis Report and the Davis Rebuttal.

**a.  Abstraction of 20-20 Design**

59.     Dr. Davis has completed three separate abstraction analyses of 20-20 Design: (1) abstraction of the category of programs, (2) abstraction of a software program interface, and (3) abstraction of a kitchen design program. See Davis Rebuttal, ¶¶ 77-79.

60.     In a broad abstraction of the category of programs, Dr. Davis concludes at the most abstract level these are computer programs.  He then concludes they are more specifically CAD programs; more specifically architectural CAD programs rather than mechanical CAD programs like SolidWorks or AutoCAD; more specifically kitchen design CAD programs; and more specifically still they may be kitchen design CAD programs for CAD professionals or CAD non-professionals or kitchen sales personnel. Dr. Davis concludes that it is in this last instance where 20-20 Design, ProKitchen and several of the other programs he compared are located. See Davis Rebuttal, ¶ 82.

61.     In an abstraction of a software program interface, Dr. Davis notes the highest level of abstraction is the notion of an interface, then a graphical user interface (GUI) versus a character orientated interface.  Within GUIs are interfaces that work strictly from menus selected with the keyboard for text and a mouse used as a pointing/selecting

device, and those that use the keyboard for text and a mouse used as a pointing/selecting and drawing device. These GUI-oriented programs can be further abstracted as using a single window at once or multiple windows. <u>See</u> Davis Rebuttal, ¶ 83.

62.     Specifically with kitchen design programs, Dr. Davis notes the highest level of abstraction is the overall task of kitchen design, then the next level consists of the various sub-tasks that go into kitchen design (e.g., creating walls, adding cabinets, countertops, appliances, etc.). At the next level of abstraction, the sub-tasks can be broken down further design options such as size, location, extent, angular orientation, etc. <u>See</u> Davis Rebuttal, ¶ 84.

**b. Filtration of Unprotected Elements of 20-20 Design**

63.     As a preliminary matter under the filtration analysis, Dr. Davis filters out the elements of the two products stemming from routine Windows conventions such as having a set of drop-down menus across the top, a subdivision of the work area into multiple smaller windows, routine menu choices and icons, etc. <u>See</u> Davis Report, ¶¶20, 26, 29-31.

64.     Dr. Davis then carefully and systematically addresses the elements of 20-20 Design, filtering out what would be considered the idea, feature or functionality of the element and instead focuses precisely on the creative expression within each of those elements.

65.     For example, in examining the functionality of "placing items" (windows, doors, appliances, plumbing, cabinets, etc.), Dr. Davis notes four ways that 20-20 Design provides for placement: the Place menu; the relevant icon on the vertical toolbar; navigating through the catalog categories; and using the search/Find window. <u>See</u> Davis

Report, ¶¶56-57.  Dr. Davis states: "The functionality here – putting items into the design – is clearly required by the task; the choice of interface elements by which to accomplish this, however, is an expressive choice made by the program designers."  <u>See</u> Davis Report, ¶57.  Dr. Davis then examines the functionality of "placing items" in six other kitchen design software programs, in addition to ProKitchen.  Dr. Davis finds that "while all of the competing programs offer the function of placing items into the design, only *one* comes close to expressing it the way 20-20 Design and ProKitchen do."  <u>See</u> Davis Rebuttal, ¶26.  20-20 Design and ProKitchen are the only two programs that allow users to place items in the identical four separate ways.  Because there are numerous ways to express the function of placing items, as evidenced by other kitchen design software programs, the doctrines of merger and scenes a faire are inapplicable to filter out this similarity of creative expression present in both 20-20 Design and ProKitchen.

66.     Another example is Dr. Davis' examination of the functionality of "drawing walls".  Dr. Davis notes that both programs express this functionality with an "idiosyncratic left mouse/right mouse combination" to draw walls, where a click of the left mouse starts and ends a wall, a click of the right mouse allows an alternation between controlling the orientation or length of a wall.  Davis Report, ¶50.  Dr. Davis examines the wall drawing functionality in six other kitchen design software programs and finds that three competing programs do not utilize the mouse for drawing walls and three others only utilize the left mouse for drawing walls.  <u>See</u> Davis Rebuttal, ¶¶74-77.  Here again, it is clear how much other kitchen design programs differ in their expression of wall drawing – no other kitchen design program utilizes the same "idiosyncratic left mouse/right mouse combination" as 20-20 Design and ProKitchen – and the doctrines of

merger and scenes a faire are inapplicable to filter out this similarity of creative

expression of present in both 20-20 Design and ProKitchen.

67.     Further examples of creative expression in 20-20 Design that have been

copied into ProKitchen that survive filtration include, among other things: the same

sequence of sub-windows (an information box, edit box, hierarchical catalog box, and

drag and drop listing) appearing on the left side of the screen; selection and arrangement

of choices within Attributes, Place, Dimentions/Measurements, Notes and Comments,

Display Settings, Dimensions, Grid, Unites, Bill of Materials and other various dialog

boxes; presentation of Placement Zones and Wall Groups, grammatically incorrect legal

disclaimer, etc.  <u>See</u> Davis Report and Davis Rebuttal for a complete discussion of the

creative expression in 20-20 Design that has been copied into ProKitchen.

**c.     A Comparison of The Expression of 20-20 Design to the Corresponding Elements of ProKitchen Show Substantial Similarity and Copying**

68.     After the filtration analysis, Dr. Davis compares the elements of 20-20 Design

to the corresponding elements ProKitchen to see if substantial similarity exists between

the creative expression of those elements.

69.     In doing so, Dr. Davis concludes that there is "substantial unfiltered

expression in 20-20 Design that has been copied by ProKitchen," and found protectable

expression in the "issue of choice, selection, and arrangement of expressive elements of

the screen layout, display, and appearance."  <u>See</u> Davis Rebuttal, ¶90.

IX.   **In an Effort to Excuse Its Unlawful Conduct, Real View Claims It Only Copied Unprotectable Elements.**

70.   After being caught copying, Real View claims it only copied unprotectable elements of 20-20 Design such as menu commands, features, functionalities and methods of operation.

a.   **Real View Fails to Address the Similarities in Creative Expression Identified by Dr. Davis.**

71.   In response to the Davis Report, Real View filed a motion for summary judgment and submitted an affidavit by named defendant Boris Zeldin ("Zeldin Affidavit") and a rebuttal report by its expert Daniel Abbott ("Abbott Report").  Basing its arguments on both the Zeldin Affidavit and Abbot Report, Real View completely fails to address the similarities in creative expression identified by Dr. Davis.

72.   Instead of addressing the expressive aspects of 20-20 Design identified by Dr. Davis, Real View sets up carefully generalized straw-man arguments and then dismisses these arguments of their own creation, simply claiming there is no protectable expression in 20-20 Design.

b.   **Real View Misapplies the Doctrines of Merger and Scenes a Faire in its "Filtration" Analysis Under the *Altai* Test.**

73.   In its summary judgment papers, Real View attempts to "filter out" the expression identified by Dr. Davis under the doctrines of merger and scenes a faire. However, Real View simply ignores other kitchen design software programs that express the idea in *entirely different ways* from 20-20 Design and ProKitchen.

74.   Real View misapplies the merger doctrine by failing to explore comparable kitchen design programs, all of which illustrate the range of expression available for a particular idea or function involved in kitchen design.  The Davis Report and affidavit of

William Smith ("Smith Affidavit") point to other kitchen design software programs that express the ideas central to kitchen design in ways unique from the expression chosen by 20-20 Design. Because a wide range of expression exists in other kitchen design software programs, the use of the merger doctrine to filter out the expression of 20-20 Design is improper.

75.     In misapplying the scenes a faire doctrine, Real View turns to numerous different software programs *outside* of the kitchen and design industry in an effort to find, often one by one, all of the modes of expression in 20-20 Design, copied by ProKitchen. Real View's line of argument for filtering out expression used by 20-20 Design is akin to claiming a novel is not original because each of its words can be found elsewhere.

76.     Many of the screenshots in the Zeldin Affidavit used to rebut the Davis Report relate to computer software programs *that have nothing to do with the kitchen design industry*, but instead are used for mechanical and structural engineering or architecture (i.e. Revit, AutoCAD, IntelliCAD, Solidwork, MiTek, ANSYS, Catia, ArchiCAD, etc.). Since the scenes a faire analysis focuses on industry programming standards and the practices and demands of the specific target industry – here, the kitchen design industry – Real View's reliance on computer programs used in unrelated industries renders its analysis fatally flawed.

### c.  Real View Misreads Lotus.

77.     Real View grossly misreads <u>Lotus</u> to say that any aspect of a software program, including the embedded creative expression within, is unprotectable simply because it is accessible through a menu command hierarchy.

78.     Real View mischaracterizes all of the elements it copied simply as "menu commands" in an attempt to shoehorn its case into the <u>Lotus</u> ruling.

**d.  Real View Mischaracterizes Elements as "Menu Commands".**

79.     Real View seeks to manipulate the definition of a "method of operation," as applied to the Lotus 1-2-3 menu command hierarchy.  The <u>Lotus</u> court stated "the Lotus menu command hierarchy does not merely explain and present Lotus 1-2-3's functional capabilities to the user; it also serves as the method by which the program is operated and controlled."  <u>Lotus</u>, 49 F.3d at 815.  The court specifically distinguished the menu command hierarchy from other elements of the program, such as the long prompts or screen displays, by stating those elements "are not necessary to the operation of the program," and therefore not part of Lotus 1-2-3's "method of operation."  <u>Id.</u>

80.     Real View has compiled a list of what it believes are "menu commands identified by Dr. Davis" and concludes in a wholesale fashion that the elements are unprotectable as "menu commands" under <u>Lotus</u>.  Including in this list of "menu commands" are elements such as Cabinet, Appliances, Countertop, Door, Bill of Materials, Trim, Wall, Window, etc.

81.     Many of the elements in Real View's list of "menu commands" are not simple menu commands akin to those analyzed in <u>Lotus</u>, but instead are the features and functionalities which comprise the bulk of 20-20 Design.  20-20 is not claiming copyright protection for these features and functionalities, but protection over the *expression* within those features and functionalities – i.e., the overall appearance of the windows and dialog boxes that allow the user to select items to place into their design; the selection, arrangement and presentation of options displayed to the user; the appearance of an item

once placed into the design, etc.  While Lotus states that expressive choices with the *menu command hierarchy* are perhaps not subject to copyright protection, it says nothing of the protectability of the expressive choices within the *features and functionalities* of a computer software program.  Lotus, 49 F.3d at 816.

82.     By arguing that these elements of 20-20 Design are simply "menu commands" and therefore unprotectable under Lotus, Real View takes the position that any feature or functionality, including the embedded creative expression within, is uncopyrightable *simply because it is accessible through the menu of a computer program*.  Lotus says no such thing.

83.     Since all computer software programs utilizing a graphical user interface are inherently menu-driven, users are able to access every feature or functionality of a program through the menus.   If the creative expression of a feature or functionality is unprotectable solely because that feature or functionality is accessible through the menu, then essentially no creative expression within a computer program is protectable.  Lotus does not stand for this proposition, and there is no case to support Real View's extreme position.

**X.     Real View Has Infringed on 20-20's Trade Dress.**

84.     The 20-20 Design trade dress (comprised of its original "look and feel," structure, selection and arrangement of its features, and expressions) is inherently distinctive and is well known to the trade and members of the purchasing public.  20-20 Design is known and used throughout the United States, Canada and the world.

85.     Upon seeing ProKitchen and its user interface, customers are likely to associate that product with 20-20 and/or 20-20 Design, and be confused into thinking that ProKitchen is one of, or related to, a 20-20 product.

86.     There have been instances of customer and 20-20 employee confusion between the two products.  Confusion among manufacturers, whose kitchen catalogs appear in both 20-20 Design and ProKitchen, have also been reported.

**XI.     Real View Has Engaged in Unfair and Deceptive Trade Practices in Violation of Mass. Gen. Laws ch. 93A and Unfair Competition.**

87.     Real View has engaged in unfair and deceptive trade practices through unlawfully copying expressive elements of 20-20 Design into its product ProKitchen, through its marketing practices and price cutting measures, and by making false and damaging statements regarding the financial stability of 20-20.

88.     Since its introduction of ProKitchen, Real View has held ProKitchen out to be a "cheaper version" of 20-20 Design and its only difference is the price.

89.     Real View has contributed to significant price erosion of 20-20 Design.

**XII.     Real View Has Intentionally Interfered with 20-20's Advantageous Relations.**

90.     Real View has been offering the supporting manufacturers of 20-20 Design certain products and services at prices that are far below industry standards, such as free catalog creation services, because it has not incurred the costs of development of its own product.  Real View has made disparaging remarks about 20-20, and has tried to lure customers away from 20-20 by offering "free swap-outs" of its software.

**XIII.   Damages**

91.     Under the Copyright Act, "the copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement …" 17 U.S.C. §504(b).

92.     Actual damages are generally measured by profits lost as a result of the infringement.  See Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1170 (1st Cir.1994).  Where a precise calculation of damages is not possible, the court can make a "just and reasonable inference" as to the amount of damages.  Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931).

93.     Damages may be based on the copyright owner's lost sales opportunities due to sales made by the infringer using the copyrighted software.  See e.g., Computer Associates Int'l, Inc., v. Altai, 775 F. Supp. 544, 571-72 (E.D.N.Y. 1991) (hereinafter, "Computer Associates").  This is essentially the amount that the copyright owner would have made had the infringement had not occurred.  Id.

94.     Beyond its own lost profits, the Copyright Act also entitles the copyright owner to "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."  17 U.S.C. §504(b).

95.     The scheme for calculating damages lays out the burdens of proof for each party to help the court arrive at an appropriate figure.  The Copyright Act states:

> the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and elements of profit attributable to facts other than the copyrighted work.

17 U.S.C. 504(b).

96.     "[T]he plaintiff must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement." Data General, 36 F.3d at 1174-75.

97.     The copyright owner need only show the gross revenues derived from the infringing activity as a whole. See e.g., Independent Services Organizations Antitrust Litigation, 23 F.Supp.2d 1242, 1246-7 (D. Kan. 1998); Allen-Myland, Inc. v. Int'l Business Machines Corp., 770 F.Supp. 1014, 1016 (E.D. Pa.1991). In Computer Associates, total revenues over the period of the infringement constituted the "gross revenue" required by the Copyright Act, meaning most if not all of the defendant company's profits were attributable to the sale of software which had components infringing the plaintiff's copyright. Computer Associates, 775 F.Supp. at 571.

98.     After the copyright owner meets his or her burden of showing the gross revenues from the infringing activity, the burden shifts to the defendant to show that some portion of the revenue was attributable to factors other than infringement." See 17 U.S.C. §504(b). The burden is placed on the infringer to ensure that the injured party gets "all that justly belongs to him" and the infringer suffers the consequences of his commingling of gains. Sheldon v. Metro Goldwyn Pictures Corp., 309 U.S. 390, 406 (1940).

99.     In the case of *willful infringement* such as here, a copyright holder is entitled to full recovery of the infringer's profits. See Whelan Associates v. Jaslow Dental Laboratory, Inc., 609 F.Supp. 1307, 1322 (E.D. Pa.1985). The copyright owner's recovery should not be reduced by that portion due to the deliberate infringer's labor

expended in developing or exploiting the infringed work.  <u>Sheldon v. Metro Golwyn Pictures Corp.</u>, 106 F.2d 45, 51 (1939).

100.    In determining a proper damages award, a court may rely on a litany of factors involved in profit apportionment, including public policy, equitable principles such as unjust enrichment, and factual considerations such as the effect of the copyrighted software on the marketability of the infringer's product.  <u>See</u> <u>Data General</u>, 36 F.3d at 1173-77.

101.    20-20 is entitled to recover damages in the nature of all of Real View's revenue and profits attributable to the infringement.  That amount will be equal to all of its revenue from ProKitchen.

102.    As set forth above, Real View deliberately downloaded an unauthorized version of 20-20 Design and has admitted copying its elements into ProKitchen.  Given that Real View is a willful infringer of 20-20 Design, it will not be permitted to deduct costs from the damages award.

103.    Real View has not yet produced any of its financial information despite discovery requests served almost one year ago.  20-20 has subpoenaed the financial records from Real View to be presented at trial.  20-20 has also identified two financial experts – Iain Cockburn and Creighton Hoffman – to testify as to damages once the financial records are produced by Real View.

104.    20-20's attorneys' fees and costs are available under both the Copyright Act, 17 U.S.C. §505 and Mass Gen. Laws ch. 93A.

105.    20-20 is entitled to a permanent injunction prohibiting Real View from marketing and selling its infringing product.

106.    20-20 is entitled to treble damages under Mass. Gen. Laws ch. 93A for Real View's intentional unfair and deceptive conduct in copying and marketing its infringing software.

## XIV.   Conclusion

107.    For all of the foregoing reasons, 20-20 is entitled to recover from Real View for copyright infringement, trade dress infringement, violation of Mass. Gen. Laws ch. 93A, unfair competition and intentional interference with advantageous relations.  20-20 is also entitled to its attorneys fees and costs in this matter.


Dated: July 13, 2009                              Respectfully submitted,

                                                  DECHERT LLP

                                                  _____/s/ Timothy C. Blank_____
                                                  Timothy C. Blank (BBO# 548670)
                                                  Joybell Chitbangonsyn (BBO# 669836)
                                                  DECHERT LLP
                                                  200 Clarendon St. 27th Floor
                                                  Boston, MA 02116
                                                  (617) 728-7100
                                                  Fax:  (617) 426-6567




### Certificate of Service

I hereby certify that on July 13, 2009, a true and correct copy of the foregoing document was served upon opposing counsel by electronic case filing.

            _____/s/ Timothy C. Blank