UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

REAL VIEW, LLC,                                    )
                                                   )
     Plaintiff and Counterclaim         )
     Defendant                          )
                                                   )
     v.                                 )
                                                   )
20-20 TECHNOLOGIES, INC.,                          )          CIVIL ACTION NO. 07-12157-PBS
                                                   )
     Defendant and Counterclaim         )
     Plaintiff                          )
                                                   )
BORIS ZELDIN AND LEONID PERLOV                     )
Additional Party Defendants                        )
in Counterclaim.                                   )
_____

**SUMMARY OF DIRECT TESTIMONY OF DANIEL ABBOTT**

      I have been informed by counsel for Real View that the Court has asked that I provide a

summary of the testimony I expect to provide at the hearing scheduled for July 22, 2009 (the

"Hearing").  In preparing this summary testimony I have been guided by the following

information, provided to me by Real View's legal counsel:

     (a)     I understand that the Court informed counsel that the focus of the Hearing will be

            whether the items identified by 20-20 Design are protected by copyright law.  I

            understand that the Court does not intend to perform a "substantial similarity"

            analysis at the Hearing, and therefore I have attempted to avoid comparisons

            between 20-20 Design and Real View's ProKitchen software in this summary of

            my testimony.

     (b)     I have been provided with four documents in which 20-20 identified similarities

            between 20-20 Design and ProKitchen: (i) 20-20's interrogatory responses, (ii)

20-20's initial expert report, (iii) a rebuttal report and (iv) the "List of

Similarities" (the "20-20 List") filed by 20-20 on July 17, 2009.  As discussed

below, the rebuttal report added new similarities that were not present in the

initial expert report, and the 20-20 List has added additional items that were not

present in any of the earlier documents.  Although I will attempt to address these

new items, I understand that Real View intends to object to the parts of the

rebuttal report that add new claims.  The new items in the 20-20 List are

unexplained, and therefore I will not discuss them in this report.  I will, however,

address them if the Court instructs me to, assuming that 20-20's expert provides

detail on these items.

(c)     I understand that 20-20's expert witness will be providing a written summary of

his expected testimony on Monday, July 20, 2009, and that he will testify first at

the Hearing.   Since my testimony will be responsive to his testimony, I may not

cover everything he will discuss.  The uncertainty regarding the scope of 20-20's

expert testimony is further highlighted by the fact that at last one feature

identified in the expert's initial report and his rebuttal report is not identified on

the List (the so-called "Google search," as it was termed in the last hearing).

(d)     I also note that I provided an Expert Report in this case, which was a detailed

response, with many screenshots and illustrations, to the report submitted by 20-

20's expert.  I understand that the Court has a copy of this report, and it is not the

Court's wish that I duplicate it here.  However, I expect to refer to the contents of

that report during my testimony.

After reviewing the List of 61 alleged similarities, I have concluded that it would be most helpful to the Court to address them by category here.

**THE MENU COMMAND STRUCTURE**

1. I understand from counsel for Real View that it is Real View's position that the menu command structure of a computer program is regarded as a non-copyrightable "method of operation," and therefore it would not be productive to discuss each menu command in my testimony. Moreover, this would be a very time-consuming task. I have asked Real View to attempt to count the number of commands present in the menus, toolbars and dialog boxes identified in the 20-20 List. The approximate number (without duplication) exceeds 300 commands.

2. The task would be further complicated by the fact that in 20-20's expert report and rebuttal report, 20-20 appears to argue that while a particular command may be common, 20-20's particular implementation or usage of the command is unusual, or varies from other programs examined by 20-20, and that Real View copied this particular usage.

3. 20-20's claims relating to the menu command structure are further complicated by the fact that 20-20 sometimes treats one word in 20-20 Design and a different word in ProKitchen as "equivalents" for purposes of alleging similarities, and that any discussion of the menus would have to address that fact.

4. Lastly, if I understand 20-20's expert report correctly and the 20-20 List correctly, 20-20's claims include instances where, even though the actual command terms are different, the "selection and arrangement" of the functions has been copied.

5. For these reasons I have not gone into the menus in any detail in this summary of my expected testimony, pending the Court's ruling on whether the menu commands are

protected by copyright.  However, I did address the menu command structure in my expert

report, and I will testify along the lines of that document if the Court wishes testimony on these

issues.

**THE LOCATION OF COMMANDS IN THE USER INTERFACE**

6.      The term "menu command structure" involves not only the commands, but their

location in the menu tree.  In the Windows operating system designers have a variety of choices

when they create the user interface.  Designers can decide whether to use toolbars, menu bars,

drop down menus, hover menus, context menus (also known as "popup" menus) and dialog

boxes.  I will demonstrate these to the Court and explain that a "command" can be put in any of

these locations.  I also understand that in the Lotus v. Borland case the District Court judge used

certain terms to describe a menu command structure.  To the extent it will assist the Court I will

be prepared to discuss and explain the terms "executable commands," "internal commands," and

"trees, branches and leafs" as they apply to the concept of a menu command structure.

7.      I also will demonstrate that the layout of interface elements in specific locations can

be changed easily by a designer using the software, and I will indicate that such changes are

often made by those using this software.

**ICON DESIGNS**

8.      Because icons can be an artistic design, I do not intend to testify regarding the icons

in the 20-20 Design or ProKitchen software, with two exceptions: (1) many of the icons used in

both programs are standard in the Windows operating system, and I will point these out; and (2)

many of these icons are standard in CAD software and have been used by both 20-20

Technologies and ProKitchen.  For example, it is standard to represent the "zoom" function with

an icon that resembles a magnifying glass.  I will point these out and show the Court examples in

other programs.  I understand that this may be important in determining the scope of protection the Court allows for these items.

## "MOUSE BUTTON" CONTROL SEQUENCES AND KEYBOARD COMMANDS

9.      The 20-20 List and the expert reports assert that Real View's software has copied the sequence of left and right mouse clicks for certain functions.  In addition, the 20-20 List contains -- for the first time, to my knowledge -- a similarity based on the users ability to access a feature by striking a specific key, the Ctrl key, on the keyboard. I understand that Real View will argue that copyright law does not protect control sequences using the computer mouse or keyboard. However, I will demonstrate these features for the Court so that the Court can determine whether there is an expression that can be protected.

## LEGAL DISCLAIMERS AND HELP PAGES

10.      There are two areas where the items on 20-20's list appear intended to show that Real View did, in fact, copy 20-20's software.  These are the legal disclaimers that appear on the "legend" when a plan is printed, and the help pages from an earlier version of ProKitchen's software (version 2.0).

11.      With respect to the legal disclaimer, I will show that one of the two sentences at issue has been in use by the National Kitchen and Bath Association (NKBA) since as early as 1996.

12.      20-20 has also presented evidence that the "help" screens from version 2.0 of ProKitchen are similar to 20-20 Design.  This was raised for the first time in 20-20's expert's Rebuttal Report.  I understand that Real View has filed a motion to strike this part of the 20-20 rebuttal report, and therefore I have not investigated or addressed this issue.

**ITEMS NOT INCLUDED IN 2020'S EXPERT'S ORIGINAL OR REBUTTAL REPORT**

13.     In addition to some new items that were raised in 20-20's expert witnesses' rebuttal report, there are several items on 20-20's List that were not mentioned in the original or the rebuttal expert report.  Upon instruction of Real View's counsel I have not investigated these.  I understand that Real View will object to this late designation.  I will, of course, investigate these items if the Court requests that I do so.  However, I was informed of these items for the first time the evening of Friday, July 17, 2009, and I was unable to prepare a response to them in time to submit this summary of expected testimony.  In addition, the items are described in such a cursory manner that if I were to respond in detail I would be speculating (for example item 49 states: "similarity of expression of resizing windows and doors after they are placed; right click and select resize.")  It's not clear from this description whether 20-20 is pointing to the graphical interface (menus or dialog boxes), or the fact that a right mouse click is used to access this feature).

**DYNAMIC FEATURES/BEHAVIOR**

14.     A number of items on the 20-20 List appear to address the features or behavior of the program in a non-static or "dynamic" state – in other words, "in action".  These items require the feature to be demonstrated to the Court while the program is operating.  These items were addressed in 20-20's expert report and I addressed them in detail in my report.  I expect my testimony to follow along the lines of my report, where I explained that in many cases these features are standard functions in CAD software applications, and I discussed where they could be found in other programs.  These items are:

(a)     **Collision avoidance.**  This feature is triggered when the user attempts to place one object in the same or overlapping location occupied by another object.  For

example, the user cannot place one wall cabinet so that it overlaps with another wall cabinet, or a dishwasher in the same location where a cabinet is already located.  Although 20-20's expert discussed this feature in his report, he did not describe any expression associated with this feature.

(b)   **Placement zone.**  This feature forces an object placed inside a "zone" to be flush against a wall (as opposed to free standing).  Apart from the name or label used to describe this feature, 20-20's expert did not describe any expression associated with it.

(c)   **Subdivided view, change in one view reflected in the other.**  I will explain that as a practical matter there are only two standard choices for this feature: plan view on top, elevation view on the bottom, or vice versa.  20-20 also claims copying associated with the ability to have a change in one view be reflected in the other, a feature that is common in design software. 20-20's expert did not describe any expression associated with the "update" aspect of this feature.

(d)   **Change wall to construction line.**  I will explain what a "construction line" is and demonstrate this feature.  Apart from the use of term "construction line," 20-20's expert has not described any expression associated with this feature.

(e)   **Tabs.**  I will illustrate the feature that allows the user to create several views of the same design and switch between them by clicking on tabs arranged in a row along the bottom of the editing area I will explain that the use of such tabs is very common in software programs, including CAD software, and in most cases the tabs can be renamed.  20-20's expert did not describe any expression associated with this feature.

    (f)    **Adding text notes to a design.**  I will illustrate this feature, and discuss that the idea of adding notes is common in computer aided design.

    (g)    **Manipulating objects on screen.**  To the extent this isn't covered elsewhere in this summary of my testimony, I will demonstrate manipulating objects on the screen -- moving, editing, extruding or deleting walls and items -- and explain that these functions, which typically rely on the computer mouse and right-click menus, are common in CAD.  The reference to "extrude" was raised for the first time in 20-20's expert's rebuttal report, and I understand that Real View has moved to strike this item.  I have not, therefore, investigated it in depth.

**SUB-WINDOWS ON LEFT SIDE OF SCREEN**

15.    I expect to discuss and explain the functions in the sub-windows perform in 20-20 Design.  Each of these windows contains a standard functionality – accessing a file structure, viewing an object before it is selected, listing items that can be placed.

**"CREATING A PICTURE OF THE CURRENT DESIGN"**

16.    It's unclear to me whether 20-20 is identifying this as a menu item, or if they intend to discuss the functionality of the feature itself.  If the feature is at issue (saving a design as an image), I will discuss this, as I did in my expert report.  If the issue is the use of the term "Save as Image" it is a menu command.

**Target Audience for 20-20 and ProKitchen.**

17.    Much of my response to the Davis report involved references to other computer-aided-design software, some of which is used for general design tasks, including kitchens, and some of which is used in other fields. In his rebuttal, Professor Davis indicated that the actual audience for these two applications is sales staff not designers. My experience doesn't support

that characterization, nor is that description used on the 20-20 Technologies website in reference to 20-20 Design.  I will testify that neither 20-20 Design nor ProKitchen are generally used by sales staff unless they are also kitchen designers; that the designers who use 20-20 Design must have both experience and training in kitchen design, training that goes well beyond learning the interface of a particular piece of software; that 20-20 Technologies generally characterizes 20-20 Design as design software, not sales software, calling their kitchen and bath software "Intuitive CAD software for residential interiors"; and that the NKBA certification process for kitchen designers requires considerable experience and training in kitchen design.   Moreover, 20-20 Design has an AutoCAD import/export function, which further suggests that the software is intended to be used by designers.


/s/ Daniel H. Abbott
Daniel H. Abbott

Dated: July 20, 2009