UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REAL VIEW, LLC, )<br>)<br>    Plaintiff and Counterclaim )<br>    Defendant )<br>)<br>)<br>v. )<br>)<br>20-20 TECHNOLOGIES, INC., )<br>)<br>)<br>    Defendant and Counterclaim )<br>    Plaintiff )<br>)<br>BORIS ZELDIN AND LEONID PERLOV )<br>Additional Party Defendants )<br>in Counterclaim. ) | CIVIL ACTION NO. 07-12157-PBS |

**REAL VIEW LLC'S REPLY BRIEF IN RESPONSE TO 20-20 TECHNOLOGIES',
INC.'S SUBMISSION REGARDING ALLEGED PROTECTABLE EXPRESSION**
*(LEAVE TO FILE GRANTED NOVEMBER 24, 2009)*

Real View LLC respectfully submits this Reply Brief to 20-20 Technologies, Inc.'s Post-Markman Submission ("20-20 Brief"). All abbreviations and record references have the same meaning as in Real View's initial Brief ("Real View Brief").

**20-20 Has Abandoned its Claim That its Menus are Protectible.** In its post-hearing brief 20-20 fails to argue that its menu commands are protected by copyright law, a central issue in this case until now. The Court should rule that 20-20's menu commands are a method of operation and may not be the subject of 20-20's infringement claims in this case.

**20-20 Has Also Abandoned its "Compilation" Theory of Protection.** 20-20 has also failed to argue protection of 20-20 Design a compilation, also a central issue this case until now. Accordingly, the Court should hold that its claims under this theory of infringement have been waived. Moreover, as Real View noted, the Copyright Act protects compilations based on the

work "as a whole," not "piecemeal," and therefore 20-20 is barred from seeking protection for only parts of its software under this theory.  The Court's ruling should specifically include 20-20's argument that the "sub-windows" in its sidebar are protected.  As described in Real View's Brief, the design of the sub-windows in 20-20 Design are unoriginal, as are their contents (e.g., manufacturer catalog data and images) or not the subject of alleged copying (for example, the "user prompts" 20-20 presents in its "information box").  Because the "boxes" and their contents are not individually protectable, and because 20-20 has not stated a case that they are protectable as a compilation, the Court should rule that the "boxes" are not copyright protected.

**Commands in Dialog Boxes are a Method of Operation**.  As Mr. Abbott explained at trial, a "command" may appear in a menu (such as the "main menu," a "popup" or "context" menu, a "right-click" menu), or within a dialog box.[1]  A dialog box is another way to organize information, including commands and menus.  See Tr. II, p. 78, Real View Ex. 101, p. 29 (dialog box "a secondary window that allows users to perform a command").[2]

20-20's response is to argue that "the mere fact that [a command] could have been placed in a menu structure does not transform a dialog box into a menu command hierarch." (20-20 Brief, p. 19).  However, in making this argument 20-20 fundamentally miscomprehends Lotus v. Borland.  The First Circuit's definition of a "method of operation" there is concrete and unambiguous: a method of operation is "**the means by which a user operates something**."  Any action or command that causes the computer to perform an operation falls squarely within this

---

[1] Mr. Abbott did not testify that dialog boxes are "a part of the menu command hierarchy," but rather that whether a command appears in a drop down menu or a dialog box "it is still a command." (Tr. II, p. 80).  20-20 has misstated this testimony in its Brief at p. 19.

[2] Microsoft has published instructions on the use of dialog boxes in Windows.  See: *http://msdn.microsoft.com/en-us/library/aa511268.aspx#rightui*.  A search on the term "apply buttons" and "printing settings" shows sample dialog boxes that use all of the elements 20-20 uses in its dialog boxes: checkboxes, up/down controls, radio buttons, command buttons and drop-down lists.

definition, regardless of its location in the user interface.  As the First Circuit emphasized: "If specific words are **essential to operate something**, then they are part of a 'method of operation . . . **This is so whether they must be highlighted, typed in or even spoken** …." (Lotus, 763 F.2d at 816, emphasis added).  It makes no difference whether the "specific words" appear in a menu or a dialog box – 20-20 chose to make them essential to the operation of 20-20 Design, and therefore they are a "method of operation" under 17 U.S.C. §102(b).  To conclude otherwise would create the bizarre incentive for software developers to put commands in menus rather than dialog boxes to avoid infringement claims.

**The Layout of the Generic Windows Dialog Boxes in This Case are Not Protectible.**

20-20 argues that the "appearance and layout" of the dialog boxes in 20-20 Design are protected. Examples of the dialog boxes 20-20 seeks protection for are at pages 13 – 15 of 20-20 Ex. 3.

This argument raises an important issue for this Court to decide. As noted in Real View's opening brief, the components of these boxes are standard: they use the default Windows grey background color, and use the standard "radio buttons," check boxes, and "command buttons" that are common to almost every Windows application. (e.g., "Save As", "OK", "Cancel", "Display", "Delete", "Color" and "Font").[3]

As a preliminary matter, since nothing in these boxes is original, 20-20's failure to address their protectability as a compilation should preclude any consideration of them by the Court.  (Even if the dialog boxes were protectable as compilations 20-20 would still have to satisfy the "virtually identical copying" standard, which it is obvious it cannon do.)

---

[3]  Microsoft discusses the various Windows "buttons" on its Developer Network: *http://msdn.microsoft.com/en-us/library/aa511453.aspx*.  This document illustrates and explains command buttons (the ubiquitous Windows "OK" button is the first example), menu buttons (which look like a link), split buttons, progressive disclosure buttons, and directional buttons.

However, the issue is more fundamental: is an arrangement of standard Windows GUI components in a dialog box <u>ever</u> protected by copyright law?[4]

It is clear that the answer is <u>NO</u>, at least in the First Circuit. As in <u>Lotus</u>, these are the "commands" that 20-20 chose for users to operate its software; they are "essential" to that operation, and whether they are in a menu or a dialog box, and (as in Lotus) regardless of how they are organized or arranged, they are a "method of operation" under §102(b). 20-20's argument that the arrangement of generic buttons in its dialog boxes is protectible must fail for the same reason the First Circuit rejected Lotus' argument that the individual words in its menus were protectible as a compilation: both are essential to operation of the software, and therefore both are a method of operation.

Moreover, the arrangement of standard buttons in a Windows dialog box could never be sufficiently original to be protectable. As in <u>Apple</u>, these "[p]urely functional items or an arrangement of them for functional purposes are wholly beyond the realm of copyright …." <u>Apple Computer v. Microsoft</u>, F. Supp. 1006, 1023 (N.D. Cal. 1992). <u>See</u> <u>also</u> Ross<u>, Brovins & Oemake, P.C. v. Lexis/Nexis</u>, 348 F.Supp.2d 845 (E.D. Mich. 2004)(relying in part on <u>Lotus v. Borland</u> in holding that dialog boxes not copyright protected; also relying on "blank forms" doctrine), <u>aff'd in relevant part</u>, 463 F.3d 478 (6th Cir. 2006). The First Circuit's observation in <u>Lotus</u> is relevant here: "We think that abstracting menu command hierarchies down to their individual word and menu levels and then filtering idea from expression at that stage." 49 F.3d at 815. Similarly, the Court should not accept 20-20's invitation to abstract the dozens of dialog boxes in this case down to their individual word and "button" levels in order to filter what 20-20

---

[4] Microsoft has published detailed papers to guide developers in the use of these various buttons, see: *http://msdn.microsoft.com/en-us/library/aa511453.aspx* (command buttons) and *http://msdn.microsoft.com/en-us/library/aa511453.aspx* (radio buttons).

4

claims are the "hundreds if not thousands" of expressive choices in their "appearance, content and layout."  20-20 Brief, p. 18.

20-20's reference to "graphics, colors, layout, artwork, etc." (20-20 Brief, p. 11) does not help its cause: 20-20 not identified any original graphics, colors, layout or artwork. Likewise, its references to "Screen displays" (20-20 Brief, pp. 9,10,11, and 12) and to "look and feel" (20-20 Brief, pp. 12, 35) should be rejected.  20-20 has done nothing more than implement the default appearance of the Microsoft Windows "look and feel".  Also, while referencing its "overall look and feel" 20-20 did not inform the court that it changed the background color of the 20-20 Design screen display throughout Exhibit 3, compromising its own argument that the "look and feel" of 20-20 Design is in any way distinctive.

**20-20 Ignores the Policies Underlying the Lotus Decision.**   On page 35 of its Brief 20-20 states: "Prof. Davis concluded that the two programs are so substantially similar that "familiarity with one program is sufficient to enable facile use of the second with almost no additional training."  This argument (which 20-20 has made repeatedly in this case), shows once again its misunderstanding of Lotus.  In Lotus the First Circuit made it clear that this was precisely what it was trying to encourage through its holding in that case:

> Under Lotus's theory, if a user uses several different programs, he or she must learn how to perform the same operation in a different way for each program used. For example, if the user wanted the computer to print material, then the user would have to learn not just one method of operating the computer such that it prints, but many different methods. **We find this absurd**. . . .   forcing the user to cause the computer to perform the same operation in a different way ignores Congress's direction in § 102(b) that "methods of operation" are not copyrightable.  Lotus, 49 F.3d at 817-18 (emphasis added).

**20-20 is Incorrect About the Relevance of Apple v. Microsoft to This Case.**  20-20 argues that Apple v. Microsoft does not apply because a license agreement was a factor in that

5

case, and no license agreement is present here.  This argument has been made unsuccessfully in other cases.  See Computer Access Technology Corp. v. Catalyst Enterprises, Inc., 2001 WL 34118030 (N.D.Cal. 2001)("licensing was just one means of eliminating certain components of the interface in that case from copyright protection, as were the doctrines of merger, scenes a faire, and lack of originality").  In Apple v. Microsoft 54 items survived filtration based on the license (the same number of elements identified by 20-20 here).  While the first two of five District Court decisions[5] dealt with the interpretation of the license agreement, the last three decisions,[6] and the 9th Circuit decision,[7] dealt almost entirely with copyright filtration of these 54 individual display elements.

The detailed analytic dissection in Apple V is relevant here. The court held the following items were not protectable: the **rectangular shape of windows** (relevant to the "sub-windows here"); **clicking the mouse** to bring a window to the top of a stack of windows (relevant to 20-20's "mouse-based" arguments here; held an idea); presenting an **icon shaped like a file folder** to represent objects in a directory (relevant to many of 20-20's icons here, including room shapes (square, U-shaped, L-shaped), dimension icons and "zoom" or magnifying glass icons); **double clicking** to open an object (held an idea); "attributes" menu item that calls up a **dialog box** that list attributes of an object (idea, merger); **words and short phrases in menus** (words/short phrases doctrine);[8] ability to **"drag and drop"** an icon into a folder (scenes a faire; relevant to 20-20 item 41, placing an item via "drag and drop").

---

[5]  709 F.Supp. 925 (N.D. Cal. 1989)(*Apple I*) and 717 F.Supp. 1428 (1989)(*Apple II*).
[6]  759 F.Supp. 1444 (N.D. Cal. 1991)(*Apple III*); 779 F.Supp. 133 (N.D. Cal. 1991)(*Apple IV*); 799 F.Supp. 1006 (N.D. Cal. 1992)(*Apple V*).
[7]  35 F.3d 1435, cert. denied, 513 U.S. 1184 (1995),

[8]  20-20 has ignored the short words and phrases doctrine completely.  For example, it does not acknowledge that the use of the terms "placement zone" or "construction line" are not protected by copyright.  See CMM Cable Rep, Inc. v. Ocean Coast Props., 97 F.3d 1504, 1519 (1st Cir. 1996)

**20-20 Has Mis-Characterized or Mis-Cited Legal Precedents and the Record**. 20-20 cites the lower court decision in <u>Mitek Holdings, Inc. v. Arce Engineering Co., Inc.</u>, 864 F.Supp. 1568 (S.D. Fla. 1994), <u>aff'd</u>, 89 F.3d 1548 (11th Cir. 1996), for the proposition that "The holder of a valid copyright is entitled to protection for … the text of the commands …." However, this opinion relied on the lower court decision in <u>Lotus</u>, which was subsequently overruled by the First Circuit. Likewise, 20-20's reliance on <u>Mitek</u> for the proposition that clicking the right button on the mouse as a short cut to entering zeros via the keypad is misplaced. The 11th Circuit made no mention of this holding when it affirmed the lower court's finding of non-infringement. And, this holding is inconsistent with the First Circuit's holding in <u>Lotus</u>, which "goes against" the Tenth Circuit decision in <u>Autoskill, Inc. v. National Educ. Support Sys., Inc.</u>, 994 F.2d 1476 (10th Cir.), <u>cert. denied</u>, 510 U.S. 916 (1993). The First Circuit stated that it "fail[ed] to see" how a "keying procedure" used to operate the program in question could be "anything but an unprotectable method of operation." 49 F.3d at 818. The same rationale applies to 20-20's attempts to use copyright law to protect "mouse clicks," which are the same (for purposes of copyright law) as a "keying procedure" – the mouse is the "means by which" the user of 20-20 Design operates the program, and therefore is an unprotectable method of operation. 20-20's newest theory, that the mouse clicks it has identified should be protected because they are "dynamic," is without citation to any authority, and unexplained by any logic that would distinguish it from the rational of <u>Lotus</u>. (20-20 Brief, p. 21).

**The "Split-Screen View" and Tabbed Multiple View (20-20 Items 7, 9).** 20-20's Brief argues that what it seeks to protect is "specifically a horizontal split screen with the plan view on the bottom and the elevation view on the top." 20-20 Brief, p. 17. As Real View noted in its Brief, Prof. Davis testified that what was protected the ability to have display an elevation

view and a plan view at the same time. (Real View Brief, p. 45). Apart from the fact that 20-20's Brief conflicts with the testimony of its own expert, the ability to split a screen in a CAD program and show one view on top and one on the bottom is standard in CAD software and is an idea, and therefore is not protectable. (See Real View Appendix, p. 64, showing this feature in Autocad).

With respect to "tabbed multiple views," 20-20 is seeking to protect a "selective display capability oriented around kitchen design elements through tabs." (20-20 Brief, p. 18). 20-20 has failed to describe any expression associated with this idea that could be protected by copyright law.

**The "Placement Zone"**. 20-20's argument regarding the "placement zone" (20-20 item #29), shows how confused even 20-20 is about this feature. Prof. Davis made it clear that the placement zone is an a "concept, notion and idea" unprotectible under copyright law, and testified that what is protectable is not the dotted line 20-20 uses to display it, but "it's a particular sized and located blank space." (Real View Brief, 42-43; Tr. I, pp. 89 - 95). 20-20 contradicts it own expert, describing it as "the dotted line around the wall." (20-20 Brief, p. 25). It is clear that the "snap to" placement zone is a method of operation, and that 20-20 has failed to identify any protectable expression associated with this feature.

**The "Construction Line" (20-20 Item #36).** 20-20 describes the "construction line" as a "phantom wall," and asserts that 20-20's feature is "unique in that it exhibits the appearance and characteristics of an actual wall entity." 20-20 Brief, p. 28. However, 20-20 has not identified any expression associated with the "phantom wall" - it is just an idea, perhaps one that 20-20 should have patented given that it is "unique." However, the idea of having a phantom line representing a wall that has the properties of an actual wall entity is not protected by

8

copyright.  Even Prof. Davis does no more than to describe this feature as a "concept" and a "slightly confusing idea."  (20-20 Brief, p. 27).

**Autcad is the CAD Program Most Relevant to the Filtering Step in This Case**.  20-20 criticized Mr. Abbott's reliance on Autocad as part of the filtration analysis in this case. However, as Mr. Abbott testified, Autocad was the first CAD program for PCs, it is the best selling CAD program in the world, and it is used for <u>all</u> purposes, including interior design.  The fact that it is the <u>only CAD program with which 20-20 allows direct file exchange</u> shows how important it is to 20-20.  Tr. II, p. 32.[9]

At the hearing 20-20's Exhibit 3 focused exclusively on two programs, Chief Architect and Fusion, with no explanation of why 20-20 selected these programs.  20-20 now asserts that "Real View earlier identified PlanIt Fusion and Chief Architect as its main competitors." (20-20 Brief, p. 31).  This statement is unsupported by any record reference, and is false.  Chief Architect is a not a "kitchen design" program; it is not even an interior design program (see images on 20-20 Ex. 3, pp. 18, 19, where the menus displayed refer to "terrain," "deck," "roofing," "slab," "framing," "fireplace" and "electric").[10]

Planit (which 20-20 owns), is not even sold in the United States, and Real View was not able to locate or obtain a copy.  Moreover, 20-20's use of Planit should be stricken based on the bad faith of 20-20's counsel who, when informed of this immediately following the first day of hearings, promised to provide Real View with a copy of Planit before the hearings resumed in

---

[9]  There are literally dozens of architectural interior design programs sold in the U.S. that could be used for purposes of comparison in this case. Kitchendraw, PRO100, Sweet Home 3D, Revit Architecture, ArchiCAD, Mitek, Configura CET, Revit Architecture and BlueCAD are specifically referenced in Messrs. Abbott and Zeldin affidavits.   A search for "home CAD software" on Amazon.com results in list that includes Punch! Home Design Studio, DesignCAD, Better Homes and Gardens Designer, Turbofloorplan, Total 3D Home, to name just a few.

[10]  See also *http://www.chiefarchitect.com/products/* -  "Chief Architect is the industry leader for residential architectural home design software."

September, but failed to do so, without explanation.  See Affidavit of Lee T. Gesmer, filed herewith.[11]

                                      Respectfully submitted,
                                      Real View LLC

                                      /s/ Lee T.  Gesmer
                                      Lee T. Gesmer, BBO #190260
                                      Gesmer Updegrove LLP
                                      40 Broad Street
                                      Boston, Massachusetts 02109
                                      Telephone:  (617) 350-6800
                                      Facsimile:  (617) 350-6878
                                      email: lee.gesmer@gesmer.com

Dated:  December 1, 2009

## Certificate of Service

I hereby certify that on December 1, 2009, I electronically filed the foregoing with the Clerk for the United States District Court for the District of Massachusetts by using the CM/ECF system. I certify that all participants in the case are registered CM/ECT users and that service will be accomplished by the CM/ECT system.

                                      /s/ Lee T. Gesmer
                                      Lee T. Gesmer

---

[11]  20-20 states: "At one point, Real View suggested that it did not analyze the Fusion product simply because 20-20 had not given it a copy. The simple fact is that PlanIt Fusion is easily obtainable in the market for a standard license fee." 20-20 Brief, p. 31, n. 5.  However, this ignores the following exchange, which took place immediately after the first day of hearings:

> **Gesmer, July 23, 2009**:  "it appears that the Planit software you were referencing in court is no longer available for purchase.  Could you provide us with a copy of that, please (for litigation purposes only, of course)."
> **Blank, July 23, 2009:** "We can get you a copy of Planit Fusion."
> **Gesmer, July 27, 2009:** "before we are swallowed up by August vacation schedules, may I ask you again for . . . a copy of the version of Planit that you are relying upon (which I believe is commercially unavailable)?"

Planit was never produced, and Real View's expert has never had a chance to examine it.  See Tr. II, p. 60.