UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REAL VIEW, LLC<br><br>　　　　Plaintiff,<br><br>　v.<br><br>20-20 TECHNOLOGIES, INC.,<br><br>　　　　Defendant. | CIVIL ACTION NO. 07-12157<br><br>ELECTRONIC ORDER GRANTING LEAVE TO FILE REPLY (DOCKET NO. 76) ENTERED ON 11/24/2009 |
| 20-20 TECHNOLOGIES, INC.,<br><br>　　　　Counterclaim Plaintiff<br><br>　v.<br><br>REAL VIEW, LLC<br><br>　　　　Counterclaim Defendant, and<br><br>BORIS ZELDIN and LEONID PERLOV<br><br>　　　　Additional Party Defendants in Counterclaim | **REPLY BRIEF OF 20-20 TECHNOLOGIES, INC. TO REAL VIEW'S POST-HEARING BRIEF ON COPYRIGHTABILITY OF 20-20 DESIGN** |

## INTRODUCTION

Real View -- an admitted copier -- has submitted a brief in which it accuses 20-20 of using litigation to keep a competitor out of the market. 20-20 has been in the kitchen design software industry for over twenty years and has never once brought an action against a competitor for infringement. In its brief, Real View boldly suggests that if 20-20 wants to keep Real View out of the marketplace, it should do so "through bona fide competition" – an ironic statement from a company which entered the marketplace by purposely copying nearly every element of 20-20 Design into its own product called ProKitchen.

After reviewing Real View's post-hearing brief, it is now clear that Real View desperately seeks to keep its shameful conduct from the jury by manipulating the decisions in Lotus Development Corp. v. Borland Int'l, Inc., 49 F.3d 807 (1st Cir.1995), and Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442 (9th Cir.1994), by making irrelevant

legal arguments and by self-manufacturing legal conclusions that find no support in the case law.  In addition, Real View relies heavily on expert Professor Daniel Abbott who delivered faulty and entirely self-serving testimony -- based in part on his reading of a Wikipedia article -- that screen displays are menu command hierarchies, functional computer programs are entirely unprotectable, and as "it turns out I filtered everything." Tr. Day 2 at 104:1.  Over the course of this litigation, Real View has continually changed its tune, from arguing it only copied unprotectable functionalities, to arguing that every element is a "menu command" under <u>Lotus</u>, to arguing that none of the copied elements survive a filtration analysis, to its latest argument that user interfaces of Microsoft Windows-based programs are entirely unprotectable.  These arguments all fail.

## I. Real View Manipulates The <u>Lotus</u> Decision to Justify Its Copying, And Simply Labels The Copied Elements "Menu Command Hierarchies."

Real View's strategy is simply to label every copied element as a "menu command" or a "menu command hierarchy" in order to fit within the <u>Lotus</u> decision.  In prior submissions and during the Markman hearing, 20-20 has demonstrated key differences in the program elements and computing environments in the <u>Lotus</u> decision as compared to those at issue in this case.  Real View's insistence that the copied elements are simply "menu commands" is nothing more than a crude attempt to extend the <u>Lotus</u> decision far past what the First Circuit originally intended.

In what Judge Boudin characterized as "the majority's tightly focused discussion," the <u>Lotus</u> decision repeatedly specified that its analysis addressed only the Lotus 1-2-3 menu command hierarchy and that it was <u>not</u> addressing other elements of the software program, such as the user interface and screen displays:

> [W]e are faced only with whether the Lotus menu command hierarchy is copyrightable subject matter … [W]e know of no cases that deal with the copyrightability of a menu command hierarchy standing on its own (i.e.,

> without other elements of the user interface, such as screen displays, in issue) …
> The Lotus menu command hierarchy is also different from the Lotus screen
> displays … [and] the underlying computer code. Id. at 813-816.

In an effort to apply the Lotus ruling to features within 20-20 Design that have nothing to do with a menu or a menu hierarchy (i.e., dialog boxes), Real View simply creates an argument that any element that *could have been* expressed in a menu structure must be considered part of the unprotectable menu command hierarchy. This sweeping conclusion draws no support from Lotus whatsoever, nor from any other case in any jurisdiction.

To buttress its argument that the numerous dialog boxes[1] in 20-20 Design are "menu commands," and therefore "methods of operation," Real View repeatedly cites the Lotus statement: "If specific words are essential to operating something, then they are part of a 'method of operation' and, as such, are unprotectable." Id. at 816. This argument is wrong. First, as a factual matter, the dialog boxes in 20-20 Design contain numerous components other than words (e.g., tabs, buttons, graphical icons, preview boxes), and appear in a specific design and layout on the screen – nothing in the Lotus decision addressed dialog boxes or a comparable element that contained more than just "specific words." Further, as the testimony showed (Tr. Day 1 at 83:8-85:11,108:4-110-20; Davis Aff. ¶¶51-55, 91, 111-112, 119-120; Exhibit 3 Chart pp. 13-16, 39-41, 52-53, 62-64), none of dialog box layouts or components are "essential to operating" 20-20 Design – use of each element and layout was an expressive choice, among infinite choices, made by 20-20's developers. Real View's attempt to label the dialog boxes as menu commands or "methods of operation" is simply unsupported by Lotus.

**II.      Real View Misinterprets Lotus And Incorrectly Claims that Lotus Eliminates All Copyright Protection For User Interfaces.**

Citing not to any case law but to a series of journal articles and editorials (see Real View Brief at pp. 13, 24-25, 32), Real View argues that Lotus was somehow the end of

---

[1] Dialog boxes appear in Copied Elements #11-14, 35, 47, 55 and 57.

copyright protection of user interfaces and that "this Court must take the same approach" when evaluating 20-20's claims. No court has ever endorsed Real View's interpretation of <u>Lotus</u> and **indeed, Real View's argument is precisely the extreme position that Judge Boudin warned against in his concurring opinion.** Further, Real View's citation to a handful of secondary sources to support its reading of <u>Lotus</u> is telling. Commentary regarding the <u>Lotus</u> case is plentiful, and ranges from praise to criticism, the latter of which includes sister circuits.[2] However, while other courts cite <u>Lotus</u> for the proposition that "menu commands" and "menu command hierarchies" are unprotectable methods of operation, no court has ever applied <u>Lotus</u> to eliminate all protection of user interfaces, and indeed <u>Lotus</u> itself did no such thing.

III.    **Real View Continues To Argue That <u>Apple v. Microsoft</u> Is Dispositive of 20-20's Claims, Choosing to Ignore The Presence Of A Licensing Agreement In That Case That Strictly Limited Apple's Infringement Claims.**

Real View argues that the <u>Apple Computer, Inc. v. Microsoft Corp.</u> decision is largely dispositive of this case, claiming that <u>Apple</u> dealt with "many of the very forms of expression" for which 20-20 claims protection, and is "the *only* case to address the copyright protection of a graphical user interface in any detail … [and] should be central to the Court's consideration of protectability…" (emphasis in original) Real View Brief, pp. 10-11. **However, Real View completely ignores the fact that there was a licensing agreement between Apple and Microsoft that covered <u>179 out of 189</u> alleged similarities between the user interfaces of the two programs**. <u>Apple Computer, Inc. v. Microsoft Corp.</u> , 799. F. Supp. 1006, 1016 (N.D.Cal. 1992) (hereinafter, "Apple I"). The Ninth Circuit, recognizing the impact of the license agreement, noted that "authorized copying account[ed] for more than 90% of the

---

[2] The Fifth Circuit cited the <u>Lotus</u> decision as "an example of how imprecise language in computer copyright cases can create confusion and conceivably lead to a misreading of what the court is trying to say." <u>Mitek Holdings, Inc. v. Arce Eng'g Co., Inc.</u>, 89 F.3d 1548, 1556 n. 16 (11th Cir.1996). The Tenth Circuit declared, "We decline to adopt the <u>Lotus</u> court's approach to section 102(b) and continue to adhere to [<u>Altai</u>'s] abstraction-filtration-comparison approach." <u>Mitel, Inc. v. Iqtel, Inc.</u>, 124 F.3d 1366, 1372 (10th Cir.1997).

allegedly infringing features."[3]  Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442 (9th Cir.1994) (hereinafter, "Apple II").  While many of the claimed elements at issue in Apple may appear similar to the elements in the present case, the Ninth Circuit made it clear it could "not start at ground zero in resolving Apple's claims of infringement" because of the license agreement.  Id.  No such license agreement exists in this case.

Interestingly, Real View states that the Ninth Circuit upheld district court rulings that every element of the Apple interface was unprotectable "with one exception," but submits no further explanation of this "exception." (see Real View Brief at p. 10).  In fact, the Ninth Circuit found at least two "exceptions," or unlicensed elements, that it considered protectable in the Apple interface: use of overlapping windows and "the appearance and manipulation of icons," specifically "zooming rectangle" and "dimming" animations of the icons, and the "use of a trash can icon to depict the discard function."  Id. at 1438.  It is especially telling that Real View ignores Apple's treatment of icons, given that Real View has gone to great lengths to argue against the protection of the graphical icons in this case[4].

### IV.     Real View Makes the Unsupportable Argument That The User Interface of a Software Program Is Unprotectable Simply Because It Is Windows-Based.

Real View argues that the fact that a program is designed for use in the Microsoft Windows operating system severely diminishes any claim of copyright protection over its user interface.  No court has ever held this to be law.

To persuade the Court, Real View resorts to a tactic it has relied on in its prior submissions – it creates a "straw man" argument and then argues against it.  Real View devotes six pages (see Real View Brief pp. 23-29) to argue that the color schemes and fonts used in 20-

---

[3] The Ninth Circuit expressly held that: "[t]he fact that Apple *licensed* the right to copy almost all of its visual displays fundamentally affects the outcome of its infringement claims."  35 F.3d. 1435, 1442 (emphasis in original).

[4] In one instance, Real View goes as far as substituting the word "icons" in place of "menu commands" when quoting from Lotus:  "Without the [icons]…, there would be no way to "push" the [20-20 Design] buttons, as one could push unlabeled VCR buttons."  Real View Brief p. 18.

20 Design are unprotectable as default elements of the "standard Microsoft Windows interface." To be clear, 20-20 has not listed the color schemes or fonts used in 20-20 Design as copied elements to be analyzed, and thus, Real View's lengthy analysis in this regard is entirely irrelevant. Additionally, Real View argues that use of such color schemes and fonts "greatly limits" the scope of protection afforded to 20-20 Design. 20-20 fails to see how the use of certain colors and fonts, which are not at issue in this case, diminishes the claims of protection over the listed elements of 20-20 Design. Real View's argument is a red herring -- a feeble attempt to attribute the overwhelming similarities between the two programs to the use of similar colors and fonts.

### A.  Despite Its Claims that "Abstraction" is Unnecessary, Real View Finds It Necessary To Abstract The Copied Elements Down To Minute Details In Order To Filter Out Every Detail Of The Program as "Windows-Based".

Real View argues that the "abstraction" part of the abstraction-filtration-comparison test is unnecessary because 20-20 has provided a list of features for the Court to consider. Yet, Real View then proceeds to abstract every copied element from 20-20's list down to its minute details (e.g., types of buttons, check boxes, up-down controls, title bars, scroll bars) (see Real View Brief pp. 23-29). Once it has satisfied itself with altering 20-20's list of protectable features, Real View then attempts to conduct a "filtration" analysis of what it has deemed to be Microsoft Windows elements. Real View cites to Microsoft Windows manuals and textbooks to argue that these elements, often one by one, exist in other Microsoft Windows-based programs, and are thus "unprotectable." Real View's argument is akin to a copier of a best selling novel citing to Webster's dictionary to claim that all of the copied words appear elsewhere, and that any work containing those words is thus unprotectable. Of course this is not the law.

> **B.     Real View Next Misquotes the <u>Apple</u> Case To Argue That The User Interface is Somehow Unprotectable Simply Because A User Can Modify the Interface and "Hide" Evidence of Its Copying.**

Real View argues that since 20-20 Design allows users to modify the screen or drag windows or toolbars around, as opposed to making them "fixed," 20-20 "sacrificed the right to complain when a competitor created a program using these same elements." This argument also has no basis in law. The fact that a user can drag or hide a window or toolbar has no bearing on whether that element contains protectable expression – the fact that a user can "hide" evidence of Real View's copying does not render the elements it copied unprotectable.

Attempting to lend some legitimacy to its contrived conclusion, Real View presents a single quote from <u>Apple</u>, taken out of context, stating that "the actual arrangement of displays on a computer monitor running any interactive program is largely the product of the user's efforts." <u>Apple I</u>, 799 F.Supp. at 1022. Here again, Real View fails to disclose and consider the significance of the licensing agreement central to the <u>Apple</u> decision. Apple, faced with the fact that the license agreement gave Microsoft the right to copy virtually all of its claimed elements, claimed the "look and feel" of its desktop-metaphor interface constituted protectable expression on its own, "apart from its individual elements." <u>Id.</u> This is not what 20-20 is asserting here. The fact that a user can drag or hide the elements Real View copied from 20-20 Design has no bearing on the question of protectability. Moreover, the information displayed, design elements and layout of the various dialog boxes, context-sensitive pop-ups and printed legend are indeed "fixed" – users cannot alter these elements.

> **V.     Real View Characterizes the Main Screen of 20-20 Design's User Interface (Copied Element #1) as "Common" and an "Industry Standard" – Yet No Other Computer Program Contains a Main Screen So Similar.**

Real View next applies its argument against protection of Microsoft Windows-based programs to the main screen of the user interface (Copied Element #1). Real View argues that

"the basic layout of a Windows program, with a horizontal menu and toolbar, is an industry standard that any competitor of 20-20 is free to copy." Here again, Real View has created its own argument by selecting just two components of the main screen and proceeding to dismiss protectability over the components it has selected. Prof. Davis, analyzing the main screen of the user interface, recognized routine Windows layout elements such as drop-down menus, icons and a main work area subdivided into smaller windows as "standard Windows conventions," and stated it was "unsurprising to find them in both programs." Davis Affidavit, ¶20. However, Prof. Davis goes on to point out that the same type and sequence of sub-windows located on the left side of the screen (Tr. Day 1 at 56:16-58:17), toolbars with virtually the same icons in the same order (Tr. Day 1 at 59:4-65:24), the same split screen with identical tabs (Tr. Day 1 at 74:4-75:14) – these expressive interface elements, which Real View conveniently ignores, are undeniably <u>not</u> industry standard, and do not appear together in any other computer program aside from 20-20 Design and ProKitchen. Specifically with respect to the sub-windows, Real View's own expert even agreed that the sub-windows that appear in ProKitchen are virtually identical to those in 20-20 Design. Tr. Day 2 at 94:4-10. Real View simply cannot justify the extensive similarities in the main screen of ProKitchen's user interface as compared to that of 20-20 Design.

**VI.    Real View Recasts 20-20's Claim of Protection Over the Sub-Windows (Copied Element #2) As A "Compilation" In Order To Make Its Own Arguments Easier.**

Real View devotes six pages in its brief (see Real View Brief pp. 31-37) to recast 20-20's claim of protection over the sub-windows (Copied Element #2) as a "compilation," and then goes on to argue against "compilation" protection for the element. Real View mistakenly argues that the sub-windows are analogous to the clearly unprotectable facts and data at issue in "phone book" cases similar to Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340

(1991).[5] However, 20-20 has claimed protection over the sub-windows of the main screen as elements containing protectable expression standing on their own, not as a compilation of unprotectable facts or data.[6]  Prof. Davis dissected the sub-windows (Copied Element #2) as "a particular set of windows, in a particular selection and arrangement."  Davis Affidavit ¶28. As a result, Real View's conclusion that the sub-windows alone do not qualify for protection as a "compilation" due to lack of originality or because they are not "the resulting work as a whole," is entirely irrelevant to 20-20's actual claims in this case.

**VII.  Real View Attempts To Dismiss Several of The Claimed Elements as "Methods of Operation" or "Functionalities" Without Sufficient Explanation.**

Mouse Clicks:  Real View describes 20-20's claims of protection over elements utilizing mouse clicks "bizarre" and an "absurdity," yet fails to address the Fifth Circuit's conclusion in Mitek that a single right click in lieu of entering zeros on a keypad was protectable expression.  89 F.3d 1548, 1550 (5th Cir.1994).

Placement Zone:  Without any support whatsoever, Real View concludes the "placement zone" (Copied Element #29) is a method of operation and has no protectable expression.  However, Prof. Davis described the expression of the placement zone as "a particular size, location and orientation of a dotted line which means placement zone … the expression as a certain size and distance around walls and construction lines." Tr. Day 1 at 92:25-95:7.  Even Prof. Abbott appears to agree with this unique expression, stating that with respect to the placement zone, "what's unique here is the fact that there's a visible line

---

[5] See Transwestern Pub. v. Multimedia Mktg. Assoc., 133 F.3d 773 (10th Cir. 1998) (telephone directory); BellSouth Adver. & Publ'g Corp. v. Donnelly Info. Publ'g, Inc., 999 F.2d 1436 (11th Cir.1993)(en banc) (business directory); Schoolhouse, Inc. v. Anderson, 2001 WL 1640081 (D.Minn. 2000) (school statistical directory).

[6] User interfaces may be entitled to copyright protection as a "compilation" of otherwise unprotectable elements if the work is original and expressive.  17 U.S.C. § 101.  See e.g., Apple II, 35 F.3d at 1446, Mitek, 89 F.3d at 1558. "Compilation" protection applies a virtual identicality standard that is separate and distinct from the abstraction-filtration-comparison analysis, which applies a substantial similarity standard.  20-20 contends that all of the identified elements contain protectable expression that has been copied by Real View into ProKitchen and that the abstraction-filtration-comparison analysis is appropriate.  Only if the Court finds the copied elements are unprotectable is an analysis of 20-20 Design as a "compilation" appropriate.

indicating how close you can get to the wall before the cabinet snaps." Tr. Day 3 at 38:2-6. Real View chooses to ignore its own expert's testimony.

<u>Split Screen</u>:  Real View inexplicably accuses Prof. Davis of changing his opinion of the split screen element (Copied Element #7), then simply dismisses the element as a functionality.  The split screen element has been described as a split screen with the plan view at the top, elevation view at the bottom, noting that while other programs offer alternative views with varying options for split screens and different configurations, no other program splits the screen in this exact way.  Tr. Day 1 at 74:4-75:14 and Davis Affidavit ¶¶ 45-48.

<u>Placing Kitchen Design Components</u>:  Aside from its own labeling of Copied Elements #40 and 41 as "Place kitchen design components – two placement methods" as "methods," Real View offers no explanation as to why these elements are methods of operation.

<u>Legal Disclaimer</u>: Real View states the legal disclaimer (Copied Element #58) is "legal boilerplate," and cites to the legend used by the National Kitchen and Bath Association ("NKBA").  However, the NKBA legend has a different layout than the legend of both 20-20 Design and ProKitchen, and importantly contains a different legal disclaimer that does not include the unique ungrammatical text, characteristic of 20-20's legend.

## CONCLUSION

20-20 has submitted substantial evidence that Real View has copied massive amounts of protectable expression.  This case must now proceed to trial.

Dated: December 1, 2009

Respectfully submitted,

      /s/ Timothy C. Blank      
Timothy C. Blank (BBO# 548670)
Joybell Chitbangonsyn (BBO# 669836)
DECHERT LLP
200 Clarendon St. 27th Floor
Boston, MA 02116
(617) 728-7100

**Certificate of Service**

I hereby certify that on December 1, 2009, a true and correct copy of the foregoing document was served upon opposing counsel by electronic case filing.
      /s/ Timothy C. Blank