UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

REAL VIEW, LLC,                            )
                                           )
          Plaintiff and Counterclaim       )
          Defendant                        )
                                           )
                                           )
     v.                                    )
                                           )
20-20 TECHNOLOGIES, INC.,                  )      CIVIL ACTION NO.  07-12157-PBS
                                           )
          Defendant and Counterclaim       )
          Plaintiff                        )
                                           )
BORIS ZELDIN AND LEONID PERLOV             )
Additional Party Defendants                )
in Counterclaim.                           )
_____

**REALVIEW LLC, BORIS ZELDIN AND LEONID PERLOV'S**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**
**REGARDING COUNTERCLAIMS OF 20-20 TECHNOLOGIES, INC.**

Pursuant to Federal Rule of Civil Procedure 50, Real View LLC, Boris Zeldin and Leonid

Perlov (collectively, "Real View") hereby move the Court to grant judgment as a matter of law

that the counterclaims advanced by 20-20 Technologies, Inc. ("20-20") are legally deficient and

judgment must enter in favor of Real View.  20-20 cannot offer a "legally sufficient evidentiary

basis" for a reasonable jury to find these issues in its favor, and the Court should resolve them

against 20-20.

**I.     NO REASONABLE JURY COULD FIND THAT REAL VIEW INFRINGED 20-**
**20'S TRADE DRESS IN 20-20 DESIGN.**

20-20 failed to present a viable case on its trade dress claim against Real View, Count II

of the Answer and Counterclaim.  A party seeking trade dress protection must show: (1) the

design is non-functional; (2) distinctiveness based on the existence of secondary meaning; and

(3) a likelihood of confusion.  See Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205,

210-216 (2000).  20-20 bore the burden to establish that its product design and configuration merits trade dress protection.  In this case, 20-20 had an even greater standard to meet because it seeks trade dress protection for product design, not product packaging.  Courts must exercise "particular caution" when extending protection to product designs because such claims present an acute risk of stifling competition.  Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 380 (2d Cir.1997).  Here, 20-20 could not and did not satisfy the vigorous evidentiary requirement established for product configuration trade dress cases.  See generally Yankee Candle Co., Inc. v. Bridgewater Co., LLC, 259 F.3d 25 (1st Cir. 2001).

### A.    20-20 Has Failed to Identify Its Specific Trade Dress

In this case, 20-20 bears "the burden to clearly identify the trade dress at issue." Id. at 40 n.9 (citing Landscape Forms, 113 F.3d at 381).  This requirement is particularly critical where, as here, a plaintiff is seeking trade dress protection for a combination of elements.  20-20 was required to articulate "the specific elements which comprise its distinct dress." Landscape Forms, 113 F.3d at 381; accord Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 116-118 (2d Cir. 2001) (the plaintiff "must articulate the design elements that compose the trade dress").  20-20 has failed to do so in this case, and as such, failed to meet its burden to establish an essential element of its trade dress claim.  20-20 has only vaguely alleged to the "look and feel" of its user interface.  This is insufficient where, as here, the alleged trade dress is in a product that is "generic," because the "overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas." Id. at 115 (internal citations and quotations omitted).

### B.    20-20 Failed to Prove the Trade Dress is Non-Functional

Section 43(a) of the Lanham Act only protects non-functional trade dress.  Under a 1999 amendment to the Lanham Act, a party asserting unregistered trade dress rights has the burden of proving the absence of functionality. 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be

protected is not functional.")  During the course of this trial, no 20-20 expert – or even a single lay witness – testified to this essential element.  To the contrary, 20-20's witnesses consistently testified that the user interface was designed in a way to "make sense" and allow the user to easily perform the functions necessary to kitchen design.  This testimony shows that the choices made in any alleged trade dress were neither fanciful nor arbitrary.  This deficiency alone is fatal to 20-20's claim of trade dress infringement.  See The Straumann Co. v. Lifecore Biomedical Inc., 278 F. Supp. 2d 130, 134-35 (D. Mass. 2003) (trade dress plaintiff's expert's failure to address proper legal standard to establish non-functionality grounds for summary judgment); see also I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998) ("We hold that the burden of showing non-functionality of a product for which trade dress protection is sought rests on the party seeking that protection").[1]

### C.      20-20 Introduced No Evidence of Secondary Meaning

Further, to prevail on a trade dress claim based on product design, 20-20 cannot rely on its product's "inherent distinctiveness," but instead must demonstrate secondary meaning.  Wal-Mart Stores, 529 U.S. at 212-14.   A party claiming that a product feature has achieved secondary meaning must make a "vigorous" showing that primary significance of feature to consumers is "not the product but the producer."  See Yankee Candle, 259 F.3d at 43 & n. 14;

---

[1]  The District Court previously explained the test for functionality in trade dress cases as follows:

The Supreme Court recently has given new guidance with respect to the meaning of "functionality" in trademark and trade dress cases. See TrafFix Devices, Inc., v. Marketing Displays, Inc., 532 U.S. 23, 31-34 (2001) . . . .  The Supreme Court defined functionality . . . ruling that a feature is functional when it is essential to the use or purpose of the device *or* when it affects the cost or quality of the device.  Id. . . . .  For the plaintiff to establish that the "overall design" of its implant is non-functional, it must show that the arrangement of the product features is "arbitrary."  See I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 37 (1st Cir. 1998) (citing Taco Cabana Int'l Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1119 (5th Cir. 1991) ("[A] particular *arbitrary* combination of functional features, the combination of which is not itself functional, properly enjoys protection.")).

The Straumann Corp., supra, 278 F. Supp. at 133.

I.P. Lund Trading ApS v. Kohler Co., 118 F.Supp.2d 92, 104 (D. Mass. 2000) (the central inquiry for secondary meaning is whether, "in the minds of the relevant consumers, the primary significance of the . . . design is to identify the source of the product, [] rather than the product itself.")

Consumer surveys and individual customer testimony are the only direct evidence of secondary meaning.  Survey evidence is "the 'preferred' manner of demonstrating secondary meaning."  Yankee Candle, 259 F.3d at 39.  However, 20-20 has submitted no such survey as evidence to the jury (or the court), nor has it produced an expert witness at trial to testify to a survey.

20-20 advanced a single witness to testify regarding customer confusion.  This sole witness was not a customer or prospective customer, but an employee of 20-20.  Testimony from 20-20's officers and employees regarding alleged customer confusion is not probative evidence. The Straumann Company, 278 F. Supp. 2d at 139; Yankee Candle, 259 F.3d at 43 n. 14 (finding that the opinions of retailers and distributors active in the field and extremely familiar with the plaintiff's products is hardly evidence of whether the "consuming public" forms the same association).   Caren Danneman, 20-20's only customer witness, did not testify to customer confusion.  In fact, she testified that she was never confused between the two programs.  Even if the Court were to accept testimony from a 20-20 employee, rather than directly from a customer, 20-20 has only put forth one anecdotal instance of customer confusion: Nu Face.  Testimony from Manon Boucher, an employee of 20-20, about her own possible confusion is not relevant in determining customer confusion.  Thus, 20-20 has put forth no evidence during trial – no expert witness, no survey evidence, and no lay witness evidence – to show its trade dress achieved secondary meaning.

Because 20-20 failed to put forth any "probative direct evidence" of secondary meaning as detailed above, 20-20 must demonstrate its user interface has acquired secondary meaning by means of circumstantial evidence.  Such circumstantial evidence includes "the nature and extent of advertising and promotion of the trade dress, and the efforts made to promote a conscious

connection by the public between the trade dress and the product's source." Yankee Candle, 259 F.3d at 43.   However, only "[a]dvertising that specifically directs a consumer's attention . . . . to those features claimed as trade dress" may support a finding of secondary meaning. Id., at 44; see also The Straumann Company, supra, 278 F. Supp. at 139 ("Advertising and marketing expenses are truly probative of secondary meaning only when . . . a manufacturer's promotion of its device tells consumers to "look for" a specific feature as indicative of source."); Walker & Zanger, Inc. v. Paragon Industries, Inc., 465 F. Supp. 2d 956 (N.D. Cal. 2006) ("[t]o be probative of secondary meaning, the advertising must direct the consumer to those features claimed as trade dress"). Advertising alone, no matter how much money or time has gone into it, is not sufficient to establish secondary meaning.

Even if 20-20 had met its burden of identifying its trade dress as the sketcher features, which is has not, 20-20 introduced no evidence evidence at trial showing that it advertised the sketcher features of 20-20 Design.  There is no "look for" advertising that would create secondary meaning for the graphical user interface in the sketcher component of 20-20 Design. 20-20's advertising evidence focused instead on the breadth of the product catalogs programmed into 20-20 Design and the "3D" features of its software, neither of which are the subject of 20-20's claims in this case.

Although 20-20 argued that "Real View has already *conceded* 'secondary meaning' through its admitted and intentional copying of 20-20 Design's interface," (20-20 Opposition to Real View's Motion for Leave to File Summary Judgment (Dkt. 93)), that position is specious. Real View never conceded secondary meaning and never "admitted" copying 20-20 Design's interface.  There is no evidence to the contrary.  Even if Real View had copied the appearance of 20-20 Design (which it denies doing), it would not constitute an "admission" that 20-20 Design is protected by trade dress because intentional copying is not probative of secondary meaning. Yankee Candle, 259 F.3d at 44-45 ("[w]e . . . do not find Yankee's evidence of intentional copying probative of secondary meaning . . . .  to the extent Yankee seeks to use such evidence as secondary meaning of its *combination* trade dress, intent plays a particularly minor role in

product design/configuration cases . . . . attempts to copy a product configuration may not be probative because the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product.")[2] (internal alterations and citations omitted); see also The Straumann Company, 278 F. Supp. 2d a 139-40 (same); Walker & Zanger, 465 F. Supp. 2d at 968 ("Competitors may intentionally copy product features for a variety of reasons; they may, for example, choose to copy design traits in response to consumer preference").  20-20's inference is particularly weak because Real View's product clearly and prominently displays its origin.

20-20 also has not presented any evidence of any damages related specifically to its trade dress claim.  20-20's only theory of damages for its trade dress claim is for price erosion, which has never been accepted in a trade dress or copyright case.

In sum, 20-20 has presented no evidence supporting its trade dress claim, which is particularly problematic where, as here, it is a subject to the vigorous evidentiary requirement of

---

[2]   The First Circuit further explained the role of intent in trade dress cases, as follows: "the relevant intent is not just the intent to copy, but to "pass off" one's goods as those of another . . . . Given that Bridgewater prominently displayed its trade name on its candles, we do not think that the evidence of copying was sufficiently probative of secondary meaning."  Yankee Candle, 259 F.3d at 45.

The evidence at trial in this case will show, in fact, that Real View display its company logo on almost all of the screens of ProKitchen, undermining any allegations of customer confusions.  Another factor that will be important to a consideration of trade dress infringement is the high cost of the products at issue here (over $4,000 in the case of 20-20 Design), accompanied by the extensive research and product comparisons purchasers engage in before buying a product of this sort.  Moreover, 20-20 is seeking trade dress protection of a standard Microsoft Windows program that looks essentially the same as thousands of similar programs.  These programs are "generic," and therefore are not protected by trade dress.  See, e.g., Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc., 280 F.3d 619, 638 (6th Cir. 2002) (recognizing that "generic product configurations," or "designs regarded by the public as the basic form of a particular item," should not be protectable even upon a showing of secondary meaning); Walker & Zanger, 465 F. Supp. 2d at 963 ("to determine whether plaintiffs product design is generic, the court assesses whether (1) the design's definition is overbroad or too generalized; (2) the design is the basic form of a type of product; or (3) the design is so common in the industry that it cannot be said to identify a particular source").  20-20's attempt to protect the Windows-based graphic user interface of its sketcher is generic under this test.

product design cases.  20-20 has only mustered a bald allegation of intentional copying, which, as shown above, does not support a finding of secondary meaning.  Thus, 20-20 has failed to prove infringement of its alleged trade dress and judgment should enter in favor of Real View as a matter of law.

**II.     20-20'S CLAIM PURSUANT TO MASSACHUSETTS GENERAL LAWS CHAPTER 93A MUST ALSO FAIL AS A MATTER OF LAW.**

In addition to its federal Trade Dress/Lanham Act claim, in Count III of its Answer and Counterclaim, 20-20 has also asserted a claim for Unfair and Deceptive Trade Practices pursuant to Chapter 93A of the Massachusetts General Laws.  20-20 has introduced no independent evidence to support this claim.  As set forth above, 20-20 cannot rely on its Lanham Act claim to support is 93A claim.  20-20 has not established that Real View has engaged in any business practices outside the normal scope of competition.  20-20 also has failed to establish any damages caused by Real View's behavior outside of its price erosion theory for copyright damages.  Therefore, this claim should be dismissed as a matter of law.

**III.    20-20'S TORTIOUS INTERFERENCE CLAIM FAILS AS A MATTER OF LAW.**

In Count 5 of its Answer and Counterclaim, 20-20 asserts a claim for "intentional interference with advantageous relations," in which it alleges that Real View has interfered with 20-20's relationships with its customers, prospective customers, and its "supporting manufacturers from the residential kitchen industry."  As set forth below, 20-20 has failed to introduce evidence sufficient to support such a claim at trial, and further, even if it had introduced such evidence, the claim would nonetheless fail as a matter of law.

**A.      20-20 Failed to Establish the Essential Elements of Its Tortious Interference Claim.**

20-20 failed to put forth the required evidence to establish its tortious interference claim. To establish its tortious interference with contract claim, 20-20 is required 20-20 to prove that: (1) 20-20 had a contract with a specified third party; (2) Real View knowingly induced the third party to break that contract; (3) Real View's interference, in addition to being intentional, was

improper in motive or means; and (4) 20-20 was harmed by Real View's actions.  See Felinska v. New England Teamsters & Trucking Industry Pension Fund, 855 F.Supp. 474, 478 (D.Mass.1994); Wright v. Shriners Hospital, 412 Mass. 469, 589 N.E.2d 1241, 1245-1246 (1992) (citing United Truck Leasing Corporation v. Geltman, 406 Mass. 811, 551 N.E.2d 20 (1990)).

Throughout the course of this case, 20-20 has not even made an effort to identify evidence showing that Real View interfered with a contractual relationship. See, e.g., Storage Technology Corp. v. Custom Hardwood, 2006 U.S. Dist. LEXIS 43690 (D. Mass. 2005)(stating elements of interference claim under Massachusetts law, one of which is that plaintiff show "a business relationship or contemplated contract of economic benefit").  20-20 failed to identify a single business relationship with which Real View interfered.  While 20-20 essentially read into the record a list of potential customers that it allegedly lost as a result of Real View, 20-20 has not established that it had a contractual relationship with these customers, nor even a contemplated contract.  20-20 has not established that Real View intentionally and maliciously interfered with the alleged customers, and 20-20 has not established any causation.  20-20 has failed to identify even one relationship with a manufacturer that was interfered with by Real View.  As such, 20-20 has presented no evidence – at trial or otherwise –of the essential elements of its tortious interference claim.  As a result, judgment must enter for Real View as a matter of law.

**B.      20-20's Tortious Interference Claim Is Preempted by the Copyright Act.**

In addition, 20-20's tortious interference claim is preempted by its copyright claim.   In Tingley Systems, Inc. v. CSC Consulting, Inc., 152 F.Supp.2d 95, 111 (D. Mass. 2001), the district court addressed the application of copyright preemption to claims on intentional interference, holding that even where the plaintiff had identified an alleged interference, such a

claim did not survive preemption.   The court quoted the First Circuit in <u>Data General</u>: "a state claim of tortious interference with contractual relations may require elements of awareness and intentional interference not necessary for proof of copyright infringement.  And yet, such an action is equivalent in substance to a copyright infringement claim where the additional elements merely concern the extent to which authors and their licensees can prohibit unauthorized copying by third parties."  <u>Id.</u>, <u>citing</u> <u>Data General</u>, 36 F. 3d 1147, 1164-65. Accordingly, 20-20's claim is legally deficient, even independent of its failure to introduce evidence in support of the underlying allegations.

**IV.   AS A MATTER OF LAW, 20-20'S UNFAIR COMPETITION CLAIM CANNOT BE SUSTAINED.**

In Count IV of its Answer and Counterclaim, 20-20 contends that Real View has engaged in unfair competition.  The unfair competition claim follows the Lanham Act claim and fails for the same reasons stated above.  In addition, 20-20's unfair competition claim is preempted by its copyright claim because it failed to allege the requisite "extra element."

Courts frequently dismiss claims of state law unfair competition based on copyright preemption.  <u>See</u>, <u>e.g.</u>, <u>Blue Nile, Inc. v. Ice. com, Inc.</u>, 478 F.Supp.2d 1240 (W.D. Wash. 2007) ("the underlying nature of plaintiffs unfair competition claim "is part and parcel of a copyright claim" and therefore dismissed based on copyright preemption").  Because 20-20 failed to put forth evidence of unfair competition or establish the "extra element" to survive preemption, 20-20's unfair competition claim fails as a matter of law.

**V.   THE TESTIMONY OF 20-20 DAMAGES EXPERT CREIGHTON HOFFMAN MUST BE EXCLUDED FROM EVIDENCE AS A MATTER OF LAW.**

During trial, 20-20 presented two witnesses who testified on the subject of damages: 20-20 employee, Manon Boucherand and Creighton Hoffman, its damages expert.  Mr. Hoffman's testimony, however, was improperly considered by the Court and presented to the jury.  As a

matter of law, it should be stricken, and to the extent 20-20's claims rely on his damages testimony, judgment should enter in Real View's favor.

The are several reasons Mr. Hoffman's testimony does not meet the legal threshold for admissibility under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), mirroring the reasons set forth in Real View's "Memorandum of Law in Support of its Motion to Preclude The Testimony of Creighton G. Hoffman" (Dkt. 105).  This motion relies on and incorporates the arguments therein, which are summarized below.

### A.      Mr. Hoffman's "Price Erosion" Theory of Damages Does Not Apply to Copyright Cases, Such as the Instant One.

Mr. Hoffman predicates his entire damages analysis on a "price erosion" theory, in which he claims 20-20 was forced to drop its price for its 20-20 Design software to better compete with Real View's allegedly infringing ProKitchen product.  Putting aside the fact that Mr. Hoffman does not perform an adequate, reliable or credible price erosion analysis, the theory of damages is simply inapplicable in the copyright context.  The theory was introduced in, and has been used in, patent cases, and has not accepted in a single reported copyright case.[3]

### B.      Mr. Hoffman's Price Erosion Theory Calculates Damages Based on Gross Revenues Instead of Net Profits.

While Mr. Hoffman was permitted to supplement his expert report, the price erosion theory presented is still based on revenues, rather than net profits.  Mr. Hoffman has alleged the entirety of the price drop, exclusive of a reduction in sales commissions paid, is profit.  However, Mr. Hoffman also testified that he did not know the profit margin was on license sales, and that such a figure was "not relevant" to his analysis.  (Transcript, Day 6 at p. 50).

---

[3]     20-20 has cited cases that have allowed the plaintiff to pursue a theory of price erosion in patent cases only, but as Judge Posner recognized in Saturday Evening Post v. Rumbleseat Press, Inc., 816 F.2d 1191, 1198 (7th Cir. 1987), the rights protected by patent law and copyright law are not the same and serve different purposes: "a copyright, even more than a patent, is a legal rather than necessarily an economic monopoly."  20-20 has offered no authority for the proposition that the panoply of damages that may be available in patent cases can be pursued in a copyright case.

### C.     Mr. Hoffman Failed to Conduct A Credible Economic Analysis, As Required to Establish "Price Erosion" Damages.

Mr. Hoffman made no attempt to comply with the proof required for price erosion damages.  In <u>Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l</u>, 246 F.3d 1336 (Fed. Cir. 2001), the Federal Circuit found plaintiff's expert's application of this damages theory to be unreliable, and affirmed the district court's decision to disallow it.  The Court stated that "the patentee must also present evidence of the (presumably reduced) amount of product the patentee would have sold at the higher price. … [T]he patentee's price erosion theory must account for the nature, or definition, of the market, similarities between any benchmark market and the market in which price erosion is alleged, and the effect of the hypothetically increased price on the likely number of sales at that price in that market."  <u>Id.</u> at 1357.  These requirements have not been met here.  Mr. Hoffman has provided no evidence of the "presumably reduced" number of licenses 20-20 would have sold had it not reduced prices by 52% in April 2009. Thus, there is no economic evidence that 20-20 was suffering a loss of sales as a result of competition from Real View.  He also provided no evidence to support his claim that competition from Real View provided the motivation for the price cut.

The <u>Crystal Semiconductor</u> court assessed the "benchmark methodology" used by the expert to control for other factors that might have resulted in downward pressure on prices, noting that Crystal's expert used such a methodology.  Mr. Hoffman used no such methodology to determine whether products in a market "free of infringement" suffered a loss of sales due to the 2009 recession.  In fact, Mr. Hoffman testified that it was "not necessary at all" to consider "changes in the economy" or "changes that are coming from competitors" under his theory. (Transcript, Day 6 at p. 51).  Accordingly, he had no way to ascertain whether the price reduction of 20-20 Design was influenced by factors having nothing to do with competition from Real View's ProKitchen software.

Further, the benchmark must be derived in a way to recognize the appropriate markets at issue.  "Economists can define hypothetical markets, derive a demand curve, and make price

erosion approximations without relying on inapposite benchmarks." Id. at 1358-59, citing Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1579-80 (Fed. Cir. 1992) (price erosion calculated based on the selling price of the same product before the infringer entered the market); Minnesota Mining & Mfg. Co., v. Johnson & Johnson Orthopaedics, 976 F.2d 1559 (Fed.Cir.1992) (price erosion was calculated based on pre-infringement prices because the patentee and infringer occupied almost the entire market).  Mr. Hoffman could have defined the appropriate market using comparables in the computer-aided design field, but he did not.  Instead, he created no hypothetical market, which would have been necessary for a demand curve.

        The Crystal court also found that, even apart from benchmarking, it is essential that a price erosion damages analysis requires a showing of "but for" causation.  That is, the expert opinion must demonstrate that, but for the price change at issue, the plaintiff's profits would have fallen by some calculable amount.  "To show causation with reliable evidence, a patentee must produce credible economic evidence to show the decrease in sales, if any, that would have occurred at the higher hypothetical price."  Id. at 1359.  "Mr. Hoffman falls short here as well, not even positing what would have happened if 20-20 had cut its price by anything less than 52%.  In fact, Mr. Hoffman based his calculation on the premise that sales had stabilized in the three quarters preceding the price cut.  This showed that no further decrease in sales was likely, and the price cut was not necessary at all.

        Mr. Hoffman also ignores the role of other competitors in the marketplace.  The Crystal Court demands an assessment of such competition, but Mr. Hoffman has assumed without basis that there are no other competitors in the kitchen design software space.  Of course, this refutes other evidence offered by 20-20 itself, including testimony referencing Chief Architect's entry into the market with a competing product priced at $1,495 during the same period as 20-20's price drop and the presence of other competitors. (Transcript, Day 6 p. 74).

        Finally, Mr. Hoffman ignores the connection between lost profits and price erosion, ignoring the requirement that the plaintiff  "present [] evidence of how a hypothetical increase in

price would have affected [plaintiff's] profits due to lost sales." <u>Id.</u> at 1360.  Consequently, Mr. Hoffman's entire economic analysis falls fatally short of the demands of <u>Crystal</u> and <u>Daubert</u>.

As noted above, Mr. Hoffman wholly failed to create a demand curve in the context of his analysis.  Such a curve is necessary "to show causation with reliable evidence." <u>Id.</u> at 1359.  Given this failure, Mr. Hoffman is unable to reliably tie a change in sales to the price change.  Mr. Hoffman indicated only that he relied on Ms. Boucher's testimony that the price reduction was caused by Real View, and that she determined the amount of the price reduction, while ignoring numerous contradictory statements in 20-20's published, and more reliable, annual and quarterly reports.

> **D.  Trial Testimony From Mr. Hoffman Outside The Scope of His Expert Reports Should Also Have Been Stricken.**

Even aside from the arguments advanced in Real View's Motion to Preclude Testimony, Mr. Hoffman's trial testimony strayed far from the information in his expert reports.  Mr. Hoffman attempted to cure multiple deficiencies related to causation through the testimony of Ms. Boucher. Such "supplementation" is impermissible and the Court should strike Mr. Hoffman's testimony as to matters beyond the scope of his reports.   Real View was effectively deprived of the opportunity to review those opinions and assertions itself in advance of his trial testimony.

## VI.  20-20'S COPYRIGHT CLAIM FAILS AS A MATTER OF LAW.

As 20-20's own expert witness, Professor Randall Davis has acknowledged, "the graphical user interface is the complete constellation of elements that are presented to [the user] graphically so that [he/she] can use the program." (Transcript, Day 4, p. 70).  Professor Davis' definition was consistent with both case law applying to compilations, and the copyright statute itself, which both require that a compilation be evaluated "as a whole."  <u>See</u> 17 U.S.C. § 101; <u>Transwestern Pub. Co. v. Multimedia Mktg. Assoc.</u>, 133 F. 3d 773, 776-77 (10th Cir. 1998) (holding a compilation protectable insofar as it features original selection, arrangement or coordination of facts as they appear in a 'work as a whole'"; "if we focus on the respective

directories as a whole there are many differences"); <u>MiTek Holdings, Inc. v. Arce Engineering</u>
<u>Co., Inc.</u>, 89 F. 3d 1548, 1558 (11th Cir. 1996) (software compilation, "protection is limited,
however, and extends only to the work as a whole"); <u>Harper House, Inc. v. Thomas Nelson, Inc.</u>,
889 F.2d 197, 205 (9th Cir. 1989) ("copyright infringement of compilations consisting largely of
uncopyrightable elements should not be found in the absence of 'bodily appropriation of
expression' . . . copying or unauthorized use of substantially the entire item"); <u>Schoolhouse, Inc.</u>
<u>v. Anderson</u>, 2000 U.S. Dist. LEXIS 22524 at *16 (D. Minn. 2000) ("because the
copyrightability of a factual compilation depends upon the originality in selection, coordination,
or arrangement of the facts 'as a whole' work, 17 U.S.C. § 101, in an infringement action the
court must compare the allegedly infringing work to the protected work as a whole"); <u>Wood v.</u>
<u>Cendant Corp.</u>, 2006 U.S. Dist. LEXIS 18899 at *24 (N.D. Okla. Apr. 11, 2006) (same).

20-20 has alleged infringement of only a small number of elements at trial, however,
representing a small fraction of the programs at issue.  20-20 failed to compare 20-20 Design
version 6.1 to ProKitchen version 3.0 at all; therefore precluding any finding of infringement as
to that combination of versions.  Moreover, most of the allegedly infringing elements 20-20 has
displayed cannot be protected by copyright, even as a part of a compilation, as a matter of law.

A review of the trial transcript shows that 20-20 has only displayed eleven elements: the
opening screen and side panel configuration; the attribute dialog box (spin arrow feature); the
wall properties dialog box (spin arrow feature); the display settings dialog box (the "item" tab
only); the split screen; the placement zones; the construction line; the order of elements on the
tool bar; the methods of placing an item; the selection of a cabinet from a catalog (the file
system), and the legal legend.

In <u>Lotus Development Corp. v. Borland Intern., Inc.</u>, 49 F. 3d 807, 819  (1st Cir. 1995),
the Court held that methods of operation are "uncopyrightable subject matter," no matter the

form they take, compilation or not.  See also 17 U.S.C. § 102(b).  Moreover, the Court held at the Markman Hearings that each of the items above was unprotectable.

The U.S. Copyright Office has issued many circulars that provide guidance directly applicable to this case.  Circular 61 states that copyright protection over computer programs does not extend to "ideas, program logic, algorithms, systems, methods, concepts, or layouts." (emphasis added).  Furthermore, Circular 32 states that the format, arrangement, and typography of a work is not protected, nor are works consisting entirely of information that is common property containing no original authorship.  Each of the elements identified by 20-20 fall within these provisions.

Moreover, standard software design techniques, "tools of the trade," design choices determined by compatibility requirements or industry design standards, all fall under the scènes à faire doctrine, and are entitled to limited copyright protection.[4]

20-20 has produced insufficient evidence to establish that the elements it has displayed in any version of its work is either protectable by copyright law at all, or that any version of Real View's software is virtually identical to 20-20's work as a whole.  Therefore, 20-20's copyright claim must be denied as a matter of law.[5]

For the foregoing reasons, the Court should grant judgment as a matter of law that 20-20's counterclaims are fatally deficient.

---

[4] Computer Associates International, Inc. v. Altai, Inc., 982 F.2d 693, 709 (2d Cir. 1992) citing Data East USA, Inc. v. Epyx, Inc., 862 F.2d 204, 208 (9th Cir. 1988); citing 3 Nimmer § 13.03[F][3], at 13-65; Engineering Dynamics v. Structural Software, 26 F.3d 1335, 1347 n. 12 (5th Cir. 1994).
[5] Real View will supplement this motion at the end of its case in chief.

WHEREFORE, Real View respectfully requests that this Court grant judgment in favor of Real View and find that 20-20's counterclaims are deficient as a matter of law.

Respectfully submitted,

REAL VIEW LLC, BORIS ZELDIN
AND LEONID PERLOV

By their attorneys,

/s/ Nancy M. Cremins                        .
Lee T. Gesmer, BBO #190260
Joseph J. Laferrera, BBO #564572
Nancy M. Cremins, BBO #658932
Crystal L. Lyons, BBO #677931
Gesmer Updegrove LLP
40 Broad Street
Boston, Massachusetts 02109
Telephone:  (617) 350-6800
Facsimile:  (617) 350-6878
email: nancy.cremins@gesmer.com

Dated:  January 28, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2011, I electronically filed the foregoing with the Clerk for the United States District Court for the District of Massachusetts by using the CM/ECF system. I certify that all participants in the case are registered CM/ECT users and that service will be accomplished by the CM/ECT system.

/s/ Nancy M. Cremins
Nancy M. Cremins