UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REAL VIEW, LLC<br><br>          Plaintiff,<br><br>v.<br><br>20-20 TECHNOLOGIES, INC.,<br><br>          Defendant. | CIVIL ACTION NO. 07-12157 |
| 20-20 TECHNOLOGIES, INC.,<br><br>          Counterclaim Plaintiff<br><br>v.<br><br>REAL VIEW, LLC<br><br>          Counterclaim Defendant, and<br><br>BORIS ZELDIN and LEONID PERLOV<br><br>          Additional Party Defendants<br>          in Counterclaim | |

**20-20 TECHNOLOGIES, INC'S OPPOSITION TO REAL VIEW, LLC'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

20-20 Technologies, Inc. ("20-20") hereby opposes judgment as a matter of law on its claims of copyright infringement, trade dress infringement, unfair competition, intentional interference with advantageous relations and unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A.

**I.     The Court Has Indicated that it Will Deny Real View's Motion with Respect to 20-20's Copyright Infringement Claim.**

20-20 has presented the Court and jury with evidence of the extensive and striking similarities between the main screen displays of its program, 20-20 Design, and Real View, LLC's ("Real View") program, ProKitchen.  The Court has previously indicated that 20-20's

1

copyright infringement claim is a "very, very viable case" and that Real View "will not get a directed verdict on copyright." **Day Five, Tr.** 107:18-22.  Accordingly, the Court should deny a request by Real View for judgment as a matter of law on 20-20's copyright infringement claim.

## II.     20-20 Has Presented Sufficient Evidence of Trade Dress Infringement

### A.     Real View Cannot Meet the Standard Required for Judgment as a Matter of Law

"Even in the best of circumstances, the standards for granting a motion for judgment as a matter of law are stringent." *Rivera Castillo v. Autokirey, Inc.*, 379 F.3d 4, 9 (1st Cir. 2004). "Courts may only grant a judgment contravening a jury's determination when 'the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party.'" *Id.* (quoting *Keisling v. SER-Jobs for Progress, Inc.*, 19 F.3d 755, 759-60 (1st Cir. 1994)).  In deciding such a motion, the Court must "draw all rational inferences from the facts in favor of the non-moving party." *Peguero-Moronta v. Santiago*, 464 F.3d 29, 45 (1st Cir. 2006).  Judgment as a matter of law is only appropriate if the evidence does not permit a reasonable jury to find in favor of 20-20. *See Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 169 F.3d 43, 53 (1st Cir. 1999).  As discussed below, 20-20 has presented substantial evidence, and certainly "more than a mere scintilla of evidence in its favor" on every element of its trade dress infringement claim.  Accordingly, Real View's motion for judgment as a matter of law must be denied. *See Peguero-Moronta*, 464 F.3d at 45; *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 50 (1st Cir. 2003).

### B.     The Lanham Act Protects Trade Dress Embodied in Screen

The Lanham Act, 15 U.S.C. § 1125(a), prohibits any person, in connection with the sale of any goods or services, from using another's trademark or trade dress where it is likely to cause confusion or mistake as to the affiliation, association, origin, sponsorship or approval of such

persons with another person.  Trade dress is "the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer."  *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 38 (1st Cir. 2001).  The elements of trade dress infringement are:

1.  The trade dress is used in commerce[1];

2.  The trade dress is non-functional;

3.  The trade dress is distinctive, *i.e.* has achieved secondary meaning in the minds of the public; and

4.  The similarity of the defendant's trade dress to the plaintiff's trade dress is likely to cause confusion.

15 U.S.C. § 1125; *see also Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981).

20-20 Design's trade dress is comprised of its original "look and feel," overall structure, selection and arrangement of its features, and expressions embodied in the main screen display. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1 (1992) ("The 'trade dress' of a product is essentially its total image and overall appearance."); *Fibermark, Inc. v. Merrimac Paper Co.*, 2003 U.S. Dist. Lexis 26866, at *41 (D. Mass. 2003) (trade dress consists of "the design and appearance of [a] product together with the elements making up the overall image").

20-20 Design's main screen display is protected by § 43(a) of the Lanham Act.  *See Sleep Science Partners v. Lieberman*, No. 09-04200, 2010 WL 1881770 (N.D. Ca. May 10, 2010) (trade dress claim for "unique look and feel" of website); *Conference Archives, Inc. v. Sound Images, Inc.*, No. 3:2006-76, 2010 WL 162072 (W.D. Pa. Mar. 31, 2010) (trade dress claim for website's "look and feel"); *Blue Nile, Inc. v. Ice.Com, Inc.*, 478 F. Supp. 2d 1240, 1246 (W.D.

---

[1] It is undisputed that 20-20 Design is used in commerce.

Wa. 2007) (trade dress claim for website's "look and feel"); *Computer Access Tech. Corp. v. Catalyst Enter., Inc.*, 273 F. Supp. 2d 1063, 1065-1070 (N.D. Ca. 2003) (trade dress claim for graphical user interface); *O.P. Solutions, Inc. v. Intellectual Prop. Network, LTD.*, No. 96 Civ. 7952, 1999 WL 47191, *22 (S.D. N.Y. Feb. 2, 1999) (trade dress claim for computer software screen display); *see also* Lisa M. Byerly, *Look And Feel Protection Of Web Site User Interfaces: Copyright or Trade Dress?*, 14 SANTA CLARA COMPUTER & HIGH TECH. L.J. 221, 251 (1998) ("trade dress is well suited to protect the entire look and feel of a[n]…interface"); Lauren Fisher Kellner, *Trade Dress Protection For Computer User Interface "Look and Feel"*, 61 U.CHI. L. REV. 1011, 1019 (1994) ("For computer products, the user interface can function as trade dress.").

Finding otherwise would render competition in the kitchen design field a farce:

> A user interface may combine words, symbols, and devices in patterns that help consumers identify its source. Without legal protection, competitors will copy a distinctive interface in order to capitalize on that product's good reputation. Consumers would then be unable to rely on the user interface to identify the source of a product, either when attempting to repurchase that product or viewing that product outside the point of a sale.

Kellner, *supra*, at 1019. Moreover, where the Lanham Act shelters "the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer," 20-20 Design's main screen display is entitled to protection.

## C.     The Evidence Establishes that the Main Screen Display of 20-20 Design is Nonfunctional

20-20 Design's main screen display of the user interface is nonfunctional, and thus protected under § 43(a) of the Lanham Act. *See* 15 U.S.C. 1125(a)(3); *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001); *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 36 (1st Cir. 1998), (citing *Two Pesos*, 505 U.S. at 775).

20-20 need only show that the overall combination of the features that make up the main screen display is not functional. *I.P. Lund*, 163 F.3d at 37 ("The fact that a product contains some functional elements does not … preclude Lanham act protection. '[A] particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection.'"), (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991)); *O.P. Solutions*, 1999 WL 47191 at *26 ("While some aspects of [plaintiff's] display, and the way it operates, might indeed be functional … the selection and arrangement of the items could well constitute nonessential, and hence non-functional, elements of [plaintiff's] trade dress."); *see also* Byerly, *supra*, at 259 ("Unlike with copyright protection, the functionality of a trade dress is determined by considering all the elements in a combination, rather than considering if each element is individually functional.").

Functionality requires a determination of whether the overall combination of features "is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices*, 532 U.S. at 32. This Court has already held that the main screen display is not a "method of operation" as that term has been defined by the First Circuit. *See* Memorandum and Order, February 11, 2010, Case 1:07-cv-12157-PBS Docket No. 84 at *14 (Saris, J.) (hereinafter "Copyrightability Order"), (citing *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 816 (1st Cir. 1995) ("The Lotus menu command hierarchy is also different from the Lotus screen displays, for users need not 'use' any expressive aspects of the screen displays in order to operate Lotus 1-2-3; because the way the screens look has little bearing on how users control the program, the screen displays are not part of Lotus 1-2-3's method of operation.")).

Further, the testimony elicited at trial clearly demonstrated that the features of the main screen display were arbitrarily placed for creative purposes.[2]  For example, placement of the side boxes of a particular type and in a particular sequence in the left-hand side of 20-20's main screen display is nonessential, and is simply 20-20's "creative decision."  *See* **Davis Tr. Day 4** at 54:7-22, 107:5-12, 111:24-112:3 .  Similarly, the preview boxes that appear in kitchen design programs need not appear in a particular order.  **Davis Tr. Day 4** at 107:22-108:2.  And even where programs (such as 20-20 Design) contain standard Window's conventions, the main screen displays can still appear unique.  **Davis Tr. Day 4** at 38:9-12; *see also* **Dubuc Tr. Day 2** at 134:3-8.  As a whole, the testimony has established that kitchen design programs have many options when creating a main screen display.  *See* **Davis Tr. Day 4**, at 111:4-18; **Davis Tr. Day 5** at 13:11-16:8.

Further, the arrangement of the main screen display does not affect 20-20 Design's cost.  While 20-20's trade dress (*i.e.* the appearance of the main screen display) has remained unchanged through successive versions, the cost of 20-20 Design has ranged from $4,195.00 to $1,995.00.  Accordingly, 20-20's main screen display is not a matter of use, purpose, cost and quality; it is simply a product of creative design.

Next, finding 20-20's main screen display to be nonfunctional does not put competitors at a "significant non-reputation-related disadvantage."  *TrafFix Devices*, 532 U.S. at 33, *quoting Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165 (1995); *see also I.P. Lund*, 163 F.3d

---

[2] Prior to *TrafFix*, the First Circuit employed an arbitrariness standard, meaning that for 20-20 to establish that the "overall design" of the main screen display is non-functional, it must show that the arrangement of the features is "arbitrary."  *See Lund*, 163 F.3d at 37, *citing Taco Cabana Int'l*, 932 F.2d at 1119.  This standard is still informative when determining functionality.  *See Straumann Co. v. Lifecore Biomedical, Incorp.*, 278 F. Supp. 2d 130, 133 (D. Mass. 2003).  The Copyrightability Order and trial testimony establish that the arrangement of the features that constitute the main screen display is arbitrary.

at 37 (courts can further look to "the effects that granting protection to a product will have on the

ability of others to compete" in determining functionality).  As demonstrated in detail at trial, the

main screen displays of competitors' programs look nothing like that of 20-20 Design.  In fact,

seven other competitive kitchen designer programs use a "substantially different" main screen

display.  *See* **Davis Tr. Day 4** at 38:13-40:14, 44:5-11, 113:20-119:24; *see also* **Davis Tr. Day 5**

at 13:11-16:8.  This is unequivocal evidence that 20-20's main screen display has not stifled

competition in the kitchen design field.  Thus, allowing protection of 20-20's trade dress in its

main screen display presents no disadvantage to competitors.

20-20's main screen display is not a reflection of an industry-standard; it is but the

product of creative design.  The numerous competitor programs in evidence depict the many

ways that a main screen display can be organized, and in doing so reveal that 20-20's main

screen display is not essential to the use and purpose of kitchen design programs.  Nor does it

affect the cost or quality of kitchen design programs.  Therefore, this Court should find that 20-

20's main screen display is not functional.

### D.    The Evidence Establishes that the Main Screen Display of 20-20 Design Has Acquired Secondary Meaning

20-20's trade dress is distinctive because it has acquired "secondary meaning."

Secondary meaning "occurs when, 'in the minds of the public, the primary significance of a

[mark] is to identify the source of the product rather than the product itself.'"  *See, e.g. Wal-Mart*

*Stores v. Samara Brothers, Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Laboratories, Inc. v.*

*Ives Laboratories, Inc.*, 456 U.S. 844, 851 n.11 (1982) (alteration in original).  Secondary

meaning is demonstrable through circumstantial evidence including: (1) the length and manner

of the trade dress's use; (2) a product's established place in the market; (3) efforts made to

promote a conscious connection by the public between the trade dress and its source; and (4)

proof of intentional copying.  *See Yankee Candle*, 259 F.3d at 43-44; *I.P. Lund*, 163 F.3d at 42.

20-20 Design, a market leader, has maintained a consistent appearance in its screen displays

since at least June 2000 with version 6.1.  This has been an intentional choice, intended to

promote its brand.  Real View has admitted intentionally making ProKitchen look "as close as

possible" to 20-20 Design.

      <u>Length and manner of the 20-20 Design's use</u>: 20-20 Design has been on the market

since March 1985.  **Benard Tr. Day 2** at 25:17-20.  It has maintained the appearance of its main

screen display since version 6.0, which was released in June 2000.  **Smith Tr. Day 5** at 66:22-

67:1 ("The main screen has remained consistent."); **Dubuc Tr. Day 2** at 121:22-122:2, 128:23-

25; *see also Decorations for Generations, Inc. v. Home Depot USA, Inc.*, 128 Fed. Appx. 133,

137-38 (Fed. Cir. 2005) (there was substantial evidence of secondary meaning where plaintiff

sold Christmas tree stands seasonally for six years); *Thomas & Betts Corp. v. Panduit Corp.*, 138

F.3d 277, 295-96 (7th Cir. 1998) ("Under the Lanham Act, five years' use weighs strongly in

favor of secondary meaning") (citing *Two Pesos*, 505 U.S. at 768, for proposition that Lanham

Act trademark principals are relevant to trade dress protection).  Indeed, William Smith testified

that maintaining the appearance of the screen has been an intentional choice because "the look

and feel of the screen is… our brand.  It's who we are and how we're recognized."  **Smith Tr.**

**Day 5** at 67:2-7.  Until Real View copied 20-20 Design's main screen display, no other

competitor's screen display looked even remotely comparable.  *See I.P. Lund*, 163 F.3d at 42

(secondary meaning may be established through exclusive use of a mark); *Frosty Treats Inc. v.*

*Sony Computer Ent. America Inc.*, 426 F.3d 1001, 1006 (8th Cir. 2005) (finding use of trade

dress in a "substantially exclusive manner" supports a finding of secondary meaning); **Davis Tr.**

**Day 5** at 13:11-16:8 (comparing 20-20 Design's main screen display with 20-20's other

competitors' main screen displays).  Further, the main screen display is where 20-20 Design's

users spend "over 90 percent" of their time.  **Smith Tr. Day 5** at 67:8-14; **Davis Tr. Day 4** at

43:16-21.  With that degree of exposure, customers will automatically associate the main screen

display trade dress with 20-20.

    <u>20-20 Design's established place in the market</u>: 20-20 Design is the premier kitchen

design software program and is well known to the kitchen and bath industry and its members

throughout the United States, Canada and the world.  *See I.P. Lund*, 163 F.3d at 42 ("Secondary

meaning may be determined with reference to a particular trade or "branch of the purchasing

public.").  20-20 Design has 80-85% of the market share in the United States.  **Dubuc Tr. Day 3**

at 30:25-31:8; *see also McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 566 F. Supp. 2d

378, 383 (E.D. Pa. 2008) (finding plaintiff's 60% market share persuasive in holding that

plaintiff was likely to succeed on merits of secondary meaning); *Yankee Spirits, Inc. v.

Gasbarro*, No. 96-10967, 1998 WL 428092, (D.Mass. May 26, 1998) ("extensive commercial

activity is a factor demonstrating… secondary meaning") (citing *Kraft Gen. Goods v. Allied Old

English*, 831 F. Supp. 123 (S.D.N.Y. 1993) for a finding of secondary meaning where plaintiff

had 9.5 % market share).  Customers seeing the main screen display of 20-20 Design will

associate it with 20-20 because of the product's consistent appearance and pervasiveness in the

market place.

    <u>Promoting a conscious connection by the public between 20-20 and 20-20 Design's

screen displays</u>: 20-20 has offered evidence that it has made efforts to include screen shots of its

program in its advertising.  **Smith Tr. Day 5** at 79:7-17, 80:4-6 ("I can think of numerous

advertisements that were done to our customers that depict screen captures from our software.").

<u>Proof of Real View's intentional copying</u>: Finally, *RealView has all but conceded "secondary meaning"* of 20-20's trade dress through its admitted and intentional copying of 20-20 Design's main screen displays.  *See Int'l Nacorp, LLC, v. Societe des Bains de Mere et du Cercle des Estrangers a Manaco*, 329 F.3d 359, 371 (4th Cir. 2003) ("a person who directly and intentionally copies another's trade dress has the burden of refuting a presumption that the trade dress has secondary meaning."); *Clicks Billiards v. Sixshooters, Inc.*, 251 F.3d 1252, 1264 (9th Cir. 2001); *Vision Sports Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) ("proof of copying strongly supports an inference of secondary meaning"); *Autodesk, Inc. v. Dassault Systèmes Solidworks Corp.*, 685 F. Supp. 2d 1001, (N.D. Cal. 2009) ("Evidence of intentional copying may support an inference of secondary meaning").  Real View has repeatedly acknowledged that it studied the interface of 20-20 Design in order to develop ProKitchen and "convert users of 20-20 Design to its product," and has admitted its goal was to make "ProKitchen as close to 20-20 Design as possible." **Ex. 101**.  This intentional copying demonstrates that even RealView recognized that it would gain some competitive advantage if it could mislead customers into thinking they were purchasing a 20-20 product.

### E.    The Evidence Establishes that the Similarities Between Real View's ProKitchen and 20-20 Design Have Caused Customer Confusion

The similarities between ProKitchen's and 20-20 Design's main screen displays have caused and are likely to cause customer confusion.  Likelihood of confusion is assessed based on eight nonexclusive factors: (1) the similarity of the trade dress; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its trade dress; and (8) the strength of the plaintiff's trade dress. *See Chrysler Corp. v. Silva*, 118 F.3d 56, 59 (1st Cir. 1997); *Pignons*, 657 F.2d at 487;

*Homeowner Options for Massachusetts Elders, Inc. v. Brookline Bancorp, Inc.*, No. 09-11790, 2010 WL 4939960, *7 (D.Mass. Dec. 1, 2010).[3]  "The most important factors are evidence of actual confusion, similarity of the marks, similarity of the goods and strength of the plaintiff's mark."  *Homeowner Options*, 2010 WL 4939960 at *7.  Each of these factors weighs in favor of 20-20, and therefore judgment as a matter of law is inappropriate.

The similarity of the trade dress:  ProKitchen's main screen display is extremely similar to 20-20 Design's main screen display.  At trial, 20-20's expert, Professor Randall Davis concluded that "there were a striking number of similarities [between the programs].  They're very much the same."  **Davis Tr. Day 5** at 16:15-19; **Danneman Tr. Day 4** at 12:11-15 ("[ProKitchen's sales representative] was right, [ProKitchen] did look like 20-20.").  Prof. Davis further elaborated that any differences between the two main screen displays "really are trivial." **Davis Tr. Day 5** at 16:25-17:23.  Even the Court recognizes how similar ProKitchen's main screen display is to 20-20's trade dress.  Copyrightability Order at 4 ("One need not have 20/20 vision to see that ProKitchen and 20-20 Design share remarkable similarities.").  It cannot be disputed that the main screen displays of the two products are exceptionally similar.

The similarity of the goods:  20-20 Design and ProKitchen are both kitchen design software programs that provide the user with the exact same service, and both programs are "computer aided selling" software.  *See* **Dubuc Tr. Day 2** at 39:24-40:14; *see also Bear Republic Brewing Co. v. Central City Brewing Co.*, 716 F. Supp. 2d 134, 147 (D.Mass. 2010) (where both companies produce craft-brewed beer, the goods are the same).

---

[3] Note that the test for likelihood of confusion is the same in trademark and trade dress cases. *See Two Pesos*, 505 U.S. at 780-81 (1992).  Thus, trademark case law is relevant to this trade dress claim.

<u>The relationship between the parties' channels of trade, the relationship between the parties' advertising, and the classes of prospective purchasers</u>:   Trade and advertising channels and prospective purchasers are "interrelated factors that are generally considered together." *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,* 376 F.3d 8, 19 (1st Cir. 2004); *Bear Republic*, 716 F. Supp. 2d at 147; *TriMark USA, Inc. v. Performance Food Group Co., LLC*, 667 F. Supp. 2d 155, 166 (D.Mass 2009).   These three factors weigh strongly in favor of 20-20.   20-20 and Real View both advertise through similar means.   **Boucher Dep.** at 45:18-46:1.   Both companies advertise in the KBDN magazine, telecommunication and newsletters.   *See* **Boucher Dep.** at 50:14-20.   Both companies make sales through sales representatives, Kitchen and Bath Industry Show, and online.   *See Bear Republic*, 716 F. Supp. 2d at 147 ("both [beer companies] promote their beers online, at beer festivals, and through online media"); *TriMark*, 677 F. Supp. 2d at 166 (both companies advertise their services via their websites and catalogs, attend many of the same trade shows… conduct in-person sales efforts with many of the same sales customers").

Additionally, it has been shown that Real View actively copies 20-20's advertisements. **Boucher Dep.** at 45:18-52:10.   The two companies target the same customers, most of whom are "small kitchen and bath dealerships."   *See* **Smith Tr. Day 5** at 65:2-9, 65:23-66:1; **Danneman Tr. Day 4** at 10:15-22, 11:9-19; *see also TriMark*, 677 F. Supp. 2d at 167 (60% of customers are smaller independent restaurants).   Moreover, 20-20's targeted customers are not sophisticated purchasers.   *See* **Danneman Tr. Day 4** at 9:25-10:2 ("Q: Do you consider yourself computer savvy, Ms. Danneman?   A: I can do e-mails and I can do 20-20.   I'm not computer savvy.").

<u>Evidence of actual customer confusion</u>: Real View's infringement has indisputably caused actual customer confusion.   *See Bear Republic*, 716 F. Supp. 2d at 148 (although not required, a showing of actual confusion will strengthen the infringement claim) (citations

omitted).  20-20 has shown that at least two reasonably prudent customers purchased ProKitchen believing that they were in fact purchasing 20-20 Design.  Taken as a whole, this evidence shows a "genuine and 'substantial' likelihood of confusion."  *See Hearts On Fire Co., LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d 274, 287 (D. Mass. 2009), *citing Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5, 10 (1st Cir. 1996).

ProKitchen's indisputable similarities tricked at least two customers into believing it was a 20-20 program.  The customers purchased ProKitchen believing it to be 20-20 Design, or a 20-20 product.  One customer was not made aware of his mistaken purchase until he contacted 20-20's product managers with questions and was informed that he had not purchased a 20-20 product.  *See* **Smith Tr. Day 5** at 70:6-23.  Similarly, another confused and misled customer was not aware of her mistaken purchase of ProKitchen until her call to 20-20 for technical assistance.  *See* **Boucher Dep.** at 39:2-16, 121:2-11.  Such testimony not only exposes actual past confusion, but is a strong indicator of the confusion that will continue to pervade the kitchen design field if ProKitchen continues on the market in its current trade dress.  *See Beacon Mut. Ins.*, 376 F.2d at 18 (recognizing that "past confusion is a strong indicator of future confusion").

Moreover, actual confusion extends to pre-sale confusion.  *See Hearts On Fire*, 603 F. Supp. 2d at 283 ("…the 1962 amendments to the Act explicitly brought pre-sale confusion within the ambit of trademark protections.").  Initial interest confusion is a specific type of pre-sale confusion:

> It involves confusion at the very earliest stage - not with respect to the source of specific goods or services under consideration, but during the process of searching and canvassing for a particular product.  The classic example is where a consumer sets out in search of one trademarked good, but is then sidetracked en route to his or her original destination by a competitor's advertisement or offering.

*See id*. at 284-86.  Here, Real View copied 20-20's product and then marketed its ProKitchen at a much lower price.  Such actions resonate with intent to divert the attention of would-be 20-20 Design purchasers, and should be considered when determining the likelihood of confusion.

The defendant's intent in adopting its trade dress:  Real View has repeatedly admitted that it intended to make its main screen display appear as close to 20-20 Design's as possible.  *See* **Ex. 101**.  Real View has admitted to downloading a copy of 20-20 Design and video tutorials.  *See* **Ex. 100**.  It studied the interface of 20-20 Design in order to develop ProKitchen, make "ProKitchen as close to 20-20 Design as possible," and "convert users of 20-20 Design to its product."  *See* **Ex. 101**.

The strength of the plaintiff's trade dress:  Several factors weigh on the strength of a trade dress including the length of time the trade dress has been used and the plaintiff's renown in its field.  *See Bear Republic*, 716 F. Supp. 2d at 150.  As explained above, 20-20 has consistently maintained the appearance of its main screen display since at least 2000, and until Real View copied it, all other competitors' main screen displays looked very different.  Customers recognize 20-20's main screen display.  **Smith Tr. Day 5** at 67:3-7 ("the look and feel of the screen is… our brand.  It's who we are and how we're recognized."); **Danneman Tr. Day 4** at 11:22-12:15.  ("Well, [Real View's sales representative] was right, [ProKitchen] did look like 20-20.")

In conclusion, not only has there already been customer confusion due to the similarities between the two main screen displays, but the evidence shows that the screen displays are strikingly similar, the products are sold in the same markets using the same sales techniques, and advertisements.  Often, Real View's advertisements mimic the look, subjects and format of 20-20's advertisements.  **Boucher Dep.** at 45:18-52:10.  ProKitchen has already admitted that it

intended to make its product look as close to 20-20 Design as possible.  Accordingly there is sufficient evidence for a jury to conclude that there is a likelihood that additional customers will be confused by the similarities between 20-20 Design's and ProKitchen's main screen displays.

**F.      20-20's Trade Dress Infringement Claim is Permissible Under § 301(d) of the Copyright Act**

20-20's trade dress infringement claim is not preempted by the Copyright Act because it contains elements separate and distinct from its copyright infringement claim – namely, likelihood of customer confusion due to Real View's unlawful copying of 20-20's trade dress.

Whereas §301(a) of the Copyright Act precludes some state law claims which are encompassed within the scope of federal copyright protection, §301(d) specifically provides that "nothing in this title annuls or limits any rights or remedies under any other Federal statute."  17 U.S.C. §301(d).  Further, "[t]he Copyright Act does not preempt the Lanham Act, or vice versa, and therefore a party may recover under both statutes.  In fact, it is common practice for copyright owners to sue for both infringement under the 1976 Copyright Act and unfair competition under the Lanham Act."  *Alameda Films, SA de CV v. Authors Rights Restoration Corp.*, 331 F.3d 472, 482-83 (5th Cir. 2003); *see also Pegasus Imaging Corp. v. Northrop Grumman Corp.*, No. 8:07-CV-1937-T-27EAJ, 2008 WL 5099691, *6 (M.D. Fla. Nov. 25, 2008).  Parallel claims under the Copyright Act and Lanham Act are not mutually exclusive or per se impermissible.  *See e.g., id.*; *Conference Archives*, 2010 WL 1626072 at *12; *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994) (permitting recovery for damages under both the Copyright Act and Lanham Act); *Montgomery v. Noga*, 168 F.3d 1282 (same); *Tracy v. Skate Key, Inc.*, 697 F. Supp. 748, 750 (S.D.N.Y. 1988).

20-20's rights to protect the trade dress of its product is "qualitatively different" from its copyright and trade dress infringement claims, and therefore not subject to preemption.  *See*

*Harper & Row, Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985); *Yankee Candle Co. v. Bridgewater Candle Co.*, 107 F. Supp. 2d 82, 87 (D. Mass. 2000) ("The Lanham Act, in contrast to the copyright statute, does not directly preempt a parallel common law cause of action where facts exist to support it.").  Real View's misrepresentations that ProKitchen is the same as 20-20 Design, combined with the extensive similarities between the two programs, have caused confusion among customers as to whether ProKitchen is associated with or authorized by 20-20.  *See Rubin v. Brooks/Cole Publishing Co.*, 836 F. Supp. 909, 924 (D. Mass. 1993) (Young, J.) (no preemption where claims contain the extra element of misrepresentation and deceit beyond mere reproduction); *Yankee Candle*, 107 F. Supp. 2d at 87 (no preemption where claim alleges misrepresentations of defendant's employees).  Therefore, 20-20's trade dress infringement claim should be deemed permissible.

### G.      20-20 Has Shown that it is Entitled to Damages and Injunctive Relief

20-20 Design has proved actual money damages from violation of its trade dress.  *See infra* § VI.

Moreover, 20-20 Design is entitled to injunctive relief.  *See Wal-Mart*, 529 U.S. at 208, 212; *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 117,121-22 (1st Cir. 2006) (although unregistered dress is subject to a higher burden than registered trade dress when proving "distinctiveness," both are entitled to injunctive relief); *see also Euro-Pro Corp. v. Tristar Products, Inc.*, 172 F. Supp. 2d 567, 571 (D. N.J. 2001); *Hark'N Tech., Inc. v. Today's Fitness Products, Inc.*, No. 1:07-CV 000080, 2007 WL 2668878, *1-3 (D. Utah Sept. 6, 2007).

**H.** **Therefore, 20-20's Trade Dress Claim Is Not Appropriate for Judgment as a Matter of Law**

20-20's has offered sufficient evidence at trial to establish that its main screen display of its user interface is non-functional, has acquired secondary meaning, and is likely to cause confusion.  Furthermore, the claim is not preempted by the Copyright Act.  A reasonable jury could find for 20-20 on this claim.  Therefore, Real View's motion for judgment as a matter of law should be denied.

**III.** **Real View Has Engaged in Unfair and Deceptive Trade Practices in Violation of Mass. Gen. Laws ch. 93A**

**A.** **Real View's Actions Constitute Unfair and Deceptive Acts Under Applicable Standards**

Mass. Gen. Laws ch. 93A §11 allows any person engaged in trade or commerce to bring an action for injuries for "loss of money or property, real or personal, [caused by] … an unfair method of competition or an unfair or deceptive act or practice" by another person also engaged in trade or commerce.  The Massachusetts Supreme Judicial Court has articulated three crucial questions to help determine whether conduct violates Chapter 93A: (1) whether it is "within at least the penumbra of some common-law, statutory, or other established concept of unfairness"; (2) whether it is "immoral, unethical, oppressive, or unscrupulous"; or (3) whether it "causes substantial injury to customers (or competitors or other businessmen)."  *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975).

The question of whether an act, in its particular context, is unfair or deceptive is one of fact; however "the boundaries of what may qualify for consideration of a Chapter 93A violation is a question of law."  *Chervin v. Travelers Ins. Co.*, 448 Mass. 95, 112 (2006).  Courts typically view the conduct at issue in a Chapter 93A violation on a case by case basis.  *Doliner v. Brown*, 21 Mass. App. Ct. 692, 698 (1986).

As an initial matter, Real View's unfair and deceptive acts occurred primarily and substantially in Massachusetts as required under Mass. Gen. Laws ch. 93A §11. In *Clinton Hosp. Ass'n v. Carson Group, Inc.*, 907 F.2d 1260, 1265-66 (1st Cir. 1990), the First Circuit set forth three factors to determine whether the alleged behavior occurred primarily and substantially in Massachusetts: "(1) where the defendant committed the deception; (2) where the plaintiff was deceived; and (3) the situs of plaintiff's losses due to the deception." Defendants Zeldin and Perlov are residents of Massachusetts, and Real View is a Massachusetts Limited Liability Corporation with its principal place of business in Waltham, Massachusetts. **Ex. 114**. The vast majority of their conduct occurred in Massachusetts, including downloading an unauthorized version of 20-20 Design version 6.1 and its video tutorials, and studying those 20-20 materials while developing ProKitchen. Furthermore, 20-20 has suffered substantial losses in Massachusetts and other states due to Real View's conduct.

It is apparent that Real View's entire business model has been based upon copying 20-20 Design and capturing its users: "Real View knew that to succeed it would have to convert users of 20-20 Design to its product. Therefore, it made ProKitchen as close to 20-20 Design as possible ..." **Ex. 101**. With this goal in mind, Real View's unfair and deceptive acts began with its willful and deliberate unlawful download of 20-20 Design version 6.1 off of the internet website "e-donkey." Real View also downloaded approximately ten video tutorials on 20-20 Design version 6.4, which were created by 20-20 and available only to licensed 20-20 users as part of the 20-20 license or accessible via a password protected website. **Smith Tr. Day 5** at 69:5-15. Real View unlawfully accessed these materials, available for licensed 20-20 users only, specifically for the purpose of studying 20-20 Design and copying its features and main screen display into ProKitchen. Bona fide licensees of 20-20 Design are bound by a license agreement

limiting their use of the product to preparing kitchen designs, and specifically prohibiting reverse engineering, copying or creating derivative works of the 20-20 Design software program. **Boucher Dep.** at 24:11-25:1, 25:24-27:16.  Real View cannot escape the restrictions of the 20-20 Design license agreement that prohibit the type of conduct Real View has engaged in.

Once Real View completed its initial goal of copying 20-20's features and main screen display into its infringing product ProKitchen, its employees made false and disparaging remarks about 20-20 and 20-20 Design to customers and third party manufacturers in a targeted effort to steal customers away and cause harm to 20-20.  Real View has misrepresented in its advertisements that 20-20 "crashes" and that 20-20 "steals" back its software licenses via an "expiring security bundle."  **Ex. 81**; **Boucher Dep.** at 57:5-58:18.  Real View's representatives have also made misrepresentations to customers that ProKitchen is the same as 20-20 Design. **Boucher Dep.** at 34:2-5; **Danneman Tr. Day 4** at 12:4-6, 12:12-15.  Real View also gives *free unlimited* ProKitchen licenses to existing 20-20 users, while charging other customers without another software program up to $995 for each license.  **Exs. 76, 80, 81**.

While Real View's actions were independently unlawful, 20-20 need not prove this to establish a Chapter 93A violation.  *See Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.*, 403 Mass. 722, 729 (1989) ("[A] violation of G.L. c. 93A, § 11 need not be premised on a violation of an independent common law or statutory duty."); *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975) (relief available is "neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitation of preexisting causes of action.").  "Even legal activity, if committed in bad faith, may violate the statute."  *See Kattar v. Demoulas*, 433 Mass. 1, 13 (2000).  The conscious nature and self-interest apparent in Real View's acts exhibit this requisite bad faith.  *See Latham v. Homecomings Financial LLC*, 27

Mass. L. Rptr. 3 (2009) (holding that "bad faith" can be shown by a "dishonest purpose, fraud, conscious doing of wrong, or breach of a known duty through motive of self-interest or ill will").

The evidence has shown that Real View's conduct is certainly "immoral" and "unethical," and has attained a "level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *See Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979); *PMP Assocs., Inc.*, 366 Mass. at 596.

**B.      20-20's Ch. 93A is Not Preempted by the Copyright Act**

20-20's claim under Mass. Gen. Laws ch. 93A is not preempted by its claim for copyright infringement.  The analysis of whether a state claim is preempted by the Copyright Act, 17 U.S.C. §301, considers: (1) that "the work of authorship in which rights are claimed must fall within the 'subject matter of copyright' as defined in §§ 102 and 103 of the Act"; and (2) whether the state law claim creates "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106."  *Harper & Row*, 723 F.2d at 200.  In the present case, it is undisputed that 20-20 Design is subject to copyright protection.

However, courts have construed the second consideration of the preemption test under 17 U.S.C. §301(a) to mean: "when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur."  *Harper & Row*, 723 F.2d at 200 (citations omitted); *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992).  Accordingly, the "extra element" necessary to prove the state claim renders the claim "qualitatively different" from the copyright claim, and there is no preemption.  *See Harper & Row*, 723 F.2d at 200.  While state law claims based *solely* upon impermissible replication of copyrighted materials may be preempted, where state law claims require proof of an extra element such as likelihood of

customer confusion, misrepresentation, or deception, the claims survive preemption. *Rubin*, 836

F. Supp. at 923 (citations omitted).

Here, Real View's unfair and deceptive conduct goes far beyond impermissible copying

and replication of 20-20 Design's main screen display into ProKitchen.  First, the nature of Real

View's access to 20-20 Design (i.e., unlawful download of version 6.1 and its accompanying

tutorials), constitutes an "extra element" different from and in addition to 20-20's copyright

infringement claim.  *See Patricia Kennedy & Co., Inc. v. Zam-Cul Enterprises, Inc.*, 830 F.

Supp. 53, 57 (D. Mass. 1993) (93A claim not preempted where "acquisition of the [protected

work] was accomplished by unfair or deceptive means").  Real View admits its unlawful

download is itself a copyright infringement.  **Ex. 102**.  Second, Real View impermissibly

accessed 20-20's video tutorials available only to licensed users via a password protected

website.  **Smith Tr. Day 5** at 69:5-15.  Further, Real View's misrepresentations that ProKitchen

is the "same" as 20-20 Design, combined with the striking similarities between the two products,

have confused customers into believing that ProKitchen was associated with or authorized by 20-

20.  **Smith Tr. Day 5** at 70:6-23; **Boucher Dep.** at 39:2-16, 121:2-11; *see R.J. Toomey Co. v.

Toomey*, 683 F. Supp. 873, 879 (D. Mass. 1988) (no preemption where defendant caused

confusion among customers as to the source of the plaintiff's product); *see also Berklee College

of Music, Inc. v. Music Industry Educators, Inc.*, No. 09-11627, 2010 WL 3070150 (D. Mass.

Aug. 4, 2010) (93A claim not preempted where allegations are based in part on infringement

under the Lanham Act).   Real View's advertisements also contain misrepresentations about 20-

20 Design's performance and that 20-20 "steals" its customers' licenses via an "expiring security

bundle" are blatantly false and misleading to consumers.  **Boucher Dep.** at 57:5-58:18; **Ex. 81**.

Real View's actions contain "extra elements" of unfair and unethical behavior that attain a "level of rascality" beyond mere copyright infringement. *Levings*, 8 Mass. App. Ct. at 504. Accordingly, 20-20's chapter 93A claim is not preempted.

**C.     Real View's Unfair and Deceptive Acts Have Caused 20-20 Significant Damages**

Real View's unlawful conduct has caused 20-20 significant damages in lost sales, price erosion, and loss of goodwill and market presence. Due to Real View's willfulness, 20-20 is entitled to an award no less than double and no more than treble damages. Mass. Gen. Laws ch. 93A §11. Multiple damages are designed to penalize defendants for willful violations. *See Int'l Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 854 (Mass. 1983). Real View's actions of unlawfully downloading 20-20 Design, systematically copying its main screen display, and targeting customers by making false and disparaging comments about 20-20 were intentional, and these actions were intended to be unfair and deceptive. *See Heller v. Silverbranch Contr. Corp.*, 376 Mass. 621, 627 (1978).

Furthermore, "[i]f a violation of [Chapter 93A] forces another to incur attorneys' fees, those fees are a loss of money or property and may be recovered" by the injured party. *Columbia Chiropractic Group, Inc. v. Trust Ins. Co.*, 430 Mass. 60, 63 (1999).

Accordingly, 20-20 is entitled to multiple damages and attorneys' fees for Real View's unlawful actions.

**IV.     Real View Engaged in Unfair Competition Under Massachusetts State Law**

**A.     20-20 Design's Main Screen Display Has Acquired a Secondary Meaning and Reputation in the Kitchen and Bath Design Industry**

20-20's trade dress, embodied in the main screen display of the user interface of 20-20 Design, have acquired secondary meaning within the kitchen and bath design industry. *See supra*, Section II. 20-20 is entitled to protect its trade dress from unfair use by a competitor. *See*

*Pic Design Corp. v. Bearings Specialty Co.*,  436 F.2d 804, 807 (1st Cir. 1971) ("[A] plaintiff claiming unfair competition may show . . . that the features of the product in question have acquired a secondary meaning such that confusion as to its source is likely to arise if defendant is allowed to copy them."); *Monroe Stationers and Printers, Inc. v. Munroe Stationers, Inc.*, 124 N.E.2d 526, 527 (Mass. 1955) (entitling a plaintiff whose product has acquired secondary meaning to protect it from use by competitors).

Indeed, Real View acknowledges the importance and reputation of 20-20's trade dress, and explains it copied those elements from 20-20 Design into ProKitchen in order to convert 20-20 users.  *See* **Ex. 101**.  After copying 20-20's trade dress, Real View began marketing ProKitchen as "the same as 20-20 Design."  *See Norton v. Chioda*, 58 N.E.2d 828, 830 (Mass. 1945) (finding unfair competition when the defendant taxicab company adopted the same "color scheme and design" of plaintiff's cabs "for the purpose of simulating [the dress] of the plaintiffs").

### B.       Real View Deliberately Copied 20-20 Design to Steal 20-20's Customers

By admittedly copying 20-20 Design's main screen display and user interface, Real View intended to use the similarities between the programs to steal 20-20's customer base.  Because of 20-20 Design's popular and recognizable trade dress, consumers viewing the screen display and user interface of ProKitchen - made to look "as close as possible" to that of 20-20 Design - are likely to either purchase or be initially interested ProKitchen under the mistaken belief that it is 20-20 Design.  *See id.* at 831 ("Proof of actual deception of the public is not required.  It is enough if… a reasonable probability of such deception exists.").  Further, 20-20 receives the benefit of any doubt as to the probability of deception.  *See Jays, Inc. v. Jay Originals, Inc.* 75 N.E.2d 514, 516 (Mass. 1947) ("If there is doubt whether confusion will result, then it should be

resolved in favor of the plaintiff.").  Indeed, there are at least two instances of customer

confusion.  **Smith Tr. Day 5** at 70:6-23; **Boucher Dep.** at 39:2-16, 121:2-11.

      C.       **20-20's Unfair Competition Claim is Permissible Because it is Qualitatively Different than 20-20's Copyright Act and Trade Dress Infringement Claims**

20-20's rights to protect the trade dress of its product is "qualitatively different" from its

copyright and trade dress infringement claims, and therefore not subject to preemption.  *See*

*Harper & Row*, 723 F.2d at 200; *Yankee Candle*, 107 F. Supp. 2d at 87 ("The Lanham Act, in

contrast to the copyright statute, does not directly preempt a parallel common law cause of action

where facts exist to support it.").

Real View's misrepresentations that ProKitchen is the same as 20-20 Design, combined

with the extensive similarities between the two programs, has caused confusion among

customers as to whether ProKitchen is associated with or authorized by 20-20.  **Smith Tr. Day 5**

at 70:6-23; **Boucher Dep.** at 39:2-16, 121:2-11; *see Rubin*, 836 F. Supp. at 924 (no preemption

where claim contains extra element of misrepresentation and deceit beyond mere reproduction);

*Yankee Candle*, 107 F. Supp. 2d at 87 (no preemption where claim alleges misrepresentations of

defendant's employees).  Therefore, 20-20's unfair competition claim must be submitted to the

jury.

      D.       **20-20 Incurred Damages as a Result of Real View's Unfair Competition**

As described more fully below, *infra* Section VI, 20-20 has incurred significant damages

as a result of Real View's actions.  20-20 is entitled to collect these damages arising out of Real

View's unfair competition.  *See Foster Mfg. Co. v. Cutter-Tower Co.*, 101 N.E. 1083, 1083

(Mass. 1913) (allowing the plaintiff injured by defendant's use of its trade name "to recover from

the defendant both the damages which it has sustained from the defendant's wrongful use of its

trade-name and the amount of the profits realized by the defendant therefrom").

## V.      Real View Intentionally Interfered with 20-20's Advantageous Relations

Real View has intentionally interfered with 20-20's relationships with potential and existing customers and cabinet manufacturer partners.  *See Owen v. Williams*, 77 N.E.2d 318, 321 (Mass. 1948) ("[O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to . . . enter into or continue a business relation with another is liable to the other for the harm caused thereby.").  20-20 has shown: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; [and] (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.  **Boucher Dep.** at 35:15-36:3; *see Comey v. Hill*, 438 N.E.2d 811, 816 (Mass. 1982).

### A.      20-20 Had Business Relationships with Customers and Cabinet Manufacturers

20-20 had ongoing relationships with both cabinet manufacturers, who paid catalog creation fees for their product lines to be included in 20-20 Design, as well as relationships with repeat retail customers who continued to purchase updated versions of 20-20 Design.  20-20's relations with its customers and cabinet manufacturers constitute existing or "probable future business relationship[s] from which there is a reasonable expectancy of financial benefit." *Owen*, 77 N.E.2d at 322.  Binding contracts between 20-20 and its customers are not required for Real View's interference with 20-20's relations to be tortious.  *See id.* (stating that proof of a binding contract is not necessary to maintain an action for intentional interference).

### B.      Real View Knew of and Intentionally Targeted Both Manufacturers and Customers

Real View used improper means far beyond "textbook business competition" to interfere with 20-20's advantageous relations.  *See AMI Mun. Vehicles Div. of Natick Auto Sales, Inc. v. Commonwealth Dept. of Procurement and Gen. Serv.*, No. 974392, 1998 WL 1284172, at *3

(Mass. Super. June 4, 1998).  Real View unlawfully downloaded 20-20 Design and purposefully copied protected expression into its program ProKitchen.  **Ex. 101**; *see Pathe Computer Control Systems, Corp. v. Abbey Holding, Inc.*, No. 89-1374, 1990 WL 122345, *5 (D. Mass. Aug. 17, 1990) (improper means include "violations of statues, regulations, or recognized common law rules") (citation omitted).  Real View then aggressively targeted existing 20-20 customers, making disparaging or false remarks about 20-20 and 20-20 Design in its advertisements, describing 20-20 as "stealing" a customer's license to 20-20 Design once the security bundle expires due to lack of upgrading and that 20-20 Design always "crashes."  **Ex. 81**; *see Cronin v. City of Methuen*, No. 06-549, 2008 WL 5875554, at *8 (Mass. Super. Oct. 6, 2008) ("Improper means can consist of … 'disparaging comments …, false statements, … [or] improper leverage to coerce' the breaking of the relationship.") (citation omitted).  Real View has also targeted 20-20's customers by offering *free unlimited* licenses of ProKitchen, and running ads that state "competition is good" or "why pay more?".

　　Real View's efforts to steal 20-20's customers rise to a level of impropriety beyond that of another case where a defendant told a plaintiff's customers that their product was "identical" to that of the plaintiff and that the customer "should switch to the less expensive [product] made by [the defendant]."  *See Custom Blends, Inc. v. Pearlco of Boston, Inc.*, No. 0400571, 2006 WL 1537522, at *2 (Mass. Super. Feb. 28, 2006) (involving two competing salad dressing makers, one of which copied the other's recipe and sold it at a discount).  Real View admits that its business model was based on the desire to capture and convert 20-20's customers.  *See* **Ex. 101**. To do so, Real View unlawfully downloaded a copy of 20-20 Design and its video tutorials, studied those materials and intentionally made ProKitchen "as close as possible" to 20-20 Design.  *See* **Ex. 101**.  Real View markets itself to customers as a cheaper option that is easy to

switch to because of the extensive similarities.  **Danneman Tr. Day 4** at 11:22-12:6.  It has only been able to sell its product at a cut rate price - or in most instances, give the product away - because it unlawfully copied the screen displays and user interface of 20-20 Design into ProKitchen.

Real View also targeted cabinet manufacturers who have traditionally included their product lines in 20-20 Design for a catalog creation fee.  Real View offered these supporting manufacturer products at prices far below industry standards, has offered free catalog creation services, has asked these manufacturers to instruct their representatives to switch from 20-20 Design to ProKitchen, and has offered these manufacturer representatives *free* licenses of ProKitchen.  **Ex. 76**; **Boucher Dep.** at 47:8-14, 54:8-9.

    **C.**    **20-20 Lost Customers and Manufacturer Partners as a Result of Real View's Intentional Interference**

20-20 has lost numerous customers and manufacturer partners to Real View.  Real View's tactics include making misleading and disparaging statements, and offering 20-20 Design users *free unlimited* licenses of ProKitchen while telling them they will have no problem switching programs because the interfaces of the two programs are so similar.  There are dozens of exhibits in evidence regarding lost customers caused by Real View's interference.  *See, e.g.* **Ex. 5**.  Additionally, Real View has harmed 20-20's relationships with cabinet manufacturers. **Boucher Dep.** at 35:9-36:3, 43:5-10.  As a result of Real View's interference, 20-20 has lost customers and manufacturer partners, suffering significant pecuniary damages.

    **D.**    **20-20's Interference with Advantageous Relationships Claim is Permissible Because it is Based upon Conduct Beyond the Alleged Copying**

Real View's intentional interference with 20-20's advantageous relations goes much further than its unlawful copying of 20-20 Design.  A tortious interference claim escapes preemption where it is based upon "evidence of some *conduct* … other than the copying itself."

*Yankee Candle*, 107 F. Supp. 2d at 87.  Real View's misrepresentations to customers regarding 20-20 Design's performance and its advertisements stating that 20-20 "steals" its users' licenses via an "expiring security bundle" are blatantly false and damaging to 20-20.  **Ex. 81**; *see id.* (tortious interference claim not preempted when based upon misrepresentations of defendant employees).   Additionally, Real View has targeted 20-20's existing users by offering them *free unlimited* licenses of ProKitchen, where other users without an existing software license are charged up to $995 per license, and assuring 20-20 users they will have no problems switching because the two programs are similar.  **Danneman Tr. Day 4** at 11:22-12:6.  Real View has also targeted 20-20's manufacturer partners by offering them free catalog creation services and free ProKitchen licenses.  **Boucher Dep.** at 43:5-10.  This unlawful conduct constitutes "extra elements" that make 20-20's claim for tortious interference "qualitatively different" from its infringement claim.  *Rubin*, 836 F. Supp. at 923.  It is therefore permissible.

## VI.    20-20's Price Erosion Damages are a Conservative Measure of Damages

20-20 has put forth a conservative measure of damages due to price erosion.  As testified to by Mr. Hoffman, 20-20 sold an average of 166 licenses at $4,195 each during the three quarters prior to the price reduction, "at the bottom of the recession."  **Hoffman Tr. Day Six** at 39:25-40:6.  Taking into account price elasticity, Mr. Hoffman calculated price erosion damages for the next 5.33 quarters based solely on the 166 licenses that 20-20 would have sold at $4,195 each.  It is important to note that 20-20 is not claiming price erosion damages related to the increased sales of 20-20 Design immediately following the price reduction.  As explained by Mr. Hoffman, if additional damages were being claimed on the increased sales, it would be necessary to isolate the impact of lower prices from other factors, such as improved marketing or general economic conditions, discussed below.  That analysis might include quantification of price elasticity, estimation of a demand curve or statistical isolation of various factors causing unit

sales to rise above 166 per quarter.  However, 20-20 has not included price erosion damages for these additional license sales - though 20-20 has undoubtedly suffered additional damages beyond the claimed amount - making such an analysis unnecessary.

Clearly, however, the increase in sales of 20-20 Design in the three quarters immediately following the price reduction cannot be entirely attributed to the price reduction.  Rather, the increase in sales must be attributed to multiple factors that occurred concurrently or shortly after the price reduction.  As testified to by Ms. Boucher, 20-20 undertook new marketing initiatives, including increased advertisements, incentive programs for manufacturers' representatives who provide sales leads, conducting customer satisfaction surveys regarding 20-20 Design and implementing requested changes and modules.  **Boucher Dep.** at 73:13-75:10.  Further, 20-20 began offering free online trainings, webinars and live-streaming events to increase exposure to the product, and began offering continuing education credits for trainings, honored by the National Kitchen and Bath Association for certification purposes.  **Boucher Dep.** at 73:13-74:23. Furthermore, sales of 20-20 Design are cyclical and have historically been highest in the second quarter, when the Kitchen and Bath Industry Show takes place.  **Hoffman Tr. Day Six** at 40:25-41:4.  Indeed, 20-20 Design sales in the second quarter of 2009 (coinciding with the price drop), rose dramatically to 510 first licenses sold, and then dropped and steadied at an average of 278 first licenses sold in each of the next four quarters.  Additionally, the improving economy during the second half of 2009 undoubtedly contributed to increased sales of 20-20 Design.

The Court has now twice denied Real View's attempt to exclude or strike Mr. Hoffman's testimony based on alleged deficiencies or improper methodologies.  The Court has also recognized that price erosion is a reasonable measure of damages in this case.  Pretrial Conference, June 10, 2010, 37:8-9, 37:20-38:2; Status Conference, Oct. 21, 2010, 9:10-24.  Case

law supports this finding.  *See Oracle USA, Inc. v. SAP* AG, 264 F.R.D. 541, 548 (N.D. Ca.

2009) (implicitly recognizing the right to seek price erosion damages in a computer software

copyright infringement case); *C & F Enterprises, Inc. v. Barrington, Inc.*, No. 96-1108-A, 1997

WL 626569 (E.D. Va. May 29, 1997).  Moreover, Real View has now had the opportunity to

cross examine Mr. Hoffman, and will have the opportunity to introduce competing damages

calculations to the jury with its own damages expert.  Ultimately, the jury will be asked to weigh

these competing calculations and determine what damages should be awarded to 20-20 for Real

View's unlawful actions.

## VII.    Conclusion

For the foregoing reasons, Real View's motion for judgment as a matter of law on 20-

20's claims of copyright infringement, trade dress infringement, unfair competition, intentional

interference with advantageous relations and unfair and deceptive trade practices under Mass.

Gen. Laws ch. 93A should be denied.


Dated: January 28, 2011                              Respectfully submitted,

                                                     _____/s/ Timothy C. Blank_____
                                                     Timothy C. Blank (BBO# 548670)
                                                     Joybell Chitbangonsyn (BBO# 669836)
                                                     DECHERT LLP
                                                     200 Clarendon St. 27th Floor
                                                     Boston, MA 02116
                                                     timothy.blank@dechert.com
                                                     joybell.chitbangonsyn@dechert.com
                                                     ***Attorneys for 20-20 Technologies, Inc.***

                  Certificate of Service
I hereby certify that on January 28, 2011, a true and
correct copy of the foregoing document was served
upon opposing counsel by electronic case filing.

_____/s/ Timothy C. Blank