UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REAL VIEW, LLC, ) | |
| ) | |
|     Plaintiff and Counterclaim ) | |
|     Defendant ) | |
| ) | |
| v. ) | |
| ) | |
| 20-20 TECHNOLOGIES, INC., ) | CIVIL ACTION NO. |
| ) | PBS-07-12157 |
|     Defendant and Counterclaim ) | |
|     Plaintiff ) | |
| ) | |
| BORIS ZELDIN AND LEONID PERLOV ) | |
| Additional Party Defendants ) | |
| in Counterclaim. ) | |

**REALVIEW LLC, BORIS ZELDIN AND LEONID PERLOV'S MEMORANDUM REGARDING THE "GRAPHICAL USER INTERFACE" AND APPORTIONMENT OF DAMAGES**

Realview, LLC , Boris Zeldin and Leonid Perlov ("Real View") respectfully submits this memorandum to address 20-20 Technologies, Inc.'s ("20-20") attempt to convert its theory of copyright infringement from infringement of the "graphical user interface" to specific screen displays, and to confirm the importance of an apportionment instruction.

### I.  "Graphical User Interface" v. "Screen Displays"

20-20 is now suggesting that the Court instruct the jury to compare only some limited number of "screens" (which has yet to be defined with any precision) and that the jury be asked under the virtual identical standard whether copying of these screens amounts to more than an insignificant portion of 20-20's software. This new theory should be rejected for two reasons.

First, 20-20's theory, and Real View and the Court's understanding throughout this case is that 20-20's graphical user interface was allegedly copied. Real View has structured and defended its case in reliance upon this understanding and the Court's rulings. Moreover, 20-20 has also repeatedly asserted protection over its "user interface" and not merely "screen displays" and has used the terms interchangeably. See Tr. 5-8 ("overall screen display"); Tr. 2-122 (20-20 witness, after testifying to value and design of the "user interface" extensively, defining the term on cross examination as "user interface is kind of the, you know, space between the end user, the human, and the machine, so it kind of dictate[s] the interaction. This is where the interaction occurs between a human and a machine."). Most significantly, however, the Court has instructed the jury on multiple occasions that the compilation at issue is for "features in the full graphical user interface." Tr. 5-11; see also Tr. 3-86 ("the claim here is to the compilation of all the different features") (emphasis added). Such a change, following the close of 20-20's case, would be highly prejudicial to Real View.

Secondly, the law is clear that the owner of a copyright compilation cannot pick and choose parts of the compilation that it wishes to be compared at trial. The illogical nature of such a request can be illustrated by looking at a more traditional type of work, for example, a compilation of American poetry. 20-20 can no more assert the jury should compare only the limited parts of its screen displays than the owner of the poetry compilation could ask a jury to focus exclusively on the first ten poems in the book and ignore the following one hundred. Likewise, the owner of a compilation in the ubiquitous telephone directory cannot claim that a few entries were copied, even if those entries included the most influential persons in town.

That the work as a whole must be evaluated has been established by virtually every federal circuit to consider the issue. The "virtual identity" test is not applied piecemeal - it must be applied to the allegedly infringed work "as a whole." See Dream Games of Arizona, Inc. v. PC Onsite, 561 F.3d 983, 988-989 (9th Cir. 2009) (noting

2

"complete printouts" were in evidence and affirming district court's rejection of jury instructions listing specific items rather than the "whole work"); Transwestern Pub. Co. v. Multimedia Mktg. Assoc., 133 F. 3d 773, 776-77 (10th Cir. 1998) (holding a compilation protectable insofar as it features original selection, arrangement or coordination of facts as they appear in a 'work as a whole'"; "if we focus on the respective directories as a whole there are many differences"); MiTek Holdings, Inc. v. Arce Engineering Co., Inc., 89 F. 3d 1548, 1558 (11th Cir. 1996) (software compilation, "protection is limited, however, and extends only to the work as a whole"); Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 205 (9th Cir. 1989) ("copyright infringement of compilations consisting largely of uncopyrightable elements should not be found in the absence of 'bodily appropriation of expression' . . . copying or unauthorized use of substantially the entire item"); Schoolhouse, Inc. v. Anderson, 2000 U.S. Dist. LEXIS 22524 at *16 (D. Minn. 2000) ("because the copyrightability of a factual compilation depends upon the originality in selection, coordination, or arrangement of the facts 'as a whole' work, 17 U.S.C. § 101, in an infringement action the court must compare the allegedly infringing work to the protected work as a whole"); Wood v. Cendant Corp., 2006 U.S. Dist. LEXIS 18899 at *24 (N.D. Okla. Apr. 11, 2006) (same).

  This requirement is grounded in the Copyright Statute itself, which defines a compilation as  follows: "A 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. …") 17 U.S.C. § 101 (emphasis added).  In Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340 (1991), the Supreme Court stated:

> Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement. As one commentator explains it: "[N]o matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking . . . . [T]he very same facts and ideas may be divorced from the context imposed by the author, and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas." (citations omitted).

499 U.S. at 349.

It would undermine this critical limitation to copyright protection of compilations if the owner of a compilation could pick and chose selected parts of her "selection and arrangement," and use that as the basis upon which to claim infringement.

> A leading copyright treatise confirms this:
>
>> By providing this definition, Congress delineated both what is and what is not protected in a compilation. They key to the definition is found in its conjunctive clauses . . . These clauses require the presence of all three elements for copyright to subsist: (1) a collection and assembling of preexisting materials, facts, or data, (2) that are then selected, coordinated or arranged (3) into a work that, by virtue of that selection, coordination, or arrangement, may be said to constitute, **as a whole,** an "original work of authorship."
>> …
>> The essence of copyright in a compilation is . . . (2) a coordination or arrangement of . . . data in such a way that the work, as a whole, is an original work of authorship (i.e., is not copied from someone else and contains at least a modicum of creativity). **Whether sufficient selection, coordination, or arrangement is present is viewed in the aggregate, not piecemeal, since it is the compiler's efforts as a whole that count**.

William F. Patry, *Patry on Copyright* § 3:66 (2009)(emphasis added).

This definition is consistent with the testimony of 20-20's own expert witness, Professor Randall Davis, who, in response to a question from the Court, defined the "graphical user interface" as not just a single screen (such as a "dialog box" or "pop-up box"), but as follows:

4

> **The graphical user interface is the complete constellation of elements that are presented to me graphically so that I can use the program.**

Trial Transcript, Day 4, p. 70.  This is also consistent with 20-20's own copyright registration for each version, which is not specific to any screen displays, but for protection of its entire program.

Moreover, 20-20's assertion of a compilation of its "screen displays" is inconsistent with the manner in which it has presented its case to the jury.  For example, 20-20 witness John Morgan performed a lengthy live demonstration comparing the two programs, highlighting such features as:

- the "continuous wall feature" in the two programs (Tr. 3-83).
- the use of the computer mouse to "rotate" a wall on the screen (including right and left clicks) (Tr. 3-84).
- the use of the so-called "edit" box to enter distances and coordinates (Tr. 3-85).
- using the mouse or the edit box to "place" a cabinet  (Tr. 3-87).
- the functionality of the "placement zone" (Tr. 3-87).

20-20 also had its witnesses, including Pierre Bernard, Christian Dubuc, John Morgan, and Manon Boucher repeatedly testify as to the development and importance of the user interface, without distinction between the overall user interface and any specific screen displays.  There would be no way for the jury to separate out the components and to assess damages and apportionment, et cetera, based upon the overall user interface versus the "screen display" theory 20-20 is now asserting.

20-20's assertion of protection in a compilation of a portion of its screen displays is even more tenuous because of the functional content of those displays.  The U.S. Copyright Office refers to the protection of screen displays usually in the context of video games.  See U.S. Copyright Circular 61.  Circular 61 lists those elements of a computer program that are not subject to copyright protection, including: "ideas, program logic, algorithms, systems, methods, concepts, or layouts." (emphasis added).

Furthermore, Circular 32 states that the format, arrangement, and typography of a work is not protected, nor are works consisting entirely of information that is common property containing no original authorship. Yet 20-20 is seeking protection of essentially the "layout" or "arrangement" of its screens.

Finally, the Court intends to give the jury working copies of each program at issue to compare. Real View would be further prejudiced if the jury were able to compare the programs without any limitation on the screen, but were instructed to compare anything less than the programs as a whole. Real View respectfully requests that the Court reject this last minute and unsupportable assertion.

## II. Apportionment

Real View also urges the Court to preserve its instruction regarding apportionment of damages. Apportionment is a highly relevant equitable right applicable to this case, were the jury to find infringement. Real View has introduced substantial evidence that a substantial portion of the value of the program to a user is the access to catalogs, and that customers will not purchase programs without such access. Real View has also introduced evidence that the 3D graphics and rendering capabilities are a key factor which drives the selection of the programs, and that Real View's graphics are superior to 20-20's. Moreover, many courts have allowed apportionment in cases where the products were differentiated based on price, recognizing that many consumers will not purchase a higher priced item, regardless of any infringement alleged, based on simple economics principles. See Data Gen. Corp. v. Grumman Systs. Support Corp., 36 F.3d 1147, 1176 (1st Cir. 1994) (noting that apportionment of profits requires the court to balance various equitable factors, in a "delicate exercise informed by considerations of fairness and public policy"); See also Computer Assoc. Int'l., Inc. v. Altai, Inc., 775 F. Supp. 544, 568-570 (E.D.N.Y. 1991) ("[plaintiff's] assumption, however, fails to take into account a critical factor: price. [Plaintiff] sells a much more expensive product than did [defendant] . . . indicat[ing]

6

that with many of [defendant's] customers, price was a substantial factor in determining to buy from [defendant] as opposed to [plaintiff]" and discussing failure by plaintiff's expert in "assum[ing] that [defendant's] complete revenues on sales of products [could] be attributable to one component of those products"); Fedtro, Inc. v. Kravex Mfg. Corp., 313 F. Supp. 990 (E.D.N.Y. 1970) (discussing differences in products and different price points).

In Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 405-06 (1940), the Supreme Court recognized the importance of apportionment to ensure an equitable result. Apportionment prevented damages from being awarded that would constitute an unauthorized penalty, and allowed the copyright holder to recover only that portion of the defendant's profits he was actually entitled to. Id. The Court held that even where the defendant had been found guilty of "deliberate plagiarism," apportionment was still required. Id. Sheldon involved weighing such "soft" factors as the value of the script, production, and star power of a movie which, like here, did not allow mathematical certainty in apportionment. See also John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 47 (1st Cir. 2003) ("In Data General, this court found some apportionment required as a matter of law because the defendant showed that, apart from its infringing activity, customers purchased its services for reasons such as the price, quality, and breadth of its service.") (citing Data Gen., 36 F.3d at 1177).

However, because apportionment is equitable and an entitlement, the fact-finder can apportion damages based on sufficient evidence in the record even without expert testimony or even a party's direct argumentation on the point. See Burlington N. & Santa Fe Ry. Co. v. United States, 129 S. Ct. 1870, 1881-1883 (2009) (upholding district court apportionment in CERCLA case even though it was defendant's burden of establishing and no expert testimony or even argumentation on methodology was offered); Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 713 (9th Cir. 2004) ("In the absence of evidence to the contrary, we presume the jury fulfilled its

duty to apportion profits."); Andreas v. Volkswagen of America, Inc., 336 F.3d 789, 798 (8th Cir. 2003) (upholding jury calculation that 90% of defendant's profits were attributable to factors other than the infringement because evidence supported a nonspeculative basis for the jury's award); Monroig v. RMM Records and Video Corp., 196 F.R.D. 214, 220 (D.P.R. 2000) ("The judgment of a jury is given wide latitude and will be upheld so long as it does not exceed some "rational appraisal or estimate of the damages that could be based on the evidence before the jury.") quoting Blinzler v. Marriott Int'l Inc., 81 F.3d 1148, 1161 (1st Cir. 1996). Indeed, asking the jury to apportion damages is no different than tasks we regularly allow juries to competently perform, including assessing comparative fault and awarding damages for pain and suffering.

### III. Conclusion

Accordingly, Real View respectfully requests that the Court include a jury instruction regarding apportionment, including on the basis of price differentials. Real View also requests that the Court instruct the jury to compare the "graphical user interface" of the two programs "as a whole."

Respectfully submitted,

REAL VIEW LLC, BORIS ZELDIN AND LEONID PERLOV

By their attorneys,

/s/ Lee T. Gesmer .
Lee T. Gesmer, BBO #190260
Joseph J. Laferrera, BBO #564572
Nancy M. Cremins, BBO #658932
Crystal L. Lyons, BBO #677931
Gesmer Updegrove LLP
40 Broad Street
Boston, Massachusetts 02109
Telephone: (617) 350-6800
Facsimile: (617) 350-6878
email: nancy.cremins@gesmer.com

Dated: January 30, 2011

**CERTIFICATE OF SERVICE**

  I hereby certify that on January 30, 2011, I electronically filed the foregoing with the Clerk for the United States District Court for the District of Massachusetts by using the CM/ECF system. I certify that all participants in the case are registered CM/ECT users and that service will be accomplished by the CM/ECT system.