# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


REAL VIEW, LLC, et al,                    )
                                          )
                 Plaintiffs and           )
                 Counterclaim Defendants  )
                                          )
         -VS-                             ) CA No. 07-12157-PBS
                                          ) Pages 1 - 95
20-20 DESIGN, INC., et al,                )
                                          )
                 Defendants and           )
                 Counterclaim Plaintiffs  )



JURY TRIAL - DAY ONE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 18, 2011, 9:00 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1  We've sold over 120,000 licenses, and I think we have currently

2  over 50,000 licenses that remain active.

3          And so what happened?  Why are we here, and what will

4  the evidence show?  Mr. Zeldin and Mr. Perlov, two apparently

5  very smart men with advanced degrees from various universities

6  here and abroad -- I believe they're engineers -- they'd worked

7  at various jobs, and they'll testify about them, and sometime

8  back in 1999 they saw our product.  And I'm not sure where they

9  saw it, and I'm not sure if they saw it or one of their friends

10  saw it and sent it to them, but I'll ask them where they first

11  saw it.  And they started a company called Real View in 1999,

12  and I believe that Mr. Zeldin and Mr. Perlov are the primary

13  shareholders of that company.  They may be the only ones, I

14  don't know, but I will ask them.

15          At first, they tried to develop their own products.

16  They've told us that they had at least three products that they

17  worked on.  One was called E-Design, one was called

18  E-Decorative Studios, and one was called 3D Furniture World.

19  But they found it challenging.  They found it difficult.  They

20  had no success.  They could not establish a market for their

21  products, and each of those products failed.

22          So sometime in 2003 or 2004 they decided they wanted

23  to get themselves into the kitchen design business and they

24  wanted to compete with us.  They could have chosen, the

25  evidence will show you they could have chosen to compete

Real View v. 20-20 - Jury Trial Day 1

b640cd02-c885-4fc7-b3a9-d98d257a8567

1   this lawsuit is.  So, for example, the catalogs.  Well, you're

2   going to hear about catalogs until it comes out of your ears in

3   this case because that's where all the money is in this

4   business.  That's where all the effort and work is, it's in the

5   catalogs.  And 20-20, if a cabinet company wants its catalogs,

6   its components, its parts, its cabinets to be in the 20-20

7   software, they have to pay 20-20 up to $100,000 for that right,

8   that privilege.  So that when the kitchen designers are sitting

9   there selling their kitchens to folks, those cabinets are in

10  the software, and those cabinets can be sold.

11       Well, Real View is providing that to the cabinet

12  companies for free.  They send the catalogs to Ukraine where at

13  much lower cost than if they used high-cost U.S. developers,

14  the catalogs are put into the software; and they've challenged

15  20-20 with respect to this very, very important part of the

16  kitchen design software market, the catalogs.  Is it wrong to

17  offer free catalog development to the catalog companies rather

18  than make them pay $100,000 to 20-20?  20-20 says it's unfair.

19       Another thing that 20-20 told you about is what are

20  called trade-ins, okay.  So Real View says, "If you're using

21  another professional kitchen design program, send us the

22  agreement, the contract for that, and we'll give you either a

23  very low discount or even a free copy of our software."  This

24  is called trying to get a foot in the market, trying to get a

25  toehold in the market when one company, 20-20, dominates the

b640cd02-c885-4fc7-b3a9-d98d257a8567

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

REAL VIEW, LLC,                          )
                                         )
             Plaintiff and               )
             Counterclaim Defendant      )
                                         )
        -VS-                             ) CA No. 07-12157-PBS
                                         ) Pages 3-1 – 3-126
20-20 DESIGN, INC., et al,               )
                                         )
             Defendants and              )
             Counterclaim Plaintiffs     )


JURY TRIAL – DAY THREE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 20, 2011, 9:42 a.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

Page 78

1  A.   No, not the user interface, no.

2  Q.   Do you have a business relationship with Real View or

3  ProKitchen?

4  A.   I do not.

5  Q.   Have you seen ProKitchen before?

6  A.   I have.

7  Q.   And when was the first time you saw ProKitchen?

8  A.   It would go back a couple years.  2007, 2008 was the first

9  time I was made of aware of it, but I probably didn't see it in

10  person for a few months after that.

11  Q.   And where did you first see it?

12  A.   I first saw it with a dealer.  I was actually made of

13  aware of it by some folks out in the field telling me that

14  there was a 20-20, for lack of a better term, "knock-off" out

15  there, and asking me what I knew about it and whether it was

16  actually related to us.

17  Q.   And when you first saw ProKitchen, what was your initial

18  reaction?

19  A.   I was amazed at just how similar it was to the 20-20 in

20  both the appearance and the functionality of doing things like

21  laying walls out and adding items to it.

22  Q.   And what did you do after you first saw ProKitchen?

23  A.   Reported it to 20-20's management team.

24  Q.   And have you also had a chance to operate ProKitchen?

25  A.   I have.  I've been provided a copy of it for court.

33579314-1b7b-4aa8-8c4d-cd0c0cb5c0fb

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS


REAL VIEW, LLC,                      )
                                     )
                Plaintiff and        )
                Counterclaim Defendant   )
                                     )
        -VS-                         ) CA No. 07-12157-PBS
                                     ) Pages 4-1 - 4-122
20-20 DESIGN, INC., et al,           )
                                     )
                Defendants and       )
                Counterclaim Plaintiffs  )
```

JURY TRIAL - DAY FOUR

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 24, 2011, 9:00 a.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

Page 10

1   A.   I can do e-mails and I can do 20-20.  I'm not computer

2   savvy.

3   Q.   And why have you continued to use 20-20 for the past

4   twelve years?

5   A.   It's just the best out there.  I'm used to it, and I like

6   the way it works.

7        THE COURT:  You have to pick up your voice so we can

8   all hear, okay?

9   Q.   And you mentioned that you've also had a chance to use

10  ProKitchen.  When did you first hear of ProKitchen software?

11  A.   About two years ago, almost three, I saw it at KBIS, which

12  is the Kitchen and Bath Industry Show.  I saw it in Chicago.

13  Q.   Was that in 2008 or so?

14  A.   No.  2009.

15  Q.   And did you ever consider using ProKitchen?

16  A.   Not at the time that I saw it.  It wasn't until the

17  beginning of '09 that I went to work for a new customer, a new

18  employer.  They had no software, and I knew that ProKitchen was

19  less money, and so I had to present to my employer, "There are

20  two out there that I know of.  I'm proficient with 20-20, but

21  because of the cost, let's look at ProKitchen."  So I called

22  them.

23  Q.   So you mentioned that you work for yourself for a company

24  called Danneman Designs.  Prior to you doing that, where did

25  you work?

Real View v. 20-20 – Jury Trial Day 4

1   A.   Allatoona Kitchen & Bath.  I was their senior kitchen and

2   bath designer.

3   Q.   And where is Allatoona Kitchen & Bath located?

4   A.   It's just north of Atlanta in Acworth, Georgia.

5   Q.   And when you just said that you were working at an

6   employer and considering purchasing kitchen design software,

7   was it while you were working at Allatoona Kitchen & Bath?

8   A.   Yes.  They didn't sell cabinetry until I came there.

9   Q.   So I believe you said that when you were considering the

10  purchase, you called ProKitchen?

11  A.   Yes, I did.

12  Q.   And who did you speak with?

13  A.   A fellow by the name of Chris Midgley.

14  Q.   And was he a ProKitchen salesperson?

15  A.   Yes.

16  Q.   And what did you discuss with him?

17  A.   The cost and how it worked and what were the terms.  He

18  offered to send me via e-mail a temporary trial download that I

19  could try.

20  Q.   And approximately how many times did you speak with

21  Mr. Midgley?

22  A.   Oh, gosh.  You see, I didn't try it when he first sent it.

23  I was very busy.  And he called and said, "Have you tried it?"

24  And I said, "I haven't had time."  I said, "It's timed out."

25  So he'd send me another one.  I was finally on the third one.

Real View v. 20-20 - Jury Trial Day 4

f7749ead-c907-40dd-bef4-3e638637b400

Page 12

1    I was very frustrated, and I -- and he said, "Well, just try

2    it," you know.  And I said, "I don't have time to read a

3    tutorial to start something all over again."  And he said,

4    "Just open it up and try it.  You'll recognize that it looks

5    like 20-20, and you'll be able to function right through it,"

6    and I did.

7    Q.   And did he send you a new trial version?

8    A.   Yes, he did.

9    Q.   And did you open it and load it?

10   A.   Yes, I did.

11   Q.   And what did you observe about the look of the program?

12   A.   Well, he was right, it did look like 20-20.  I was

13   actually able without any tutorial to put my lines in and start

14   placing cabinets, downloaded a catalog.  I did a lot of

15   complicated things without any tutorial.

16   Q.   Did Mr. Midgley say anything else about the 20-20 product

17   as compared with ProKitchen?

18   A.   Well, we mentioned that it was less expensive, quite a

19   bit, and that it was easier to use, and also that it wouldn't

20   crash like 20-20 does.

21   Q.   Did you understand what he meant by that?

22   A.   Yes.  If you overtax 20-20, it will crash.  I mean, it

23   will just freeze, and you'll lose your design.

24   Q.   And did he tell you what the price was for ProKitchen?

25   A.   Yes.

f7749ead-c907-40dd-bef4-3e638637b400

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

REAL VIEW, LLC,                    )
                                   )
              Plaintiff and        )
              Counterclaim Defendant   )
                                   )
        -VS-                       ) CA No. 07-12157-PBS
                                   ) Pages 5-1 - 5-111
20-20 DESIGN, INC., et al,         )
                                   )
              Defendants and       )
              Counterclaim Plaintiffs  )


              JURY TRIAL - DAY FIVE

        BEFORE THE HONORABLE PATTI B. SARIS
            UNITED STATES DISTRICT JUDGE




                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    January 25, 2011, 9:00 a.m.




              LEE A. MARZILLI
            OFFICIAL COURT REPORTER
        United States District Court
        1 Courthouse Way, Room 7200
            Boston, MA  02210
            (617)345-6787

42596eba-0ed4-4157-a065-9d0fee37674d

Page 70

1   video tutorials that you created?

2   A.   Yes, it was.

3   Q.   When did you first hear about ProKitchen?

4   A.   In 2007.

5   Q.   Can you tell me how you first heard about it.

6   A.   I received a phone call from a manufacturer who was asking

7   me if his 20-20 catalog that he has would work on ProKitchen.

8   Q.   Did he say whose program ProKitchen was?

9   A.   He assumed it was ours.

10   Q.   And what did you do?

11   A.   I told him I'd check it out; you know, there was a

12   possibility that we were branding it for a specific market

13   segment.  So I called sales because I was in product management

14   at that time.  I asked if they were branding this or talking to

15   anyone about using it in a different context.  No one knew what

16   I was talking about.  So I called the customer back and said

17   that it wasn't.  Then I did some research on what he was

18   talking about.

19   Q.   So the person who called you believed that the ProKitchen

20   software was a 20-20 product?

21   A.   It was his understanding that it was a light version of

22   20-20 Design, and that's why he was asking if his existing

23   catalog would work on it.

24   Q.   So did you actually end up seeing ProKitchen at some

25   point?

42596eba-0ed4-4157-a065-9d0fee37674d

1    confusion, which may get you over a directed verdict on it --

2    it likely does -- but I'm just having trouble.  It just will be

3    very complicated.

4         And the next issue is, on intentional interference,

5    are there going to be separate damages set across for these

6    twelve, you know, whatever customers you've specifically

7    identified?

8         MR. BLANK:  Mr. Hoffman is not going to testify on

9    that.

10        THE COURT:  So how will I do that?  I can't just say

11   everybody was because a fair number of them -- I mean, really,

12   the primary thrust of what most people are saying is, they were

13   getting killed by a knockoff product that was cheaper, not that

14   it was confusion.  Even this Georgia lady wasn't confused.  She

15   said it was a cheaper price, so --

16        MR. BLANK:  She called it ProKitchen.

17        THE COURT:  Right, but she wasn't confused.  She just

18   said it was a cheaper price.  So I'm trying to figure out

19   how -- are there dollar numbers that come in for the specific

20   customers you say were interfered with?

21        MR. BLANK:  We don't plan to do that.

22        THE COURT:  So if they only came back with intentional

23   interference and not copyright and not consumer confusion,

24   there's no way for them to divvy out the numbers for

25   specifically which customers were wooed away?

42596eba-0ed4-4157-a065-9d0fee37674d

1       MR. BLANK:  Well, this testimony identifies and

2   there's additional exhibits which identify customers that were

3   lost to ProKitchen.

4       THE COURT:  Yes, absolutely, but I'm just saying, is

5   there a damage number that comes with it somewhere?

6       MR. BLANK:  Well, I think the damages -- well, I think

7   the jury can assess them.  I don't have an expert.

8       THE COURT:  No, you can't.  You can't guess.  So I'm

9   just trying to figure this out right now.

10      MR. GESMER:  I know this doesn't deal with exactly

11  what you're saying, but we're going to file a motion for a

12  judgment as a matter of law on the trade dress, the intentional

13  interference.

14      THE COURT:  I don't know, I mean, I've been listening

15  with those in mind.  At this point I think I understand the

16  copyright case to the limits that this complicated area of the

17  law permits.  I mean, I sort of know where the gray areas are,

18  no pun intended, since gray is a big issue here.  But on the

19  trade dress, intentional interference issues, intentional

20  interference is simple to instruct on.  That's well known and

21  that's simple.  And the trade dress is just, as we've been

22  looking at the ABA model instructions and other cases, it just

23  turns out to be a hard area to instruct on.

24      MR. GESMER:  One issue is, under the statute, where

25  it's a nonregistered trade dress, they have a burden of proving

42596eba-0ed4-4157-a065-9d0fee37674d

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS


REAL VIEW, LLC,                        )
                                       )
                 Plaintiff and         )
                 Counterclaim Defendant)
                                       )
            -VS-                       ) CA No. 07-12157-PBS
                                       ) Pages 6-1 - 6-82
20-20 DESIGN, INC., et al,            )
                                       )
                 Defendants and        )
                 Counterclaim Plaintiffs)
```

JURY TRIAL - DAY SIX

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 26, 2011, 8:55 p.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    categories that are in the financial statements.  We don't

2    really have detailed business records for those, but I have

3    assumed that those are necessary things in order to make the

4    sale.  You certainly have to pay the sales commission.  You've

5    got to do product support if you're going to collect revenues

6    for support and services and so forth.  So that leaves me when

7    I deduct those with total profit of about $772,000.

8        Now, the company took that profit and plowed virtually all

9    of it back into the business, and we'll see that, but the

10   unjust enrichment I've calculated is fundamentally the

11   $772,000; and that of course assumes that the company's

12   revenues were only what's shown here, and, again, more than

13   half the licenses aren't shown.

14   Q.   Now, Mr. Hoffman, so I see you've deducted sales

15   commissions, product support, and product sale costs reported

16   to us by Real View.  What about other costs incurred by

17   Real View, such as dues and office supplies and subscriptions

18   and the like?

19   A.   Well, those things, at least in my view, are not directly

20   related in making the sale, things like recruiting expenses,

21   legal fees, a whole host of things.  The company plowed it back

22   in.  There's also substantial expenses being the transfer to

23   what appears to be the Ukraine, to the Ukrainian subsidiary.

24   We don't know what happens to that afterwards, but clearly

25   making transfers to the Ukraine would not appear to be an

1f6d279b-8ec2-45f6-91a8-2e88a91e0835

1    Undoubtedly they would have.  Did the price decrease help?

2    Sure it did.  Did I separate the two?  We don't have the data

3    to separate it, so I've left it all out.  I've assumed zero in

4    that period rather than try to get into the statistical

5    analysis that's undoable.

6    Q.   Okay, so your total lost profits from price erosion then

7    are what?

8    A.   $1,995,828, at least, plus everything else that could have

9    been done since the price drop.

10   Q.   Okay, and then your total damages -- well, I'll go back to

11   it in a sec.  And did you include any damages to 20-20's sales

12   or price erosion for any period before 2009?

13   A.   No, and if you go back to the -- I don't know if you can

14   go back to the earlier chart.  There we go.  No, there is no

15   price erosion during this entire period, absolutely nothing,

16   even though 20-20's sales are coming down, you know, it's at

17   least alleged that in part that's because Real View is on the

18   market, but there's no damages to 20-20 in my calculations

19   during that entire period at all.

20   Q.   All right.  And does 20-20 continue to incur lost profits

21   from price erosion?

22   A.   Yes, because if prices have been reduced and it continues

23   to sell at the reduced price, I'm sure if it could increase its

24   price it would.  We heard Ms. Boucher testify that they've

25   raised prices in the past, and that's always a good thing to do

Page 46

1   if you want to make more money.  But they certainly have not

2   been able to do that to date, and so they continue to lose

3   money as we sit here today as a result.

4   Q.   And so how much are the total damages from the alleged

5   wrongful acts of Real View?

6   A.   The total comes to $2,768,809, and, again, that's at

7   least, because we've got serious issues with the unjust

8   enrichment, financial statements not being right, and with the

9   price erosion, we've left a lot out.

10  Q.   Mr. Hoffman, just a final --

11          THE COURT:  What's the start period for that, just to

12  make that clear?

13          THE WITNESS:  The beginning period would be about

14  February of '06 when the first license sale was made.

15  Q.   Mr. Hoffman, is there any overlap or double counting when

16  you add the amount of unjust enrichment to the amount of price

17  erosion?

18  A.   No.  The unjust enrichment reflects transactions that

19  Real View made, sales that they made.  The price erosion

20  reflects sales that 20-20 made, so that there's no one

21  transaction that's in both piles.  Either one company made it

22  or the other, so there should be no overlap and no double

23  counting here at all.

24          MR. BLANK:  I have no further questions, your Honor.

25          THE COURT:  Thank you.

Page 56

1   A.   Right, then 294 and then 247.

2   Q.   I want to just try a little bit of arithmetic with you so

3   we can understand exactly what happened to 20-20's revenues as

4   a result of this, and I won't go past those three quarters to

5   keep it simple.

6          MR. GESMER:  Please switch back to the ELMO now.  I

7   may ask you to go back and forth.

8          THE WITNESS:  I think we have a question.

9          THE COURT:  Oh, you have a question.  Yes, all right.

10         A JUROR:  I don't know if you can switch back to that,

11  but I was going to say --

12         THE COURT:  Could you get us back to that other

13  document?

14         A JUROR:  We were following along on that document --

15         THE COURT:  Well, can we get back on that document so

16  he can point to what his issue is?

17         A JUROR:  It wasn't actually.  I was asking to switch

18  back to the one on the machine rather than the computer screen

19  version because it was a little bit bigger, and I know one of

20  us today is having some issues seeing very small numbers on the

21  screen.

22         A JUROR:  Because he left his glasses home.

23         (Laughter.)

24         THE COURT:  Been there, done that.  So let me just --

25  Q.   Okay, so we'll go back to the ELMO, and as I was saying --

Real View v. 20-20 - Jury Trial Day 6

1f6d279b-8ec2-45f6-91a8-2e88a91e0835

Page 57

1          THE COURT:  I'm trying to figure out, isn't there a

2     way of even zooming it in even closer?  There is.  There's

3     something that says zoom?

4          MR. GESMER:  Yes, I can, your Honor.  The more I zoom,

5     the less you see of the page, but I can zoom quite a bit.

6          THE COURT:  Okay.

7          MR. GESMER:  Okay?

8     Q.   So just to go back to this, in the three quarters before

9     the price cut, the average sales per quarter was 166?

10    A.   That's correct.

11    Q.   Then in the three quarters after the price cut, the unit

12    sales were 510, then 292, then 282?

13    A.   That's correct.

14    Q.   All right.  So, now, let me try this and see if we can all

15    understand exactly what happened.  In the three quarters before

16    the price cut, so I'll say three quarters -- I apologize for my

17    handwriting, it is terrible -- the three quarters times 166

18    units per quarter --

19          THE COURT:  What is that thing on the left?

20          (Laughter.)

21          MR. GESMER:  I apologize, your Honor.  I have very,

22    very poor handwriting, and I'm stuck with it, and I'm very

23    sorry.  I will translate.  My daughter never ceases to enjoy

24    making fun of my handwriting.  It's one of her great joys in

25    life.

Real View v. 20-20 - Jury Trial Day 6

1f6d279b-8ec2-45f6-91a8-2e88a91e0835

1        THE COURT:  I see where I can now make it out.

2    Q.   So it says three quarters times 166 units per quarter,

3    times $4,195 per sale -- and I did the arithmetic before I

4    stood up here -- equals $2,089,000, and I rounded the last

5    three zeros, but approximately $2,089,000 in sales.  Does that

6    thus far appear to be correct arithmetic, Mr. Hoffman?  The

7    three preceding quarters times 166 per quarter --

8        THE COURT:  Well, we'll take your word for it.

9    A.   Yeah, okay, I'll check it, and I don't have a calculator.

10   Q.   Okay, take my word for it, taking my word for it --

11   A.   I'll check it.

12   Q.   -- for now --

13       THE COURT:  Take his word for it.

14   Q.   Then in the three following quarters, the three quarters

15   following the price cut, we have sales of 510, 292, and 282.

16   So in those three quarters, we have total sales of 1,084 units.

17   Taking my word for the arithmetic, have I -- well, you

18   understand I've added up the three quarters after the price

19   cut, the unit sales in those three quarters, correct?

20   A.   Yeah, okay, I think you have.

21       THE COURT:  Units sold during that spike, is that

22   right?

23       MR. GESMER:  During the three quarters following the

24   price cut.

25       THE COURT:  The spike in sales.

Real View v. 20-20 - Jury Trial Day 6

1          MR. GESMER:  The spike and then the leveling off.

2    Q.   Then if we multiply the 1,084 units times the sale price,

3    $1,995 per unit, the product is $2,162,500.  I'll ask you to

4    take my word on that arithmetic, but it was calculated by a

5    computer, so it must be right.

6    A.   Well, it appears to be wrong and radically wrong.  I'm

7    looking up above at your four times 166, and four times 16 is

8    64.  I don't know how you get the first digit to be a 2.

9    Q.   I'm sorry, Mr. Hoffman, please say that again.

10   A.   Well, as I understand what you've done, you've taken the

11   166 units --

12   Q.   184.

13   A.   You have 166 units times $4,000 apiece to get to

14   $2 million.  Is that what you did?

15          THE COURT:  Times three.

16          THE WITNESS:  Times three.  Okay, that will get you

17   there.  Good.

18   Q.   Okay.  Lawyers go to law school to avoid math, so I'm on

19   very thin ice here, and I hope I didn't make a mistake.  And

20   then the bottom part shows what actual revenue 20-20 -- what

21   actual money came in in the three quarters following the price

22   cut, correct?

23   A.   That's correct.

24   Q.   All right, now, what you have done is, you have said:

25   Let's take the 166 units per quarter, and let's charge

Real View v. 20-20 - Jury Trial Day 6

Page 60

1   Real View the dollar amount of the price cut; that is, the

2   number of sales during that period of time times the

3   approximately $2,000 price cut.  But why have you not also

4   added back in the profit that 20-20 made as a result of the

5   price cut and as a result of the spike in unit prices?

6   A.   Well, again, it's because we cannot decouple -- you're

7   talking about units above the line, that they sold 510 units in

8   the first quarter, for example; some of that because of the

9   price cut, some of it because of seasonality -- the second

10  quarter is always higher -- some of it because the trade show

11  happens then, some of it because there's pent-up demand, some

12  of it because they've improved the software, some of it because

13  they've done other marketing things, a whole lot of things

14  going on there.  Some of it, the economy is beginning to get a

15  little bit better.  And we can't break out the impact of the

16  price cut from all those other things.

17      What we can see is that as a result of dropping prices and

18  doing all those other things and having the economy get a

19  little better, the company was able to hold its own on revenue,

20  okay?  That's it.  But the first 166 units, no question, could

21  have sold them for $4,200 apiece.  They didn't sell them for

22  $4,200 apiece; sold them for $2,000.  They lost money on those.

23  And then we could talk about how much additional damage is in

24  the other units, the rest of the 510, for example.  But I've

25  left all that out purposely because the damages would be

Real View v. 20-20 - Jury Trial Day 6

1f6d279b-8ec2-45f6-91a8-2e88a91e0835

Page 61

1   higher.

2   Q.   In your analysis, you've given Real View no benefit of

3   this              You've assumed that Real View must pay the

4   price for all of the price cut, but Real View gets none of the

5   benefit of the increased sales and profits, correct?

6   A.   No.  There's no benefit, no benefit at all from having

7   dropped the price on those 166 units.  You know, Real View did

8   not do 20-20 a favor by making them drop the price on those.

9   Now, did they do them a favor on making them drop the price on

10  the others?  I don't think so.  You know, the company 20-20

11  sure didn't want to drop its price, okay?

12  Q.   Mr. Hoffman, you've used some pretty fancy terminology in

13  your testimony, regression analysis and some of that real, you

14  know, college advanced statistic terms, but isn't it true that

15  20-20 basically made as much or more in sales in the three

16  quarters after they dropped their price as they made in the

17  three quarters before they dropped their price?  Isn't that

18  just a simple, plain fact of arithmetic?

19  A.   No.  They did a lot of things to hold themselves together,

20  and they clearly lost money on those 166 units every quarter,

21  clearly.  And they may have damages on the others as well,

22  okay?  But they did not want to drop their price.  Nobody did

23  them any favors or benefits by getting them to drop their

24  price.  All things being equal, you don't cut your price in

25  half.

Page 62

1   Q.   But 20-20 was holding steady at about 166 units per

2   quarter in the three quarters, the nine months before it cut

3   its price, correct?

4   A.   That's correct, at $4,200 a unit.

5   Q.   It could have just kept it at that price, and it could

6   have kept selling 166 units a quarter for $4,200,

7   approximately, and life would have gone on, and there would be

8   no damages that you would be asserting against Real View,

9   correct?

10  A.   Oh, if there had been no price erosion, if they hadn't

11  been forced to drop the price, you're absolutely right:  If

12  there was no price erosion, there would be no price erosion

13  damages.  But there was price erosion.

14  Q.   I'm asking you, they could have just kept selling at that

15  price just as they had at those three quarters?  Nothing

16  happened during those three quarters that forced them to cut

17  their price.  They were holding steady at 166 units a quarter

18  for nine months before they cut their price.

19  A.   Right, but that was substantially less than what their

20  sales had been before, and they were faced with a competitor,

21  who we are assuming should not have been on the market, that

22  was selling what is asserted to be a virtually identical

23  product for less than half the price.  We saw it was $1,495.

24  And so they felt they had to do something by virtue of that

25  competitor who shouldn't have been there.  And that's price

Real View v. 20-20 - Jury Trial Day 6

1f6d279b-8ec2-45f6-91a8-2e88a91e0835

Page 63

1    erosion.

2    Q.   And that assumption that you just expressed is based on

3    Ms. Boucher's testimony, correct?

4    A.   It's based on the testimony of management that that's why

5    they did it, and it's based on the observation they didn't have

6    to do it in Europe, and they didn't have to do it with the

7    other 77 percent of the business.

8         THE COURT:  So let me ask you, did you award damages

9    for those three quarters where there was a spike?

10        THE WITNESS:  Only on the first 166 units, not on the

11   rest of the 510.  So if you take the difference between 166 and

12   the 510, we say, well, some of those additional sales were made

13   because -- and maybe a lot of them were made because the price

14   went down, but not all of them.  Some of them were made to

15   people who would have bought it at $4,200.

16        THE COURT:  Just to understand, some of your damage

17   figure includes the first 166 for the three quarters where

18   there was a spike?

19        THE WITNESS:  Yes.  All the way across it's just 166.

20   So everything above 166 in the spike, no damages at all.

21   Q.   And you don't credit Real View at all for those profits

22   that resulted from the spike?

23   A.   I don't credit Real View for having done a favor to

24   20-20's economics by making them drop the price in half, no.

25   There is no benefit, to the best of my understanding.

1    52 percent price cut?

2    A.   No, because I didn't make the 52 percent price cut, okay.

3    The management of 20-20 made it.  I've simply calculated the

4    damages that they experienced because of that, and I have

5    assumed that if they could have kept the prices higher, they

6    sure would have kept the prices higher.  They try to raise

7    their price whenever they can.  They don't try to drop their

8    price whenever they can.  And, yes, I did an in-depth analysis,

9    and you'll see that at the back of my reports.  There's a long

10   length of all the documents I reviewed, all the testimony I

11   reviewed.  It's in my reports.  So I did the analysis.  I've

12   reviewed the documents.

13          MR. GESMER:  Your Honor, I'm not going to be able to

14   conclude Mr. Hoffman today.  I see it's --

15          THE COURT:  Well, how much longer do you have?

16          MR. GESMER:  Maybe ten or fifteen minutes.

17          THE COURT:  Well, go for it.

18          MR. GESMER:  All right.

19          THE COURT:  Well, let me ask this.  Mr. Alba points

20   out, will there be much redirect?  I'm just worried we're going

21   to lose tomorrow as a court day, so I'm just sort of thinking

22   we should finish this witness if we can possibly do it.  So

23   will you have much on redirect?

24          MR. BLANK:  So far, no.

25          THE COURT:  So I'll go till 1:15, and then hopefully

Real View v. 20-20 - Jury Trial Day 6

Page 81

1      So what would you do?  If you were to say, well, they

2  lost X on the amount of the price drop but they gained X on the

3  amount of the additional sales, it looked roughly as if to

4  negative out the problem in those three months anyway.

5      MR. BLANK:  But if the only thing that happened was

6  the price drop, it would be different, but there were other

7  things happening at the time.

8      THE COURT:  Maybe, but don't forget, 20-20 is a

9  monopolist.  I mean, when all is said and done, they have 85 to

10  90 percent of the market share.  Under any definition of

11  monopoly, they had it.  So it just could -- I don't know, is it

12  true that 90 percent of their price came in -- 90 percent was

13  profit?  I mean, usually it's 10 percent is profit.

14      MR. BLANK:  No.  I mean, and we're not talking

15  about -- we're talking about the -- when you drop the price

16  from $4,200 to $2,000 --

17      THE COURT:  It's going to be a spike in sales.  It's

18  Economics 101 from college.  I mean, sure, the price goes down,

19  the sales go up.  I mean, that's just --

20      MR. BLANK:  But the profit -- I mean, it doesn't cost

21  you any less, except for the sales commission, it doesn't cost

22  you any less to sell the product.  You're not slashing people's

23  salaries at the same time.  You're not --

24      THE COURT:  You took Ec 1, didn't you, wherever you

25  went to college?  When the price goes down, right --

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

REAL VIEW, LLC,                         )
                                        )
              Plaintiff and             )
              Counterclaim Defendant    )
                                        )
        -VS-                            ) CA No. 07-12157-PBS
                                        ) Pages 7-1 - 7-135
20-20 DESIGN, INC., et al,              )
                                        )
              Defendants and            )
              Counterclaim Plaintiffs   )


JURY TRIAL - DAY SEVEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE



United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 28, 2011, 9:12 a.m.



LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

324ef62a-1a08-4272-8588-4bf7dc14b54c

1          (Defendant Exhibit 336 received in evidence.)

2     Q.    How do you typically sell ProKitchen?

3     A.    On a day-to-day basis, it is sold via Internet and

4     telephone marketing.

5     Q.    And how many phone calls do you typically make before a

6     customer purchases ProKitchen?

7     A.    Typically you're looking at, you know, ten to twelve.  It

8     could go up to as many as twenty.

9     Q.    And over what period of time?

10    A.    Two months to, you know, three months sometimes, you know,

11    you work with clients.

12    Q.    Do you offer a free trial of ProKitchen?

13    A.    To everyone, yes.  Yes, ma'am.

14    Q.    And how often does a customer use the free trial before

15    they decide to purchase?

16          MR. BLANK:  Objection.

17          THE COURT:  Overruled.

18    A.    Always.  Always send out a free trial to my customers.

19    Q.    Have you ever had a customer express any confusion to you

20    about the similarity between ProKitchen and 20-20?

21    A.    Not to me, no.

22    Q.    Has a customer ever told you that ProKitchen is the same

23    as 20-20?

24          MR. BLANK:  Objection.

25          THE COURT:  Overruled.  I'll allow that for state of

324ef62a-1a08-4272-8588-4bf7dc14b54c

Page 43

1    A.    Uhm, the -- are you referring to the Showroom graphics?

2    Q.    Yes.

3    A.    Uhm, if it came out -- because I was using 20-20, you

4    know, up until 2008?  Does that help?

5    Q.    Well, I don't know.  I'm just asking you, do you recall

6    one way or the other?

7    A.    I never bought the Showroom modular for my 20-20, so I did

8    not use the Showroom module.  The graphics I'm referring to is

9    the graphics within the program itself.

10   Q.    And did the 20-20 Design program that you used have

11   graphics?

12   A.    Yes, it did have graphics.

13           MR. BLANK:  Nothing further.

14           THE COURT:  Okay, thank you very much.  I hope you

15   enjoyed the snow.  You don't get much of it from where you're

16   from, huh?

17           THE WITNESS:  No, I do not.

18           THE COURT:  We don't get this much here usually

19   either.

20           (Witness excused.)

21           THE COURT:  Your next witness.

22           MR. GESMER:  Yes, your Honor, I'd like to read two

23   exhibits into evidence, and I'd like to show them to the jury

24   on the ELMO as well.

25           THE COURT:  Sure.

Real View v. 20-20 - Jury Trial Day 7

324ef62a-1a08-4272-8588-4bf7dc14b54c

Page 44

1           MR. GESMER:  This will be 20-20 Exhibit 101 and

2    ProKitchen Exhibit 338.

3           This is Plaintiff Exhibit or 20-20 Exhibit 101.  I'll

4    read from it now:  "Inertia is a powerful force in all human

5    affairs, but more so in software than most -- once a software

6    company establishes a market, its users are reluctant to switch

7    to a new program if it requires 'relearning' the user

8    interface.  Real View knew that to succeed it would have to

9    convert users of 20-20 Design to its product.  Therefore, it

10   made ProKitchen as close to 20-20 Design as possible."

11          Now I'd like to read from Real View Exhibit 338.  This

12   is the first page with the caption of that document, "Pretrial

13   Memorandum."

14          "20-20 is, as it proudly asserts, the world's leading

15   provider of CAD software for the design industry.  Real View is

16   the start-up new-comer.  Inertia is a powerful force in all

17   human affairs, but more so in software than most -- once a

18   software company establishes a market, its users are reluctant

19   to switch to a new program if it requires 'relearning' the user

20   interface.  Real View knew that to succeed it would have to

21   convert users of 20-20 Design to its product.  Therefore, it

22   made ProKitchen as close to 20-20 Design as possible, in order

23   to make the transition as easy as possible for those 20-20

24   users who were open to converting to a program that (Real View

25   asserts) was faster, more stable, had superior features, and

324ef62a-1a08-4272-8588-4bf7dc14b54c

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS


REAL VIEW, LLC,                      )
                                     )
              Plaintiff and          )
              Counterclaim Defendant )
                                     )
         -VS-                        ) CA No. 07-12157-PBS
                                     ) Pages 8-1 - 8-143
20-20 DESIGN, INC., et al,           )
                                     )
              Defendants and         )
              Counterclaim Plaintiffs )




                   JURY TRIAL - DAY EIGHT

              BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT JUDGE




                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         January 31, 2011, 9:15 a.m.
```

```
                    LEE A. MARZILLI
                  OFFICIAL COURT REPORTER
                United States District Court
                1 Courthouse Way, Room 7200
                    Boston, MA  02210
                      (617)345-6787
```

Page 100

1  thought it was a valid point to show that this is so common

2  that it's kind of beyond any -- should be beyond any

3  consideration.

4  Q.   Mr. Zeldin, you've heard testimony about 20-20's position

5  in the market, and you've given testimony about 20-20's

6  position in the market, correct?

7  A.   Yes, I did.

8  Q.   And it's your understanding and testimony that 20-20 is

9  the market leader, correct?

10 A.   In the kitchen and bath design, yes, it is the market --

11 not market leader.  It is the market -- dominant market player,

12 dominant software in the market.

13 Q.   And that 20-20 has been in that position for many years,

14 correct?

15 A.   In the United States, yes.

16 Q.   And is it your view that just because 20-20 is big or

17 successful, that you could copy from 20-20?

18 A.   My view, that I can copy from anyone.  It's my federal

19 right to copy features, functionalities.  It is -- it is --

20 this position is valid.  It was essentially confirmed by the

21 Supreme Court --

22       THE COURT:  No, no.  I'll give the legal instructions.

23 A.   Okay.  But, anyway, if people wouldn't copy, they wouldn't

24 drive carriage.  They --

25       THE COURT:  They wouldn't drive what?

687c0d88-d426-4380-a3b8-378ece383d7a

Page 117

1    bought -- I rented --

2    Q.   Let's stick with 20-20.  You know, you can talk about

3    other softwares, but let's stick with 20-20.  So you sat down

4    side by side with him.  Was it in his house?

5    A.   Yes.

6    Q.   And did he ever send you an electronic copy of it?

7    A.   No.

8    Q.   Did you ask him to do that?

9    A.   No.

10   Q.   And did you select things from 20-20 Design that you

11   wanted to copy into ProKitchen?

12   A.   I would object to the word "copy" here.

13   Q.   Why?

14        THE COURT:  I didn't hear you.

15        MR. BLANK:  He said he would object to the word

16   "copy."

17        THE COURT:  What word would you use?

18        THE WITNESS:  I would use to identify some features

19   which should be included into our software.

20   Q.   Now, was this at a time when you also thought it was okay

21   to copy?

22   A.   I think why?  I don't think change my mind.  I still think

23   that it's okay to copy it.

24   Q.   Okay.  So where is that -- so you looked at things that

25   you liked.  You looked at things that you wanted to put into

687c0d88-d426-4380-a3b8-378ece383d7a

1                     UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4    REAL VIEW, LLC,                     )
                                         )
5           Plaintiff and               )
            Counterclaim Defendant      )
6                                        )  No. 1:07-cv-12157-PBS
                                         )
7    vs.                                 )
                                         )
8                                        )
     20-20 DESIGN, INC., ET AL.,         )
9                                        )
            Defendants and              )
10          Counterclaim Plaintiffs     )
                                         )
11

12

     BEFORE:  THE HONORABLE PATTI B. SARIS
13

14

                          JURY TRIAL - DAY TEN
15

16

17

            John Joseph Moakley United States Courthouse
18                        Courtroom No. 19
                         One Courthouse Way
19                       Boston, MA 02210
                     Thursday, February 3, 2010
20                          8:15 a.m.

21

22

            Brenda K. Hancock, RMR, CRR
23              Official Court Reporter
        John Joseph Moakley United States Courthouse
24                  One Courthouse Way
                     Boston, MA 02210
25                    (617)439-3214

CONFIDENTIAL

1

1     Volume:  I       Pages:  1-153   Exhibits:  A, B

2            UNITED STATES DISTRICT COURT

3            DISTRICT OF MASSACHUSETTS

4     Civil Action No. 07-12157

5     - - - - - - - - - - - - - - - - - - - - - - - x

6     REAL VIEW, LLC,

7           Plaintiff,

8        v.

9     20-20 TECHNOLOGIES, INC.,

10          Defendant.

11    - - - - - - - - - - - - - - - - - - - - - - - x

12    20-20 TECHNOLOGIES, INC.,

13          Counterclaim Plaintiff

14       v.

15    REAL VIEW, LLC,

16          Counterclaim Defendant, and

17    BORIS ZELDIN and LEONID PERLOV,

18          Additional Party Defendants in Counterclaim

19    - - - - - - - - - - - - - - - - - - - - - - - x

20         VIDEOTAPED DEPOSITION OF MANON BOUCHER

21    Friday, January 14, 2011, 12:30 p.m. to 4:06 p.m.

22              DECHERT, INC.

23      200 Clarendon Street, Boston, Massachusetts

24       Reporter:  Marianne R. Wharram, CSR/RPR

CONFIDENTIAL

65

14:11:15    1    price for the software?

14:11:16    2        A.   No.

14:11:16    3        Q.   Except I think as you mentioned an

14:11:20    4    occasional --

14:11:21    5        A.   Occasional --

14:11:21    6             MR. GESMER:   Objection.   Objection,

14:11:22    7    leading.

14:11:25    8        Q.   (BY MR. BLANK)   I'm sorry.   Okay.

14:11:25    9        A.   Yes, occasionally.   Every time we went to a

14:11:26   10    show --

14:11:26   11        Q.   I have to place a question.   Prior to April

14:11:29   12    of 2009, when you testified you cut the price by

14:11:32   13    more than 50 percent, did you -- were there

14:11:36   14    previous occasions where you had cut the price of

14:11:38   15    the software?

14:11:38   16        A.   Yes.

14:11:39   17        Q.   And can you describe those previous

14:11:41   18    occasions?

14:11:41   19        A.   There were show promotions, so we always

14:11:45   20    offered a discount of around ten percent or $500.

14:11:48   21        Q.   And how long did those promotions last?

14:11:50   22        A.   Around a month or two maximum.

14:11:56   23        Q.   Now, were you involved in the decision to

14:11:58   24    lower the price from 4,195 to 1,995?

CONFIDENTIAL

66

| 14:12:03 | 1 | A.   Yes, I was. |

14:12:03     1       A.   Yes, I was.

14:12:04     2       Q.   And can you tell me how that decision was

14:12:06     3   made?

14:12:06     4       A.   There was a lot of meetings and

14:12:10     5   discussions, and we had -- and we came up with --

14:12:14     6   we had no other options than to cut our prices in

14:12:17     7   half because ProKitchen was selling the same

14:12:19     8   software at half the price.

14:12:21     9       Q.   So why did you decide to drop the price?

14:12:25    10       A.   Because ProKitchen was selling at half the

14:12:28    11   price and it's the same software.

14:12:30    12       Q.   Did -- were there any other reasons you

14:12:34    13   lowered the price?

14:12:35    14       A.   No.

14:12:35    15       Q.   And how have you implemented this price

14:12:39    16   cut?

14:12:40    17       A.   We've advertised it at KBIS as a show

14:12:46    18   discount.

14:12:46    19       Q.   And this was for the 2009 spring KBIS show?

14:12:50    20       A.   Yes.

14:12:50    21       Q.   Now, initially, was it intended to be a

14:12:58    22   permanent price cut?

14:12:59    23       A.   No, no.

14:13:00    24       Q.   What was it initially intended to be?

CONFIDENTIAL

124

| | | |
|---|---|---|
| 15:32:30 | 1 | with Mr. Smith? |
| 15:32:31 | 2 |     A.  I don't recall if I did with Mr. Smith. |
| 15:32:36 | 3 |     Q.  This response reads -- I'm going to read |
| 15:32:39 | 4 | this in its entirety. |
| 15:32:41 | 5 |         MR. BLANK:  Which response? |
| 15:32:42 | 6 |         MR. GESMER:  Response number nine, page |
| 15:32:45 | 7 | 11 of 20-20's interrogatory responses to Real View. |
| 15:32:47 | 8 |     Q.  (BY MR. GESMER)  Again, the question was, |
| 15:32:50 | 9 | identify every incident of consumer confusion of |
| 15:32:52 | 10 | which you are aware that resulted from Real View's |
| 15:32:55 | 11 | alleged copying of the 20-20 Design product.  And |
| 15:32:58 | 12 | then the response is, 20-20 objects to this request |
| 15:33:03 | 13 | based on objections 1 through 5 supra. |
| 15:33:07 | 14 | Notwithstanding and subject to the foregoing |
| 15:33:10 | 15 | objections, 20-20 states that discovery is still |
| 15:33:13 | 16 | pending, but for example, 20-20 received a call |
| 15:33:18 | 17 | from a customer experiencing technical difficulties |
| 15:33:22 | 18 | with a software product it had purchased, firmly |
| 15:33:27 | 19 | believing it was 20-20 Design, while in fact, it |
| 15:33:30 | 20 | had purchased ProKitchen.  Did I read that |
| 15:33:33 | 21 | correctly? |
| 15:33:34 | 22 |     A.  Yes. |
| 15:33:34 | 23 |     Q.  Do you know who that customer was? |
| 15:33:38 | 24 |     A.  It sounds like Nu Face, unless it's another |

CONFIDENTIAL

125

15:33:43    1    one.  There's no name mentioned here.

15:33:45    2         Q.  Well, are you aware of any other instance

15:33:47    3    of consumer confusion other than Nu Face?

15:33:52    4         A.  Confusion, no.

15:33:53    5         Q.  Okay.  Now, you can set this aside, please.

15:33:58    6    Give this back to me.  Now, I'm going to ask you to

15:34:17    7    look at some more exhibits, but I'm hoping that --

15:34:25    8    well, I think I have copies of them for you.  These

15:34:42    9    are some exhibits that I copied before coming here

15:34:44    10    today.

15:34:45    11              MR. GESMER:  And these are the

15:34:49    12    exhibits, Tim, that you gave us in the spring that

15:34:51    13    had the Post-It notes on them, so we put our own

15:34:55    14    stickers on them.

15:34:57    15              MR. BLANK:  That's fine.  If you just

15:34:59    16    tell me what numbers they are --

15:35:00    17              MR. GESMER:  I can do that.

15:35:00    18              MR. BLANK:  -- I can have them at the

15:35:02    19    ready.

15:35:02    20              MR. GESMER:  I will do that.

15:35:03    21              MR. BLANK:  Are they our -- are they

15:35:05    22    our exhibits?

15:35:06    23              MR. GESMER:  Yes, these would be your

15:35:08    24    exhibits.