UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
REAL VIEW, LLC.,               )
                Plaintiff and  )
                Counterclaim   )
                Defendant      )
                               )
        v.                     )   CIVIL ACTION NO. 07-12157-PBS
                               )
20-20 TECHNOLOGIES, INC.,      )
                Defendant and  )
                Counterclaim   )
                Plaintiff      )
                               )
        v.                     )
                               )
BORIS ZELDIN and LEONID PERLOV,)
                Counterclaim   )
                Defendants     )
                               )
_____)
```

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

June 9, 2011

Saris, U.S.D.J.

This case is about computer-aided design programs for home kitchens. After a ten-day trial, a jury found that Real View, LLC, Boris Zeldin and Leonid Perlov, in designing ProKitchen 2.0 and 3.0, were not liable for infringement of 20-20 Technologies' copyright in 20-20 Design (versions 6.1, 6.4 or 8.1), a similar program. The jury also found Real View not liable on 20-20's claims of trade dress infringement under § 43(a) of the Lanham Act and common law interference with contract. However, the jury

1

awarded 20-20 $1,370,590 in damages for Real View's admittedly illegal download of 20-20 Design version 6.1, which Real View relied upon in developing its competing program. The Court reserved for itself 20-20's claim that Real View violated M.G.L. c. 93A, § 11, which the Court now decides based upon the evidence presented at trial. The Court finds that 20-20 has failed to prove that Real View violated Chapter 93A.

## BACKGROUND

In 1999, Zeldin and Perlov incorporated Real View, LLC, a small software company, in Waltham, Massachusetts. (Trial Tr. Day 7, 8:16-17.) The company has never received financing from any outside source, and has relied solely on Zeldin and Perlov's investment of personal funds. (Id. at 53:8-15.) At first, Real View focused generally on creating software that displayed realistic-looking three-dimensional images of objects using Java graphics technology. (Id. at 53-54.) Early in its existence, the company designed a program that provided three-dimensional images of rooms and allowed users to change and reposition furniture and other elements of the room while also allowing them to rotate the image in order to see it from various perspectives. (Id. at 58.) At some point in the early 2000s, Real View decided to focus its efforts on designing this same type of computer assisted design (CAD) software for the kitchen and bath design industry. (Trial Tr. Day 8, 108-09.) It understood that 20-20, and its software

program 20-20 Design, were the major chefs in the kitchen. (Id.)
In order to compete, Real View established a business model that
involved giving away its software licenses for free to
professionals and then charging fees for customer support and
catalogs of kitchen furnishings that users could browse within
the design program. (Id.)  This was in contrast to 20-20, which
charged around $4,000 for each license of its 20-20 Design
software. (Id.; see also Def.'s Ex. 210 (in an email to a kitchen
design professional from May 2003, Perlov wrote, "At the time
being we are developing an innovative 3-D kitchen and bath
professional planner. . . . After finishing development Real View
is planning to provide [the program] free to all kitchen and bath
business professionals." (emphasis in original).)  Even when Real
View introduced a fee, it gave away free licenses to users of
other programs, including 20-20 Design. (Pl.'s Exs. 76, 80.)

Real View also believed, however, that in order to compete
with 20-20, it needed to mimic 20-20 Design's user interface,
including both the appearance of the program on the screen and
the mechanisms for manipulating the program. (Trial Tr. Day 8,
115.)  In this way, users would not need to "learn [a] new
program from scratch" if they decided to switch from 20-20 Design
to Real View's new competitor product. (Id. at 115:23-25.)
Toward this end, at some point in 2003 or 2004,[1] Real View,

_____

[1]    At trial, Zeldin testified that the download of 20-20
software occurred in April 2004, after Zeldin and Perlov became

3

through Perlov, illegally-downloaded a copy of 20-20 Design version 6.1 off the internet site eDonkey.com. (Pl.'s Ex. 101.) Real View also viewed a number of video tutorials for 20-20 Design users that were available on the internet. (Pl.'s Ex. 100.) In the timeframe at issue here, the videos, which were not introduced as evidence in this case, depicted the operation of 20-20 Design versions 6.1 and 6.4 and were created by 20-20 employee William Smith ("Smith"). (Trial Tr. Day 5, 69:1-5.) These videos were Zeldin and Perlov's primary source of information concerning 20-20 Design. (Pl.'s Ex. 100.)

The source of the video tutorials is less clear than the source of the illegally downloaded software. Smith testified that these videos were only available by authorized users of the software and could only be reached within a password-protected section of 20-20's website. (Trial Tr. Day 5, 69:5-15.) He also testified that he frequently monitored the internet for anything related to 20-20 Design software and that, to his knowledge, these videos were not freely available on the internet outside of 20-20's website. (Id. at 87.) It is not clear how Zeldin and Perlov gained access to these videos, as Zeldin did not provide an explanation during his testimony and Perlov did not testify at

---

acquainted with the software at an industry show in Chicago in March 2004. (Trial Tr. Day 8:113-14.) This testimony conflicts with various submissions from Real View stating that the download occurred in 2003. (Id. at 112-13.) The Court need not decide when the download occurred as this issue does not have an impact on either liability or damages.

trial.  But, given the fact that Zeldin and Perlov never paid a license fee for their use of 20-20 Design, and Smith's credible testimony that these videos were not available outside of the 20-20 website, it is likely that Real View, through Perlov, somehow accessed the password-protected area of the 20-20 site.  There is not enough evidence in the record, however, for the Court to determine how Real View bypassed the password protections.

After downloading 20-20 Design and the video tutorials, Perlov and Zeldin studied the software for hours to learn about 20-20 Design's graphics and how users functioned within its interface. (Trial Tr. Day 8, 115:16-19.)  Real View, according to its own admissions, then sought to design a copy-CAD program that would be as close to "20-20 Design as possible." (Pl.'s Ex. 101.) This would allow 20-20 users to easily transition to Real View's product.  Real View's efforts to target 20-20 customers by providing a close analogue to 20-20 Design are also evident in ads Real View published in kitchen and bath design magazines seeking sales representatives who had experience with "2020 Design and/or Planit [another kitchen and bath CAD competitor]." (See Pl.'s Exs. 90-94.)

Shortly after production of ProKitchen, Real View also pursued an advertising and marketing campaign that was intended to unseat 20-20 from its perch at the top of the kitchen CAD industry.  20-20 argues that this strategy involved a deliberate

effort to mimic 20-20's marketing scheme and deceive consumers
about ProKitchen and 20-20 Design.  For example, Real View
allegedly published a marketing document that noted "nine
reasons" to switch to ProKitchen from 20-20 Design shortly after
20-20 produced marketing materials stating that there were "nine
reasons" to upgrade to 20-20 Design version 9.0. (Boucher Dep.
49:2-5.)  Real View also allegedly imitated 20-20's strategy of
inviting manufacturer clients to live streaming web events, and
advertised a number of newly-added ProKitchen features not long
after 20-20 incorporated similar features into its own software.
(Id. at 46-49.)

Finally, in June 2010, Real View sent an "email blast to
5,000 customers." (Trial Tr. Day 9, 34:15.)  Like prior
advertisements, the email invited customers of other products to
"[s]witch [their current] Professional Design Software for
ProKitchen at no license cost." (Pl.'s Ex. 81.)  It also warned
customers that "[b]efore purchasing any design software, please
make sure that your security bundle is not going to expire in a
year. . . . Don't let your software vendor steal your permanent
license by expiring the security bundle ask an advice [sic] from
your legal counsel." (Id.)  When confronted with this document at
trial, Zeldin explained that Real View had "received a number of
requests from different users, Chief Architect, AutoCAD, and 20-
20, that some of the security bundles did expire, and I think we

overreacted." (Trial Tr. Day 9, 35:9-11.)  He explained that
though he believed the email was "factually correct," it "wasn't
appropriate" for Real View to send it. (Id. at 35:21, 36:8.)
Zeldin insisted that the email was not targeted at 20-20. (Id. at
36:11.)  However, given the similarities between the two programs
and 20-20's significant market share, which in an interrogatory
Real View acknowledged to be about 90 percent of the market in
2002, (see Trial Tr. Day 8, 108:15-21,) the Court doubts the
veracity of this testimony.

APPLICATION OF LAW TO FACTS

A) Chapter 93A

Under Chapter 93A, "unfair or deceptive acts or practices in
the conduct of any trade or commerce" are unlawful.  Mass. Gen.
Laws c. 93A, § 2(a).  To determine whether a practice violates
Chapter 93A, the fact-finder must look to "(1) whether the
practice . . . is within at least the penumbra of some common-
law, statutory, or other established concept of unfairness; (2)
whether it is immoral, unethical, oppressive, or unscrupulous;
[and] (3) whether it causes substantial injury to consumers (or
competitors or other businessmen)."  Mass. Eye & Ear Infirmary v.
QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005)
(quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593,
596, 321 N.E.2d 915, 917 (1975)).  Courts evaluate unfair and
deceptive trade practice claims based on the circumstances of

each case. <u>Kattar v. Demoulas</u>, 433 Mass. 1, 13-14, 739 N.E.2d 246, 257 (2000).

B) <u>Preemption</u>

Before this standard is applied to the facts here, it is necessary to explain the relationship between this Chapter 93A claim and the claims tried to the jury.  Although Chapter 93A "is a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights," <u>Slaney v. Westwood Auto, Inc.</u>, 366 Mass. 688, 693, 322 N.E.2d 768, 772 (Mass. 1975), its scope is limited by the operation of other laws.

Most important for the purposes of this case, the Federal Copyright Act contains an express preemption provision that preempts all state causes of action that are grounded in "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright. . . and come within the subject matter of copyright. . . ." 17 U.S.C. § 301(a). Courts have interpreted this language to encompass any state cause of action recognizing a right "abridge[d]" by an act that would also, "by itself, infringe an exclusive right provided by Federal copyright law, e.g., an act of reproduction, performance, distribution, or display," unless "the State law claim includes [an]'extra element' that 'changes the nature of the action so that it is qualitatively different from a copyright infringement

claim.'" <u>Curtis v. Herb Chambers I-95, Inc.</u>, 458 Mass. 674, 678, 940 N.E.2d 413, 418 (Mass. 2011)(quoting <u>Computer Associates Intern., Inc. v. Altai, Inc.</u>, 982 F.2d 693, 716 (2nd Cir. 1992)).

The test to determine whether a cause of action includes an extra element that changes the nature of the action to make it qualitatively different from a copyright infringement claim is functional and fact-specific. <u>See</u> <u>Data General Corp. v. Grumman Sys. Support Corp.</u>, 36 F.3d 1147, 1164 (1st Cir. 1994), abrogated on other grounds, 130 S.Ct. 1237 (2010). "In applying the section 301 preemption provision, courts focus not upon the label affixed to the state cause of action, but rather upon 'what the plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced.'" <u>Patricia Kennedy & Co., Inc. v. Zam-Cul Enterprises, Inc.</u>, 830 F.Supp. 53, 56 (D. Mass. 1993)(quoting <u>Altai</u>, 982 F.2d at 716).

C) <u>Theories of Chapter 93A Liability</u>

20-20 has asserted two different theories of liability under Chapter 93A. The first theory focuses on a single discreet act: the alleged "circumvent[ing]" of the password-protected area of 20-20's website in order to view video tutorials for the computer program 20-20 Design. The second involves Real View's full course of conduct related to the marketing and sale of ProKitchen. This claim alleges that Real View engaged in a "marketing campaign adopted and executed by Real View to both

mimic 20-20's promotional activities and, at the same time, misrepresent facts about Real View's and 20-20's respective products, all in an effort to unfairly compete and gain marketplace advantage." (Pl.'s Reply Br. 10.)  The Court will address each theory in turn to determine whether and to what extent it escapes copyright preemption. <u>See</u> <u>Patricia Kennedy</u>, 830 F.Supp. at 57 (separating out those theories of Chapter 93A liability that would be preempted by the Copyright Act and allowing the plaintiff to move forward solely on an alternative theory).  Then the Court will determine whether 20-20 has proven sufficient facts to establish liability.

1) <u>Circumvention of the Protections on 20-20's Website.</u>

20-20's first theory of liability is carefully crafted to avoid copyright preemption.  If 20-20 had asserted a Chapter 93A violation merely for the illegal download of Real View's software, its claim would have been preempted.  The software at issue is protected by copyright, <u>see</u> 17 U.S.C. § 101, and the act of downloading the software is actionable under copyright law. <u>See,e.g.</u>, <u>Maverick Recording Co. v. Harper</u>, 598 F.3d 193, 197 (5th Cir. 2010)(mere downloading of audio files infringes copyright holder's exclusive right to "reproduce their copyrighted works").  Therefore, a c. 93A claim based on this fact alone would not allege any extra "element" that would change the nature of the action, which, at its heart, would concern

copyright.  Similarly, if 20-20's claim had focused solely on the download of the tutorial videos, this aspect of the claim would have been preempted as well.

With these limitations in mind, 20-20 has sought entry into the c. 93A scheme, including its double and treble damages provisions, by focusing on the means Real View allegedly used to access the tutorial videos.[2]  20-20 asserts that Real View illegally "hacked" into 20-20's website for the purposes of downloading the tutorial videos.  If substantiated, this claim would include an "element" that makes it qualitatively different from a copyright infringement claim.  Courts have held that an allegation of the use of unethical means to <u>access</u> another's

---

[2]  Real View argues that it was "ambushed" by this claim, as it was raised for the first time two months before trial.  But these claims of prejudice are overblown.  Real View had ample access to the best sources of information about the tutorial videos and their acquisition: Perlov and Zeldin.  Moreover, although this specific allegation may have emerged late in the game, 20-20's assertion of a new theory of Chapter 93A liability did not run afoul of the interests protected by federal civil procedure or procedural requirements rooted in Chapter 93A's goal of encouraging "reasonable settlement offers." <u>Halper v. Demeter</u>, 34 Mass. App. Ct. 299, 301, 332 N.E.2d 332, 334 (1993).  In contrast to the cases cited by Real View, it had notice of the existence of a Chapter 93A claim well before trial, and was aware of the issues raised by this specific claim during trial preparation. <u>Compare</u> <u>Holmes Group, Inc. v. RPS Products, Inc.</u>, 424 F.Supp.2d 271, 294-96 (D. Mass. 2006)(deciding not to consider Chapter 93A where the plaintiff had not alleged <u>any</u> Chapter 93A claim in its complaint and, therefore, failed to meet federal notice pleading requirements); <u>Halper</u>, 332 N.E.2d at 334 (rejecting Chapter 93A theory based on totality of the defendant's conduct that was asserted for the first time "during the plaintiff's closing arguments and in his supplemental requests for findings filed after the close of evidence").

copyrighted work sufficiently sets a c. 93A claim apart from copyright law to escape preemption. <u>See</u> <u>Patricia Kennedy</u>, 830 F.Supp at 57 (finding that Chapter 93A claim based on the defendant's obtaining the copyrighted material by disputing its origin and refusing payment survived preemption).

In many circumstances, evidence of a targeted and deliberate effort by Real View to use unauthorized means to bypass an internet security protection to gain access to the tutorial videos would meet the elements necessary to establish c. 93A liability.  Such unethical and immoral conduct would fall within the penumbra of a number of state and federal laws. <u>See, e.g.</u>, 17 U.S.C. § 1201(1)(1)("[N]o person shall circumvent a technological measure that effectively controls access to a work protected under this title.").

Nonetheless, 20-20 has not established by a preponderance of the evidence that Real View engaged in such improper circumvention here.  20-20's theory is based primarily on Real View's admission that it downloaded ten tutorial videos and the testimony of its employee that, during the timeframe at issue, these videos were behind a password-protected area of the website.  20-20 urges the Court to draw the inference that Real View illegally bypassed 20–20's password protection in order to enter the website.  But even if the Court inferred that Real View gained access to the password-protected area of the website, this

fact alone does not necessarily establish Chapter 93A liability.
For example, it is quite possible that Real View obtained the
tutorial videos with a third party's username or password, and,
as Real View has noted, the statutory analogues to 20-20's claim,
the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1039, and
the Digital Millenium Copyright Act (DMCA), 17 U.S.C. § 1201, do
not necessarily prohibit this conduct.  For example, courts have
found that in order to demonstrate that a party's access to a
website was unauthorized for the purposes of the CFAA, the
plaintiff must show that such access was explicitly forbidden by
the website's terms.  <u>See</u> <u>EF Cultural Travel BV v. Zefer Corp.</u>,
318 F.3d 58, 63 (1st Cir. 2003); <u>see also</u> <u>Business Information</u>
<u>Sys. v. Prof. Governmental Research & Solutions, Inc.</u>,
02-cv-00017, 2003 WL 23960534, * 8 (W.D. Va. Dec. 16, 2003)("As a
result, if BIS intended that each username and password were to
be used solely by the person to whom it was assigned, then they
could have included this restriction in their terms and
conditions of usage.").  Courts have also held that the use of a
valid username and password without authorization does not
constitute circumvention of a technological measure under the
DMCA.  <u>See</u> <u>Egilman v. Keller & Heckman, LLP.</u>, 401 F.Supp.2d 105,
113 (D.D.C. 2005).

It is true that Chapter 93A liability can be premised on
conduct that does not violate any other laws.  However, this case

law illustrates that the propriety of accessing password-protected areas of websites may turn on fact-specific questions concerning the contractual arrangements existing between the parties and the precise means used to enter the website. Without any evidence regarding the tutorial videos, the website at issue, its terms of use, or the means by which Real View procured the videos, the Court finds that 20-20 has not proven c. 93A liability here. Simply, the evidence is too barebones.

2) <u>Marketing of ProKitchen</u>

20-20 also pursues a theory of Chapter 93A liability based upon Real View's full course of conduct beginning with its "dubious development origins" and continuing through its efforts to "repeatedly and systematically associate[] its product with 20-20 Design in an obvious attempt to pass ProKitchen off as either the new version of the market-leading 20-20 Design, or as its perfect substitute." (Def.'s Br. 16.)

The crux of this theory seems to be Real View's alleged "passing off" of its product as 20-20's, a claim that escapes copyright preemption because it alleges a different element, namely the causing of confusion about the product's source. See <u>Tingley Sys., Inc. v. CSC Consulting, Inc.</u>, 152 F.Supp.2d 95, 110 (D. Mass. 2001). The jury rejected a similar theory of liability under 20-20's Lanham Act claim. Although the Court is not bound by these fact findings, 20-20 fails on this theory of Chapter 93A

liability as well. Real View purposefully marketed its product as a 20-20 Design substitute, but it never intended to "pass off" ProKitchen as 20-20 Design. Indeed, Real View's strategy seems to have been exactly the opposite. Although Real View's product and marketing strategy mirrored 20-20's, Real View was focused on enticing potential consumers with a competitive pricing scheme and then convincing them that ProKitchen was similar enough to 20-20 that they could make the switch easily. Zeldin's testimony regarding his conversations with potential buyers is consistent with this interpretation.

Moreover, 20-20 was not able to establish that Real View's actions resulted in more than de minimis consumer confusion. 20-20 alleges that it demonstrated three cases of consumer confusion. However, the evidence established at trial does not even go this far. The record citation provided by 20-20 does not demonstrate that 20-20 distributor John Morgan was ever confused by ProKitchen. (Pl.'s Br. 16.) At trial he testified that he was initially struck by how similar the two programs were, (Trial Tr. Day 3, 78,) but he, like most kitchen and bath CAD consumers, was fairly sophisticated, and there was no evidence that he was ever confused about the source of Real View's product.

20-20, thus, can produce, at most, two cases of consumer confusion, and the Court is unwilling to infer that confusion was much more widespread than this. As John Morgan's experience

illustrates, the industry is characterized by fairly prolonged
and sophisticated relationships with professional consumers, and
it is unlikely in this context that consumers would be confused
about the source of a product they were purchasing. Therefore,
to the extent that 20-20's Chapter 93A claim is grounded in a
theory that Real View passed off its product as 20-20's, this
claim fails.

20-20 has also pursued a slightly different theory of
Chapter 93A liability founded upon what it alleges are Real
View's deceptive marketing practices. Foremost among the alleged
evidence of improper marketing is the email blast sent by Real
View in spring 2010 to about 5,000 recipients. At no point in
the email did Real View ever mention 20-20 by name or make an
express factual misstatement about its product. Although the
email was likely a veiled attack on 20-20, the major competition
in the field, I find it does not evince an egregious level of
"rascality that would raise the eyebrow of someone inured to the
rough-and-tumble field of commerce." See Levings v. Forbes &
Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979).

Furthermore, I find that Real View's other advertising
strategies, including its alleged efforts to mimic 20-20's
advertisements and associate ProKitchen and 20-20 Design, also do
not rise to the level of a c. 93A violation. Moreover, to the
extent that this claim is grounded solely on an allegation that

Real View "copied" advertisements, it is likely preempted by copyright law. See MasterCard Intern. Inc. v. Nader 2000 Primary Committee, Inc., No. 00 Civ. 6068, 2004 WL 434404, at * 5 (S.D.N.Y. March 8, 2004).

Finally, there is also no evidence of any harm that flowed from the imprudent email or Real View's other marketing strategies. See McDonald v. Rockland Trust Co., 59 Mass.App.Ct. 836, 798 N.E.2d 323, 329 n. 9 (Mass. App. Ct. 2003)(finding no c. 93A liability where there was an "absence of evidence of damages"). 20-20's damages calculations focused on the company's lost profits resulting from its decision to reduce the price of 20-20 Design in April 2009 in order to compete with Real View. (See Trial Tr. Day 6, 44-45.) But there was no evidence that any of these damages flowed from Real View's advertising as opposed to its legal product and competitive pricing scheme. Furthermore, even if the price reduction occurred in part because of Real View's advertising strategies, 20-20 cut off its calculation of price erosion damages in July 2010, just a few months after the email. (Id. at 44:4-5.)

After consideration of all of the evidence in this case, I agree that Real View's actions were often far from commendable, but c. 93A, in conjunction with the looming issue of copyright preemption, demands a higher standard. Throughout trial 20-20's prime beef was that Real View's product was a knock-off that

17

looked and felt dramatically similar to 20-20's.  The propriety
of this feature of ProKitchen, however, is not determined by
Chapter 93A but by the federal Copyright Act, and the jury
decided that issue in Real View's favor after a full trial and
extensive comparison of the two computer programs.  If a party
seeks to use a state law claim to protect "legal or equitable
rights that are equivalent to any of the exclusive rights within
the general scope of copyright. . . and come within the subject
matter of copyright," then the Copyright Act provides the full
scope of remedies available.  In these contexts, state law may
neither be used to protect copying the Act proscribes nor to
punish copying that the Act leaves unregulated. <u>Cf.</u> <u>Thomas &</u>
<u>Betts Corp. v. Panduit Corp.</u>, 65 F.3d 654, 661 (7th Cir. 1995)
("Effective competition and the penumbra of the patent laws
require that competitors be able to slavishly copy the design of
a successful product.").  This case is about Real View's alleged
copying, and 20-20 cannot achieve through Chapter 93A what it
failed to achieve through its copyright claims.

## ORDER

The court orders entry of judgment on the Chapter 93A claim in favor of Real View.  The parties shall submit a form of judgment within 14 days.


           /s/ PATTI B. SARIS
          PATTI B. SARIS
          United States District Judge