UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
REAL VIEW, LLC.,              )
             Plaintiff and    )
             Counterclaim     )
             Defendant        )
                              )
        v.                    ) CIVIL ACTION NO. 07-12157-PBS
                              )
20-20 TECHNOLOGIES, INC.,     )
             Defendant and    )
             Counterclaim     )
             Plaintiff        )
                              )
        v.                    )
                              )
BORIS ZELDIN and LEONID PERLOV,)
             Counterclaim     )
             Defendants       )
                              )
_____)
```

**MEMORANDUM AND ORDER**

September 21, 2011

Saris, U.S.D.J.

## I. Introduction

This copyright dispute concerns kitchen computer-aided design software.  Real View, LLC ("Real View") filed an action seeking a declaratory judgment that various versions of its program ProKitchen did not infringe 20-20 Technology, Inc.'s ("20-20") copyright in the computer program 20-20 Design.  20-20 counter-claimed against Real View and its founders Boris Zeldin

1

and Leonid Perlov.  The background of this case is further
described in this Court's June 9, 2011 order, with which this
Court assumes familiarity. See Real View, LLC v. 20-20 Tech.,
Inc., 07-12157, 2011 WL 2262924 (D. Mass. June 9, 2011).

At issue here is the jury's award of $1,370,590 in damages
to 20-20 arising from Real View's illegal download of 20-20
Design version 6.1, which Real View then relied upon in
developing its competing software.  The jury found that
ProKitchen did not infringe 20-20 Design, but it awarded these
damages based solely on the illegal download.  Real View
stipulated to the illegality of the action, so the only question
left for the jury was damages.

The Court gave the following instructions with regard to
the illegal download:

> Now, let me talk separately about the download.
> Remember you heard about the download of 6.1.  Finally,
> as you heard, Real View has stipulated that it
> downloaded a copy of 20-20 Design Version 6.1 without
> permission of 20-20 and without a license.  If you find
> that this is the only infringement and there is no
> copyright violation for copying the main screen display
> or the default screen shot, you must award damages
> resulting from that infringement only and not all these
> other lost profits you heard about from 20-20. This
> does not mean that the damages from this download are
> necessarily simply the license fee of the 20-20 Design
> program. By statute -- and here is what the statute
> says -- you may award 20-20's lost profits resulting
> from the infringement and Real View's profits
> attributable to the infringement.  In making this
> determination, you may consider what 20-20 may have
> reasonably charged for a license permitting Real View's
> use of the 20-20 Design program, any design costs that
> Real View saved by its use of the 20-20 Design and

[sic] the development of ProKitchen and any benefit
Real View obtained by its use of 20-20 Design in the
development of ProKitchen.

(Trial Tr. Day 10, 63:14-25, 64:1-9.)

Real View now moves for a new trial under Fed. R. Civ. P.
59(a) or, in the alternative, to remit the jury's award down to
$4,200, the amount that 20-20 charged for a license fee for 20-20
Design at the time of the illegal download.

The crux of 20-20's case at trial was that Real View's
program infringed 20-20's copyright in 20-20 Design. The vast
majority of the trial in this case involved the comparison of
various versions of Real View's computer program ProKitchen to
20-20 Design.  The jury's unexpected damages verdict raises a
number of complex legal questions that were never fully addressed
by the parties before the end of trial.

Because I conclude that even if the Court's instruction was
legally proper, there was no basis for any damages award beyond
the $4,200 license fee that 20-20 charged its customers, and I
remit the award to that amount.

## II. Discussion

### A.  Grounds for Remittitur

A court has discretion to order a new trial under Rule 59(a)
"in so far [as the verdict] is against the weight of the
evidence, . . . the damages are excessive, or. . .for other
reasons, the trial was not fair to the party moving." <u>Cigna Fire</u>

Underwriters Co. v. MacDonald & Johnson, Inc., 86 F.3d 1260, 1262-63 (1st Cir. 1996).  Further, such a motion "may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." Id.

In the alternative to ordering a new trial, a court may order a remittitur of damages if the jury's award was "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Tuli v. Brigham & Women's Hosp., 2011 WL 3795599, at *8 (1st Cir. Aug. 29, 2011) (internal quotation marks and citations omitted).  Further, a court may remit a jury's award down to the maximum amount that could have been awarded based upon the evidence presented at trial. See Marchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 704 (1st Cir. 1988).  When a court orders remittitur, the plaintiff has the option of either accepting the new damages figure or moving forward with a new trial. See Mejias-Quiros v. Maxxam Property Corp., 108 F.3d 425, 428 (1st Cir. 1997).

**B. Damages Arising from the Illegal Download**

Under 17 U.S.C. § 504(b) a copyright owner is entitled to recover the "actual damages suffered. . . as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account

4

in computing the actual damages."  In the instruction at issue, the Court essentially quoted from this statutory language and instructed the jury on the number of judicially-developed factors that it could rely upon in determining the appropriate amount of damages.  Although the instruction may have been correct as a matter of law, this Court must determine whether 20-20 introduced sufficient evidence to establish damages under the factors expressly included in the instruction.

## 1. Hypothetical License Fee

In some cases, a hypothetical license fee is a permissible basis for determining a plaintiff's "actual damages" arising from an infringement. See, On Davis v. Gap, Inc., 246 F.3d 152, 164 (2nd Cir. 2001). "To rule that the owner's loss of the fair market value of the license fees he might have exacted of the defendant does not constitute 'actual damages,' would mean that in such circumstances an infringer may steal with impunity." Id. at 166.  See also Bruce v. Weekly World News, Inc., 310 F.3d 25, 28 (1st Cir. 2002)(where copyright damages from unauthorized use of the photograph were based on a reasonable licensing fee determined by examining industry practice). Where the infringer does not market and sell the infringing work, but uses it, the analysis is complicated because the court must determine the "value of the use," that is what a willing buyer would have been required to pay to a willing seller.  See Deltak, Inc. v.

<u>Advanced Sys., Inc.</u>, 767 F.2d 357, 363 (7th Cir. 1985) (allowing for damages based upon the "value of use" of plaintiff's marketing materials "equal to the acquisition cost saved by infringement instead of purchase.").

In this case, it is difficult to fathom any situation in which 20-20 would have given Real View an unrestricted license for a software product knowing that it could then use it to create a copycat product.  Some courts have concluded that this fiction does not preclude 20-20 from seeking a hypothetical license fee. <u>See,</u> <u>e.g.</u> <u>Getaped.com, Inc. v. Cangemi</u>, 188 F. Supp. 2d 398, 405 (S.D.N.Y. 2002). (holding that "permitting recovery of a reasonable license fee is appropriate even where plaintiff cannot show defendant would have been willing to negotiate a license to use plaintiff's copyrighted work, or where the plaintiff cannot plausibly argue that it would have been willing to license defendant's use.")  In other situations, though, other courts declined to give a hypothetical license instruction. <u>Liu v. Price Waterhouse LLP</u>, No. 97 CV 3093, 2000 WL 1644585, at *3 (N.D. Ill. Oct. 30, 2000) (illegal download of software later used in developing competing software did not serve as basis for hypothetical license instruction because the infringing work was not what was actually published or marketed).  The caselaw in this "value of use" area is sparse and still evolving.  Still, a hypothetical license fee is hypothetically possible.

6

In cases where hypothetical license fees have been awarded, plaintiffs have generally introduced evidence that directly addresses the amount charged by copyright-holders for the type of use undertaken by the infringer. See, e.g., Jarvis v. K2, Inc., 486 F.3d 526, 534 (9th Cir. 2007) (plaintiff introduced (1) expert testimony regarding the value of the infringed work; (2) testimony from one of the infringer's employees regarding what the company normally paid for similar uses; and (3) prior licenses between the copyright holder and the infringer); Polar Bear Prod., Inc. v. Timex Corp., 384 F.3d 700, 709 (9th Cir. 2004) (plaintiff introduced testimony from a CPA regarding the amount the plaintiff had quoted for a similar licensing arrangement).  In fact, recently the court in Oracle USA, Inc. v. SAP AG, 07-1658, 2011 WL 3862074 (N.D. Cal. Sep. 1, 2011), found the jury's award of a hypothetical license fee of $1.3 billion to be unduly speculative despite the presence of expert testimony regarding a hypothetical license fee because the plaintiff had failed to introduce "objective evidence of benchmark transactions, such as licenses previously negotiated for comparable use of the infringed work, and benchmark licenses for comparable uses of comparable works." Id. at *7.  Courts have insisted on objective evidence supporting the fair market value of a hypothetical license fee.  See also Getaped.com, 188 F. Supp. 2d at 406 (finding that the copyright-holder's evidence of

a hypothetical license fee, which included the copyright holder's out-of-pocket cost of creating the work, was an insufficient basis for determining a hypothetical license fee); cf. MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc., 622 F.3d 361, 367 n.2 (5th Cir. 2010) (the royalty amount that copyright holder employee testified he would pay to prevent a competitor from entering the industry was not "cognizable as a 'reasonable royalty' calculation at which a buyer and seller would agree to be market value for a particular piece of software").

On the other hand, the fact that "the fair market value of a reasonable license fee may involve some uncertainty. . . is not sufficient reason to refuse to consider this as an eligible measure of actual damages." On Davis, 246 F.3d at 166. Furthermore, as is the case with all "actual damages," when determining the hypothetical license fee, "uncertainty [should] not preclude recovery. . .if the uncertainty is as to amount, not as to the fact that actual damages are attributable to the infringement." 4 Nimmer § 14.02[A], at 14-12.  However, the amount of damages must not be "speculative" and must be grounded in objective evidence of what a buyer would reasonably have been charged for the particular use at issue. See Jarvis, 486 F.3d at 533-34 (citing cases).

Here the jury was presented with almost no evidence regarding a hypothetical license fee besides the $4,200 license

fee that 20-20 charged its customers.  20-20's damages expert never discussed what kind of fee would reasonably be charged for the use of 20-20 Design software in the development of non-infringing competing software.  Indeed, Mr. Hoffman's entire price erosion model was based upon the assumption that Real View's ProKitchen software infringed 20-20 Design. (See Trial Tr. Day 6, 35:10-13.)

20-20 argues that a jury could have relied on two pieces of evidence to arrive at an appropriate determination of a reasonable license fee.  First, it points to evidence concerning the resources 20-20 dedicated to the development of 20-20 Design. (Trial Tr. Day 2, 34 (describing at least fifteen years of work on developing the product while leading a team of about thirty developers); 133 (describing the amount of money dedicated to the project as "millions and millions" of dollars).)  Though in theory a fact-finder could rely upon the costs the copyright-holder dedicated to producing the copyrighted work as a basis for determining the value of the work, the jury was not provided with enough evidence to quantify 20-20's expenses.  20-20 employees' testimony regarding the "millions and millions" dedicated to the production of 20-20 Design is mere speculation.

Second, 20-20 points to the testimony of William Smith who suggested that a hypothetical license fee for the type of use at issue is best approximated by the $38 million 20-20 paid to

9

acquire one of its competitors. (Trial Tr. Day 5, 77:7-24.)  This testimony provides nothing more than a conclusory viewpoint, and $38 million far exceeds any approximation of a reasonable fee. See Hofmann v. O'Brien, 367 Fed. Appx. 439, 444 (4th Cir. 2010) (finding award of hypothetical license fee unduly speculative where it was based solely on testimony of the value of other works that were not at issue, and the plaintiff's own broad assertion that he would have charged a "great deal" for a license to use his work in such a way).  In fact, Smith's testimony exposes the implausibility of 20-20's arguments.  The jury was provided with possible license fee awards as low as $4,200 and potentially as high as $38 million.  A determination of a hypothetical license fee based on these facts would be no more precise than pulling numbers out of a hat.

### 2. Saved Development Costs

The Court also instructed the jury that it could take into account "any design costs that Real View saved by its use of. . . 20-20 Design [in] the development of ProKitchen."  The role of an infringer's saved development costs in determining copyright damages is not well-developed.  In the related area of patent infringement, a fact-finder can consider the "saved development" costs of the infringer as part of the reasonable royalty analysis. See Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1580 (Fed. Cir. 1996) (relying in part on saved research and

development costs in calculating initial royalty rates).  In the
copyright context, when determining the hypothetical license fee,
some courts have taken into account the copyright-holder's
development costs, as a measure of the value of a hypothetical
license. See, e.g., Harris Market Research v. Marshall Mktg. &
Commc'ns, Inc., 948 F.2d 1518, 1524 (10th Cir. 1991); Softel,
Inc. v. Dragon Med. & Scientific Commc'ns Ltd., 891 F.Supp. 935,
941 (S.D.N.Y. 1995). But one court recently pointed out that
there was no caselaw supporting a theory of copyright damages
based on "saved development costs," and held that copyright
holders were not entitled to recoup all their research and
development costs as actual damages for defendants' infringement.
See Oracle Corp. v. SAP AG, 734 F. Supp. 2d 956, 971-72 (N.D.
Cal. 2010)).

Regardless, because 20-20 failed to introduce sufficient
evidence of Real View's saved development costs, the Court need
not resolve the difficult question.  The only evidence of the
costs Real View would have incurred in developing ProKitchen
without access to the illegally downloaded program was testimony
about the "millions and millions" 20-20 dedicated to developing
20-20 Design over seventeen years compared to the $150,000 Real
View spent over two years. There was no evidence that the jury
could rely upon to determine how much of these development costs
went into the specific version of 20-20 Design that Real View

11

downloaded.   Moreover, the speculative nature of this testimony
cannot serve as a basis for determining damages.

Furthermore, even if there had been more specific evidence
of saved development costs of the infringer or the research and
development costs of the copyright holder, this evidence would
have been insufficient alone to support a damages determination
based upon a hypothetical license fee.   The touchstone of the
imputed license fee analysis is what the parties would have
agreed upon as a license price for the use at issue.   As
discussed above, 20-20 introduced no evidence on what this fee
would have been.   Without any other evidence, a back-of-the-
envelope analysis of Real View's saved development costs would
not provide the jury with a sufficient basis for arriving at a
non-speculative hypothetical license fee figure.

### 3. Price Erosion Damages

With regard to "actual damages," the First Circuit has held
that "[t]he plaintiff bears the burden of proving that the
infringement was the cause of its loss of revenue." Data Gen.
Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1170 (1st Cir.
1994).   In meeting that burden, the plaintiff must show, first,
"with reasonable probability that, but for the defendant's
infringement, the plaintiff would not have suffered the loss."
Id. at 1171.   Second, the plaintiff must "prove that the
infringement was a proximate cause of its loss by demonstrating

that the existence and amount of the loss was a natural and probable consequence of the infringement." Id.  "At the same time, the plaintiff need not prove its loss of revenue with mathematical precision." Id.

The only evidence 20-20 introduced regarding actual damages was the extensive testimony of its expert Creighton Hoffman concerning lost profits resulting from "price erosion."  Although the precise basis for the jury's damages award is not entirely clear from the record, it is likely that this price erosion evidence served as an important piece of its calculation.  The jury award of $1.37 million exceeds Hoffman's estimate of Real View's profits ($772,000) from selling other versions of the software, but it is less than his nearly $2 million estimate of actual damages resulting from price erosion. (Trial Tr. Day 6, 44:13.)  If the jury subtracted the estimated price erosion damages from the last one and a half quarters of Hoffman's model, and included only damages from price erosion between April 2009 and March 2010, it would have arrived at a damages figure of around $1.48 million, very near the ultimate damages verdict. (Trial Tr. Day 6, 44:3-16.)

However, price erosion was an impermissible basis for the jury's award of damages resulting from the illegal download.  At no point did Hoffman ever testify that any of this price erosion was the result of the illegal download, and 20-20 failed to

13

demonstrate through any other evidence in the record that any of the price erosion damages were either directly or proximately caused by the illegal download. See Polar Bear, 384 F.3d at 710 ("[Copyright holder's] financial losses were not of Timex's making, and mere speculation does not suffice to link the losses to the infringement.").

It might be true that generally a copyright-holder need not expressly spell out the causal chain between the infringement and the resulting actual damages.  But in this case there are a number of reasons why the connection between the illegal download and the price erosion damages is in doubt, and 20-20 never provided any evidence to establish a causal link.  First, as 20-20 itself highlighted at trial, Zeldin and Perlov claimed that their primary sources of information regarding ProKitchen were ten video tutorials. See Real View, 2011 WL 2262924, at *2. Although these videos may have been obtained improperly, 20-20 never proved that this acquisition constituted a separate act of infringement. See id. ("The source of the video tutorials is less clear than the source of the illegally downloaded software."). Given Real View's access to these videos, and the claimed importance of this access in the development of ProKitchen, the connection between the illegal download and Real View's market success is unclear.

Further, the download occurred in either 2003 or 2004, see

id. at *1 n.1, but 20-20's price erosion damages begin in 2009.
On its own, this fact would not preclude a jury from finding
causation, but without any evidence from 20-20 tying the download
to the price erosion damages, there was no basis for a jury to
find proximate causation in light of the time gap.

### 4. Infringer's Profits

Infringer's profits, including per the instruction at issue
here, "any benefit Real View obtained" through the illegal
download, are an even simpler matter. Section 504(b) provides:
"The copyright owner is entitled to recover. . .any profits of
the infringer that are attributable to the infringement. . . .
In establishing the infringer's profits, the copyright owner is
required to present proof only of the infringer's gross revenue,
and the infringer is required to prove his or her deductible
expenses and the elements of profit attributable to factors other
than the copyrighted work."  Although the statute describes only
the plaintiff's burden to establish the defendant's gross
revenue, courts have held that "a copyright owner is required to
do more initially than toss up an undifferentiated gross revenue
number; the revenue stream must bear a legally significant
relationship to the infringement." Polar Bear, 384 F.3d at 711;
see also 4 Nimmer § 14.03, 14-34 ("When an infringer's profits
are only remotely and speculatively attributable to infringement,
courts will deny recovery to the copyright owner.").

In the only case either party has found addressing a factual pattern similar to this one – where a party was accused of illegally downloading a piece of software and then relying on it to produce a competing product – the court observed that allowing plaintiff to argue that the defendant's profits resulted from the illegal download would assume that infringer's profits include "fruit of the poisonous tree." Liu, 2000 WL 1644585, at *2. According to the court, "that defendants may have viewed or studied plaintiff's program is irrelevant if [the] resulting work" does not infringe. Id. I find this reasoning persuasive. The attenuated relationship between the initial infringement and Real View's ultimate profits is not a sufficient basis for a damages award on the basis of infringer's profits.

**C. Damages**

Pursuant to Fed. R. Civ. P. 59, the Court remits the damages award to $4,200, the price 20-20 charged customers during the time-period at issue. Real View admitted at trial that it would have been charged at least that amount for the value of the license with restrictions. A license without restrictions would be worth considerably more. 20-20 now has the choice of a new trial or acceptance of remittitur. Furthermore, because the Court's prior decision denying pre-judgment interest was based primarily on the exceedingly high damages award, (Doc. 241, at 3,) I revisit that determination here and conclude that the

award of pre-judgment interest is appropriate to restore to 20-20 the time value of the money it would have received had Real View legally purchased a license.  In line with the precedent from this circuit, the applicable rate is the 12% Massachusetts interest rate. See <u>TMTV, Corp. v. Mass Prods., Inc.</u>, 645 F.3d 464, 474 (1st Cir. 2011).


<b><u>ORDER</u></b>

Defendant's motion for remittitur is allowed (Doc. 238).  Defendant shall inform the court by September 29, 2011 whether it seeks a new trial.  If not, judgement shall enter in the amount of $4,200 plus pre-judgment interest of 12% from 2004.


/s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge