IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


REAL VIEW, LLC,                        )
                                       )
              Plaintiff and            )
              Counterclaim Defendant   )
                                       )
         -VS-                          ) CA No. 07-12157-PBS
                                       ) Pages 1 - 24
20-20 DESIGN, INC., et al,             )
                                       )
              Defendants and           )
              Counterclaim Plaintiffs  )



                    MOTION HEARING

          BEFORE THE HONORABLE PATTI B. SARIS
             UNITED STATES DISTRICT JUDGE




                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts  02210
                    December 8, 2011, 9:20 a.m.








                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
               United States District Court
               1 Courthouse Way, Room 7200
                    Boston, MA  02210
                    (617)345-6787

6af2f138-f03a-432c-8d80-0b4466f59495

1    A P P E A R A N C E S:

2         LEE T. GESMER, ESQ. and CRYSTAL L. LYONS, ESQ.,
     Gesmer Updegrove, LLP, 40 Broad Street, 3rd Floor, Boston,
3    Massachusetts, 02109 for the Plaintiff and Counterclaim
     Defendant.

4
          LAWRENCE R. ROBINS, ESQ., Finnegan, Henderson, Farabow,
5    Garrett & Dunner, LLP, 55 Cambridge Parkway, Cambridge,
     Massachusetts, 02142, for the Defendant and Counterclaim
6    Plaintiff.

7         ANNA BALISHINA NAYDONOV, ESQ., Finnegan, Henderson,
     Farabow, Garrett & Dunner, LLP, 901 New York Avenue, NW,
8    Washington, DC, 20001, for the Defendant and Counterclaim
     Plaintiff.

9
     ALSO PRESENT:  Brigitte Blake, Esq., In-House Counsel,
10                  20-20 Technologies, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6af2f138-f03a-432c-8d80-0b4466f59495

```
 1                     P R O C E E D I N G S

 2          THE CLERK:  Court calls Civil Action 07-12157,

 3   Real View v. 20-20 Design.  Could counsel please identify

 4   themselves for the record.

 5          MR. GESMER:  Lee Gesmer and Crystal Lyons for

 6   Real View.

 7          MR. ROBINS:  Larry Robins and Anna Naydonov for 20-20,

 8   and with us at counsel table is Brigitte Blake, the in-house

 9   counsel for 20-20.

10          THE COURT:  Thank you.  So we've got some newcomers.

11   So we're here for oral argument on what to do now, but I

12   actually had a little of my own agenda, just to talk you into

13   something, or at least explore an issue.  Just the dynamics of

14   the last trial were such that the count that the jury came back

15   with was actually agreed to, liability, and no one spent much

16   time at all exploring what possible damages could flow from

17   that count.  All the focus, as you all know, was on whether the

18   main screen shot was virtually identical or substantially

19   similar.  I mean, that's really where 85 to 90 percent of the

20   effort went into, if not more.

21          So the question that I have is, I may have been right

22   or I may have been wrong in how I charged the jury on what I

23   would call the primary thrust of this trial.  The idea of going

24   back through another trial or another Daubert hearing on what's

25   a hypothetical license or what isn't in a very difficult and
```

6af2f138-f03a-432c-8d80-0b4466f59495

1  changing area, and then to be reversed on appeal on the key

2  issue, seemed like a waste of time and resources for everybody.

3  And so I just wanted to float the idea, before we get into

4  argument on what I do on Part B, whether or not it made some

5  sense to appeal me -- how many judges say that? -- on the

6  virtual identicality versus substantial similarity.  I don't

7  know if that's something you've all explored.  You may need to

8  go back to clients.

9           MR. ROBINS:  It's definitely not something that we've

10  considered, but with the client present, obviously we can

11  confer and talk about it.

12          THE COURT:  Have you thought about that, Mr. Gesmer?

13          MR. GESMER:  That assumes that 20-20 will appeal those

14  issues, and, first, I'm not sure that they will, but if they

15  would, I'd have to -- I have not thought about that.  If they

16  tell me that they are going to appeal that and that they're

17  interested in jumping directly to an appeal, I'll give that

18  some thought.  I have not thought about it until today, until

19  right now.

20          THE COURT:  I say that simply because while I

21  certainly was relying on case law -- I mean, I wasn't plucking

22  that out of the thin air -- 20-20 had a very difficult case

23  under a virtual identicality standard but does not have such a

24  hard case under a substantial similarity standard.  It's just

25  one thought because we are on very new terrain with what kinds

1    of damages can be derived with respect to an unlawful download.

2    You know, we did the best we could going through what little

3    case law there was and different kinds of circumstances, and I

4    wrote what I thought was correct in navigating those cases, but

5    that could potentially take another six months, and this has

6    already -- I don't know how much it's cost in legal fees, but

7    I've poured huge amounts in between what we've called the

8    Markman proceeding and the trial itself, and this will take

9    another big -- I'm assuming I will be allowing another expert.

10   I don't know what discovery -- that's what we're going to argue

11   about -- if any, and then I go through a Daubert hearing

12   because I think it's very unclear what the standard is.  So

13   that's what I'm struggling with is, should we go through this

14   next six months, spend another fortune, only to have me

15   reversed on the standard?  Just I'm playing it out for you all.

16            MR. ROBINS:  Well, I think --

17            THE COURT:  Why don't you stand up.  It's easier to

18   do --

19            MR. ROBINS:  -- with virtual certainty that we are

20   going to appeal the verdict in the principal copyright

21   infringement case, so I don't think there's any question that

22   that's going to happen.

23            THE COURT:  I thought that may be the case.

24            MR. ROBINS:  So insofar as whether we do the appeal

25   before we do a trial on the illegal downloading claim, it's

1    certainly something that we would consider and talk about.  I

2    can't give you an answer, obviously, without consulting with

3    the client and --

4              THE COURT:  Would you also be appealing my remittitur?

5              MR. ROBINS:  I guess we were approaching that with the

6    new trial and the leave to do additional discovery and present

7    additional expert testimony.

8              THE COURT:  I'm not even sure the First Circuit would

9    take it because it leaves open a big issue.  My nightmare would

10   be working through all the difficult issues that flow from this

11   and then getting reversed on the other one, and then having to

12   go back and have the Court retry -- have a third trial.

13             MR. ROBINS:  I understand completely the Court's

14   concern, and I can see some logic in the approach that you

15   suggested.  I also wonder if the First Circuit would take the

16   case in the posture that it is right now.

17             THE COURT:  I'm not sure.  I'm not sure.  If you all

18   don't want it or think it's too iffy, I'll go back to -- we're

19   going to argue today the basic issue, but it was a thought I

20   wanted to go out there on because it just struck me that I

21   could -- it's a very, very new evolving area, and someone could

22   disagree with a lot of the decision points along the way.

23             And, Mr. Gesmer, you haven't thought about it either,

24   whether you would even agree to it?

25             MR. GESMER:  I have not, your Honor.  I'd need to

1    discuss it with Real View.  Assuming it's acceptable to 20-20,

2    I have to discuss it with them.  I can't make a judgment about

3    that this morning.

4           THE COURT:  I don't know how much money has been

5    spent, but I think you have at least -- I actually think I'll

6    be upheld on that piece of it, just because that's where the

7    case law went, but then this might be a vehicle for raising

8    Part B too, which is the remittitur.  But if you think that

9    that's not so clear you would appeal that, then that's not as

10   strong an argument.

11          MR. ROBINS:  I honestly have not considered that issue

12   at all at this point.

13          THE COURT:  Okay.  Well, let's argue about the

14   motions, and then you can get back to me.  That was my primary

15   reason for doing this, rather than doing it on the papers, is

16   to actually float by you that possibility.  Okay, so --

17          MR. ROBINS:  In that case, your Honor, we're before

18   you today on a motion to reopen discovery for what we feel is a

19   brief period of time and for leave to identify a new expert

20   witness to testify specifically on the value of the forced

21   license between Real View and 20-20 that arose as a result of

22   the illegal download of the 20-20 Design software back in 2004.

23          The discovery that we seek is very limited.  We simply

24   would like to get the documents from the defendants that show

25   the interaction between Mr. Perlov and Mr. Zeldin and their

1   developers in the Ukraine back and forth to see what was

2   discussed, what kind of information was communicated to them,

3   where it came from, whether it came from the software or from

4   the video tutorials that we've talked about, and to identify

5   with specificity exactly what went on and exactly what the

6   defendants or the plaintiffs did with the software.

7           THE COURT:  Let me ask you this:  You've come up with

8   three possible ways of thinking about damages in the papers

9   that I've seen.  One is a hypothetical license, right?  One is

10  somehow to reinvigorate your price erosion model, and the third

11  is some sort of value of use, to the extent that isn't already

12  incorporated into a hypothetical license.

13          MR. ROBINS:  I think one and three are essentially the

14  same thing.

15          THE COURT:  I think so too.  As a practical matter --

16  this case has been going on for so long -- I'm very reluctant

17  to open up discovery, but I would allow you to come up with an

18  expert that would deal not with price erosion -- that's come

19  and gone -- you know, this isn't sort of the second bite at the

20  apple -- but which would come up with a hypothetical license

21  fee/value of use.  Have you already consulted an expert?

22          MR. ROBINS:  We have had preliminary discussions with

23  an expert, yes.  We've not proceeded beyond that because

24  obviously we needed to know where the Court was going to go on

25  this issue before committing to the --

1          THE COURT:  Well, does he have enough information?

2    Could he come up with an opinion based on the factual record or

3    the facts that are available to him as an expert?

4          MR. ROBINS:  Those are two different questions.  He

5    can come up with an opinion from the facts that are available

6    to him, with the addition of certain agreements that 20-20 has

7    made in the course of its business with other parties that bear

8    directly on the value of a license in this case.

9          THE COURT:  And does he have those already?

10         MR. ROBINS:  He has the framework of those licenses

11   and the relevant terms.  He hasn't actually seen the agreements

12   themselves.  And the other piece of the puzzle is, it is

13   actually fairly common in the software industry for competitors

14   to license their software to each other in OEM deals or

15   development deals or the like.  So there are some benchmark

16   licenses that he is aware of that he can draw into the analysis

17   too to compare, you know, what's gone on in the industry with

18   what 20-20 has done in order to come up with a reasonable

19   estimate of what value might be placed on a license like this

20   between these two --

21         THE COURT:  So you don't need all this other

22   discovery.

23         MR. ROBINS:  We do in the sense that, as you raised in

24   your opinion granting the remittitur, there is some question as

25   to what role the software download played in Real View's acts

1   and what role the video tutorials raised.  So to the extent

2   that that's an issue and the causation there is going to bear

3   in some way on ultimately what the value of the license was to

4   Real View, we need to be able to explore what they did with

5   those two items and figure out, what was the principal tool?

6   Did they use them evenly?  Did they actually use the tutorials

7   more?  Did they use the software more?  We don't know that, but

8   it's apparently going to be an issue in determining how much of

9   the damage was caused by the illegal download, and that's why

10  we've asked to do that additional discovery.

11          THE COURT:  Let me just say this:  This has been

12  already a very expensive, very prolonged fight.  It's an '07

13  case.  I'm not inclined to reopen fact discovery in the way you

14  want.  I was persuaded that it would involve another six months

15  to a year, or essentially like reopening discovery to begin

16  with.  I would allow you to put in an expert report, and to the

17  extent that there were particular documents that should have

18  been produced in some sort of automatic disclosure kind of way,

19  I'm not sure I have that big a problem with that; but we're not

20  opening up depositions or interrogatories or that kind of

21  thing.

22          So what you say you just need is comparable licenses,

23  is that it?  The licenses that Real View issues, is that the --

24          MR. ROBINS:  According to the case law, the McRoberts

25  case in particular, the method of determining the value of a

1    license in this type of circumstance is to look at comparable

2    deals.  You know, obviously the most ideal would be a deal

3    between the two parties, but we don't have that here, as

4    they've never done business together; but we do have

5    circumstances where 20-20 has licensed its software to

6    competitors in connection with other types of deals, and then

7    there are industry agreements and benchmarks in general where

8    the same thing has been done.  And between the two --

9          THE COURT:  Well, where do you think Real View has

10   licensed to competitors?

11         MR. ROBINS:  Well, Real View hasn't that I know of.

12   20-20 has.

13         THE COURT:  Oh, so you can rely on your --

14         MR. ROBINS:  Right, the agreements that we're going to

15   rely on in presenting the expert testimony are our own.  I

16   agree that we don't need --

17         THE COURT:  So you don't need anything.

18         MR. ROBINS:  Well, other than the point that I made

19   before with regard to a new issue that was raised in the

20   briefing for the motion for a new trial with regard to the

21   relative role between the video tutorials and the software, I

22   would agree.

23         THE COURT:  Well, and that may be vetted in the trial,

24   but I'm not going to reopen fact discovery.  So you have what

25   you need to put on an expert case is what you're telling me.

1  Your issue is how well you can prove causation.

2          MR. ROBINS:  Right.

3          THE COURT:  All right, so you have what you need for

4  the hypothetical license fee, right?

5          MR. ROBINS:  And we can present our expert case, yes.

6          THE COURT:  Right.  So if I deny discovery, why

7  doesn't it just make sense for them to come up with an expert

8  opinion?  You'll attack it, as you always effectively do,

9  Mr. Gesmer.  We'll decide whether we need a Daubert hearing,

10  you may need your own expert, and then we go to trial.  And if

11  they want to subpoena your people to deal with the causation

12  issue, well, then so be it.  I agree with you, I'm not

13  reopening discovery generally.  We're too far along in that.

14          MR. GESMER:  Let me ask you to clarify a point with

15  20-20.  There's this saved cost, saved development cost, saved

16  design cost issue that they raised in their motion; and as the

17  briefing went on, it appeared to me that they were backing off

18  from that and that they were not going to try to pursue the

19  argument that Real View saved X dollars by having access to

20  this software.  And I think it would be helpful if we

21  determined this morning whether that was the case, whether that

22  is off the table.

23          THE COURT:  Are you primarily going on hypothetical

24  license?

25          MR. ROBINS:  Yes, but the development costs do play

1   into the valuation of the --

2          THE COURT:  Yes, I think you're right.  I mean, it

3   plays some role, I mean, you could, I suppose, argue in a

4   hypothetical license.  It's not completely irrelevant.  But

5   they're not going on a separate theory.  He's just clarified

6   that.  He wants a hypothetical license.

7          MR. GESMER:  Well, if they're claiming that Real View

8   saved money by having access to the software, then that opens

9   an enormous area of complexity.  We would have to retain an

10  expert to analyze Real View's development costs.  There are

11  between 25,000 and 50,000 e-mails in Russian between 2002 and

12  2006 --

13         THE COURT:  That may be.  You've asked for the

14  clarification.  They're going on hypothetical license.  They

15  said that the value of use may have some relevance to how they

16  calculate what that's worth.  So I can't do any more right now.

17  What I'm simply doing is, I'm denying the motion to reopen fact

18  discovery, I'm allowing the motion to permit an expert on a

19  hypothetical license fee, and what I am doing is not allowing

20  the price erosion that Mr. Hoffman -- was that his name?

21         MR. GESMER:  Yes.

22         THE COURT:  That's dead and gone.  We're not doing a

23  price erosion theory.  That failed.  We're just doing the

24  hypothetical license.  So I don't know what that means you have

25  to do, and maybe you have to do it, but I thought this

1   discussion would be useful to making determinations about what

2   you wanted to do about appealing.  I don't know how good your

3   case is.  I'm not going to reopen discovery, but that doesn't

4   mean you can't subpoena these people to trial.

5        And when do you think you can put out your expert?  I

6   mean, you don't know until you've seen what he said, right?

7        MR. GESMER:  Right.

8        MR. ROBINS:  I think, with the holidays, we probably

9   need about 60 days.

10       THE COURT:  Okay, pick a date.  I'm in no rush.  I'm a

11  different judge than the last time you had me because I'm now

12  the Chair of the Sentencing Commission, so I am back and forth.

13  I'm very busy.  Can you do it by February 1?

14       MR. ROBINS:  I think February 15 would probably be

15  more realistic, just because we're going to lose a couple weeks

16  almost certainly at the end of December with the holidays.

17       THE COURT:  Well, then that pushes us off a long time

18  as it is.  How long afterwards -- have you hired an expert to

19  think about it?

20       MR. GESMER:  No, your Honor.

21       THE COURT:  All right, you're on a tighter financial

22  tether.  So I think what we should do is, I think February 1 --

23  what's that?  It's a --

24       THE CLERK:  A Wednesday.

25       THE COURT:  A Wednesday.  Then a response by March 1?

1          MR. BLANK:  Well, I would like 60 days.  May I make a

2     point, your Honor, that pertains on this issue, please?

3     Real View did not infringe 20-20's software.  So typically in

4     the software industry, when you take a license, it's a license

5     to use the copyright, it's a license to make copies.  I

6     question whether they have any licenses that do not involve a

7     real copyright license, where you sublicense software and allow

8     someone else to distribute it, or use underlying technology in

9     a way that uses the copyright.

10          What happened here is, the software was downloaded,

11     and conceptually, as soon as it was downloaded, all legal

12     consequences stopped because it wasn't copied into Real View's

13     software.  So I seriously question what kind of license the

14     plaintiff can come up with, and I respectfully ask that the

15     Court ask about this because otherwise --

16          THE COURT:  No, because I don't know what I'm talking

17     about yet either.  The case law is very unclear about this, and

18     I've asked him as much as I'm going to ask him.  You're going

19     to get the report and then you'll see, and then you'll be able

20     to respond.  So you'll come up with -- I think February, I

21     mean, that's almost two months, February 1, and you've known

22     about this now for six -- I mean, it's been a long time.  So

23     February 1.  Then April 1, your report.  I mean, I want this

24     tried.  I don't want a whole other year to go by.  In the

25     meantime, we'll set a -- I forget, what would a trial look

1    like?  We have to think about that.  I'll set a

2    pretrial/Daubert hearing right now because I'm assuming there

3    will be a motion to -- let's say in May?

4         THE CLERK:  May, Judge?

5         THE COURT:  Yes.  Does that make sense?  So it would

6    be February 1, your counter would be April 1, cross-Daubert

7    motions if -- I mean, am I wrong to assume that's going to

8    happen?

9         MR. GESMER:  It almost certainly will, yes.

10        THE COURT:  I think, right?

11        MR. GESMER:  Yes.

12        THE COURT:  April 15 for any Daubert motions.  Any

13   oppositions, let's say May 1, and then we'll have a hearing on

14   the Daubert motions like the end of May?

15        MR. ROBINS:  Yes.

16        THE CLERK:  How about Thursday, May 24, 2:30 or 2:00,

17   2:00 o'clock?

18        MR. ROBINS:  That's acceptable.

19        THE COURT:  Now, I understand if you all want to --

20   there's some leeway in here, some padding, so you can give each

21   other a few extra days here and there, if that's necessary.

22   But what I'm really urging is, at the end of this -- what I'm

23   really worried about is, we're going to go through the next six

24   months, we're going to have a battle, and then potentially

25   another trial if the hypothetical license fee stands up, and

1    then I'm going to -- what if I get reversed and the First

2    Circuit says, "No, no, no, virtually identical is too hard.

3    It's got to be substantial similarity"?  Then do you go up --

4    I'm just sort of -- I guess you could go up on the whole thing

5    and have this just be a waste of money; or, theoretically, the

6    opposite would be, you could both appeal me on this, and the

7    First Circuit would have a fuller record.

8            It sounds like you're not appealing the remittitur.  I

9    think I'm right on that.  I mean, I struggled with it.  It took

10   us a long time to go through the case law.  I don't know that

11   you'd have as much success on the remittitur.  That having been

12   said, I don't know.  The case law on substantial

13   similarity/virtual identicality is pretty thin.  There isn't

14   that much -- I mean, the First Circuit could redo Lotus v.

15   Borland and come up with a whole new standard.  That's my

16   concern, we're doing all this for nothing is the concern.

17           MR. ROBINS:  We understand, and we'll certainly

18   discuss the possibility.

19           MR. GESMER:  Your Honor, may I address one other

20   point.  We know from their interrogatory answers that 20-20

21   purchases all of their competitors' software.  They said in

22   their interrogatories they've been doing that for twelve years

23   as of the date of the interrogatories.  They acquired through

24   an agent our software.  We would like to know what they paid

25   for that because that could be the value of the license here.

1   We're only hearing about the hypothetical license now.  We

2   heard about it for the first time on day nine of trial.  Now,

3   over our objection, you're opening discovery, allowing them to

4   enter an expert report, but we've been --

5            THE COURT:  I have not opened discovery.  I allowed

6   your motion to close discovery.  You were the one fighting

7   discovery.  Are you now moving for discovery?

8            MR. GESMER:  No.  We cannot defend against this

9   argument unless we're able to explore how they give this

10  software away, how they show it to the public, how much they

11  paid to get our software.  So what I am asking you for --

12           THE COURT:  Well, I'm sorry, I don't have a motion on

13  that at this point.  As far as I'm concerned, you were just

14  fighting off their discovery.  And if you guys want to both

15  agree to discovery, that's another story.  Maybe you both enter

16  into certain agreements.  And, in any event, if you want, I

17  mean, you can take one another's expert deposition.  I mean,

18  that's fair enough.

19           MR. BLANK:  Your Honor, you refused to extend

20  discovery in this case back in April of 2009.  It's simply not

21  fair to allow them to enter a new expert report after trial on

22  a totally new issue.

23           THE COURT:  Excuse me, Mr. Gesmer.  You fought

24  discovery.  You just won that battle.  If you want discovery,

25  that may be fair.  You haven't affirmatively moved for

1   discovery.  Now, if in fact you feel that due process or

2   fairness call out for some discovery about the basis for an

3   expert opinion, that may be fair, and it may go both ways.

4           MR. GESMER:  Your Honor, our objection is to allowing

5   them to enter this new expert report.  This should not be

6   allowed.

7           THE COURT:  That's overruled.  I said that in my

8   opinion, that I would allow the hypothetical license fee theory

9   to go forward to a jury.  If you feel you need discovery to

10  respond to the expert, you can say that.  But similarly, I --

11  just it's tit for tat.  You know, it goes two ways.  I would

12  suggest you two sit down and see what you can agree to.  It's

13  been very expensive, so I'm not just going to do one-ended

14  discovery.  It may be that if you get that, then he gets value

15  of use.  But what I'm really encouraging you all to do is to

16  think about appeal or to think about settlement.  Is that

17  discussion gone?

18          Can we go off the record for one minute.

19          (Discussion off the record.)

20          THE COURT:  So we'll go back onto the record.  So

21  basically we have this set up, this schedule.  If you both

22  agree that you need some expert discovery other than the

23  deposition of the experts, so be it.  I've otherwise not

24  reopened fact discovery.  It may be as Mr. Gesmer says that

25  there's certain -- in fairness, you may need certain things to

1   evaluate the expert opinion, and that's fair.

2         MR. BLANK:  Your Honor, do you anticipate that the

3   jury will see the two programs?

4         THE COURT:  I haven't anticipated anything.  I have

5   not even thought about a trial at this point.  All that's clear

6   is, you've made very good points that I'm not after four years

7   opening up, which essentially means reopening all fact

8   discovery.  We've had a trial.  I'm not doing it.  But what I

9   think might be fair is some level of, for both sides, expert

10  discovery, a deposition of the expert, et cetera.  And if in

11  fact you agree on some fact discovery, value of use, the use of

12  the tutorials -- for you, what did you want, the --

13        MR. GESMER:  We'd like to know what they pay their

14  agents to acquire all this software.  They acquired our

15  software in violation of our license, your Honor.  What did

16  they pay for that?  That's probably the value of damages in

17  this case.

18        THE COURT:  I don't know how you get that unless

19  they --

20        MR. GESMER:  They grabbed our software illegally

21  against our license.

22        THE COURT:  Yeah, but they didn't copy it the way

23  yours did.

24        MR. GESMER:  We didn't copy it either, your Honor.  We

25  have a verdict of noninfringement, your Honor.

1      THE COURT:  No, no.  You have a verdict that the

2 screen shots are not virtually identical.

3      MR. GESMER:  And legally that was a verdict of

4 non-copyright infringement.

5      THE COURT:  I agree, but that's different from not

6 using it.  They used it.  I heard from the stand they used it.

7 They may have designed around it, which is perfectly legal, but

8 they did use it.

9      MR. GESMER:  But use that doesn't rise to a copyright

10 infringement --

11      THE COURT:  I know that, I know the law, but they used

12 it.  They used it to develop their own and then designed around

13 it.  And that may be not copyright infringement.  I agree with

14 that.  That's what the jury found.  It's just they did use it

15 to compete.  So I don't know what it's worth.  I've never been

16 involved in this area.  There are precious few cases in the

17 United States of America that have ever been involved in this

18 area, and one of which involved companies like Oracle which are

19 so much bigger than any of you, right?  They're struggling with

20 this right now as well, aren't they?

21      MR. ROBINS:  Yes, they are.

22      THE COURT:  Have they reached a conclusion on what to

23 do with it?

24      MR. GESMER:  They're trying to go to the Ninth Circuit

25 on the issue of whether a hypothetical license applies where

1    the parties agree they would not have licensed to each other.

2              THE COURT:  Yes, that's exactly our issue, right?

3              MR. GESMER:  Yes, it is.

4              THE COURT:  Has it already been argued to the Ninth?

5              MR. GESMER:  No, no.  They're briefing the issue of

6    interlocutory appeal of that issue.

7              THE COURT:  So that would be another good issue,

8    right, if you were to do a double?

9              MR. ROBINS:  We have been kind of in parallel with

10   them all along.

11             THE COURT:  That's such an interesting issue.  You're

12   going to make history.

13             MR. GESMER:  I hope we're alive to see it, your Honor.

14             THE COURT:  Huh?

15             MR. GESMER:  I hope we're still around to see it.

16             THE COURT:  Okay, all right.  So I think we've got a

17   little schedule in place.  If you want specific kinds of

18   discovery, as I said, I'm not going to open it for one side and

19   not another, so maybe you can talk about it outside.  If you

20   agree, I agree.

21             MR. ROBINS:  Thank you.

22             THE COURT:  In the meantime, when do you think you can

23   get back to me?  I know it's the holiday period for people.

24   Can you get back to me by Christmas, the two of you, about what

25   you want to do on interlocutory appeal?

1        MR. GESMER:  It's fine with me, sure.

2        THE COURT:  Because then you don't want to rev up a

3    whole expert.  And I guess a possible way to do it would be to

4    appeal also my decision on remittitur on the viability of a

5    hypothetical license fee for people who weren't likely to --

6    who are competitors, the same issue as Oracle.

7        MR. GESMER:  Yes.

8        THE COURT:  I mean, I suppose you could have a

9    two-for, and then we can just see where this goes.

10        MR. GESMER:  That will be an argument that we'll be

11    raising going forward, so to bring it up to the First Circuit

12    makes sense at this point.

13        THE COURT:  Now, they may not take it, it may seem too

14    vague to them, but I don't know that that's not worth a try.

15    And if not, then we've tried, and then I'll go forward.

16        MR. ROBINS:  I'm not sure myself that the First

17    Circuit would take that second issue.

18        THE COURT:  I don't think so either.

19        MR. ROBINS:  It's really a fact-driven decision and

20    not --

21        THE COURT:  I'm afraid you're right.  I'm afraid

22    you're right.  So the only thing that would really be

23    appealable really would be, I suppose, the remittitur at this

24    point, but you're on thin ice there, so --

25        In any event, good, I will see you, and is it all the

1    way till May?

2              MR. ROBINS:  Right.

3              THE COURT:  Okay, good.  All right.

4              MR. ROBINS:  Thank you, your Honor.

5              THE COURT:  Have a nice holiday for everyone.

6              MR. ROBINS:  You too.

7              MR. GESMER:  Thank you, your Honor.

8              THE CLERK:  All rise.

9              (Adjourned, 9:52 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )

        I, Lee A. Marzilli, Official Federal Court Reporter,

do hereby certify that the foregoing transcript, Pages 1

through 24 inclusive, was recorded by me stenographically at

the time and place aforesaid in Civil Action No. 07-12157-PBS,

Real View, LLC v. 20-20 Design, Inc., et al, and thereafter by

me reduced to typewriting and is a true and accurate record of

the proceedings.

    In witness whereof I have hereunto set my hand this 19th

day of December, 2011.

            /s/ Lee A. Marzilli
            _____
            LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER

6af2f138-f03a-432c-8d80-0b4466f59495