UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                          )
REAL VIEW, LLC.,          )
          Plaintiff and   )
          Counterclaim    )
          Defendant       )
                          )
     v.                   ) CIVIL ACTION NO. 07-12157-PBS
                          )
20-20 TECHNOLOGIES, INC., )
          Defendant and   )
          Counterclaim    )
          Plaintiff       )
                          )
     v.                   )
                          )
BORIS ZELDIN and LEONID PERLOV, )
          Counterclaim    )
          Defendants      )
                          )
_____)
```

**MEMORANDUM AND ORDER**

July 11, 2012

**Saris, U.S.D.J.**

**Introduction**

In this copyright action involving kitchen design software,
Real View has filed a motion to preclude the testimony of 20-20
damages expert Weston Anson (Doc. No. 279).  After hearing, I
find that Mr. Anson is qualified to render an opinion regarding
the most likely form of a hypothetical license agreement between
Real View and 20-20 for the interface-related intellectual
properties used in the kitchen design software.  In addition,

1

after review of the lengthy submissions, I find that his overall methodology is reliable. <u>See</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 596 (1993). However, I strike Mr. Anson's report because the past license agreements he reviewed are not comparable and do not adequately support his opinions regarding the terms of a hypothetical license.

## Background

This copyright dispute concerns kitchen computer-aided design software. Real View, LLC ("Real View") filed an action seeking a declaratory judgment that various versions of its program ProKitchen did not infringe 20-20 Technology, Inc.'s ("20-20") copyright in the computer program 20-20 Design. Defendant 20-20 counter-claimed against Real View and its founders Boris Zeldin and Leonid Perlov. A jury awarded $1,370,590 in damages to 20-20 arising from Real View's illegal download of 20-20 Design version 6.1, which Real View relied upon and studied in developing the user interface for its competing software. Real View contended at trial that the only damages caused by the illegal download was $4,200, the list price of the software. The jury found that ProKitchen did not infringe 20-20 Design, but it awarded $1,370,590 in damages based solely on the illegal download. Real View stipulated to the illegality of the action, so the only question left for the jury was damages. In a September 21, 2011, Remittitur Memorandum and Order, with which

the court assumes familiarity, the Court allowed Real View's motion for remittitur.  See Real View, LLC. v. 20-20 Techs., Inc., 811 F. Supp. 2d 553 (D. Mass. 2011).  However, the court also held that a hypothetical license fee, representing what a seller would reasonably have charged a buyer for a license allowing the particular use of the intellectual property at issue, can be a permissible basis for determining a plaintiff's "actual damages" arising from an infringement.  See On Davis v. Gap, Inc., 246 F.3d 152, 164 (2nd Cir. 2001); see also Bruce v. Weekly World News, Inc., 310 F.3d 25, 28 (1st Cir. 2002) (where copyright damages from unauthorized use of the photograph were based on a reasonable licensing fee determined by examining industry practice).  20-20 then sought a new trial.

## Discussion

20-20 seeks to call Mr. Weston Anson as an expert witness to testify at trial regarding the most likely form of a hypothetical license agreement between Real View and 20-20 for the intellectual properties used in the kitchen design software.  Mr. Anson holds an M.B.A. from Harvard University and has substantial experience with intellectual property licensing transactions.  He has authored over 100 articles regarding intellectual property, licensing, valuation, and related topics as well as a book on "Fundamentals of Intellectual Property Valuation."  In addition, he has analyzed and valued intellectual property assets for many

corporations and served on the boards of industry trade groups
such as the Licensing Industry Merchandisers' Association.
Finally, he has previously testified in litigation involving the
licensing and valuation of software and copyrights.  Mr. Anson is
qualified to opine regarding the terms of a hypothetical license
agreement between Real View and 20-20.

The admission of expert evidence is governed by Federal Rule
of Evidence 702, which codified the Supreme Court's holding in
Daubert, 509 U.S. 579 (1993), and its progeny.  See United States
v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002); see also Fed. R. Evid.
702 advisory committee's note.  Rule 702 states:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is
> based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 702.

The trial court must determine whether the expert's
testimony "both rests on a reliable foundation and is relevant to
the task at hand" and whether the expert is qualified.  Daubert,
509 U.S. at 597; Diaz, 300 F.3d at 73.  "[W]hile methodology
remains the central focus of a Daubert inquiry, this focus need
not completely pretermit judicial consideration of an expert's
conclusions.  Rather, trial judges may evaluate the data offered

4

to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." <u>Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.</u>, 161 F.3d 77, 81 (1st Cir. 1998).  In the context of a hypothetical license, "'[e]xcessively speculative' claims must be rejected . . . . An objective, non-speculative license price is established through objective evidence of benchmark transactions, such as licenses previously negotiated for comparable use of the infringed work, and benchmark licenses for comparable uses of comparable works." <u>Oracle USA, Inc. v. SAP AG</u>, 07-1658, 2011 WL 3862074 (N.D. Cal. Sep. 1, 2011) (citing cases); <u>see</u> <u>Jarvis v. K2, Inc.</u>, 486 F.3d 526, 534 (9th Cir. 2007).

To form his opinion regarding the expected terms of a hypothetical license agreement between Real View and 20-20, Mr. Anson considered a number of other software licensing agreements. First, he reviewed 20-20's past licensing agreements with other parties.  He examined the key terms of each agreement and determined the ways in which the agreements were similar and different.  Second, Anson considered licensing agreements between various other parties in the software development market.  He identified the agreements contained in a publicly available database that were most relevant to this case and analyzed and compared their terms.  In addition, Anson researched licensing practices and customs in the software industry and analyzed the

financial conditions and relative competitive positions of Real
View and 20-20 to assess their negotiating leverage.  I find this
general methodology to be reliable.  <u>Cf.</u> <u>Georgia-Pac. Corp. v.</u>
<u>U.S. Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)
("rates paid by the licensee for the use of other patents
comparable to the patent in suit" should be considered in
determining the amount of a reasonable royalty for a patent
license).

However, the data Mr. Anson offers in the form of past
license agreements do not adequately support his opinions
regarding the form and compensation terms of a hypothetical
license agreement between Real View and 20-20.  Anson "agree[s]
with [Real View's expert] Dr. Epstein that each of the comparable
or representative agreements . . . used to frame the Hypothetical
Agreement involve varying technologies and terms.  As Epstein
stated, 'there is no directly comparable license.'"  Doc. No. 293
Ex. A at 2.  Moreover, both Anson, in his expert report, and
Epstein, in his rebuttal report, identify reasons that each of
the benchmark licenses studied by Anson is not comparable to the
hypothetical license at issue here.  Thus, both parties' experts
agree there are no directly comparable licenses.  Real View
argues that this lack of reasonably comparable licenses renders
Anson's opinions regarding the terms of a hypothetical license
excessively speculative.  Anson retorts that the lack of a

6

comparable license is an obstacle to the licensing of
intellectual property that is regularly overcome by parties who
successfully negotiate a license agreement.  <u>See</u> Doc. No. 293 Ex.
A at 27.

20-20's past reseller licensing agreements with other
parties are not comparable to the hypothetical license in this
case between two entities that produce directly competing
software.  Real View admits it illegally downloaded 20-20's
software to copy it and make its software, ProKitchen, as close
to 20-20 Design as possible.  In this context, there is a lack of
comparability between what Anson describes as "Re-Seller" or
"Distributor" agreements, wherein the licensee sells the <u>same</u>
product as the licensor, and his proposed hypothetical
"Collaboration and Distribution" agreement, wherein the licensee
has the right to use the licensor's intellectual property as a
component of the licensee's own product.  Doc. No. 282-A at 9,
Ex. 1.  Anson concedes that the use permitted in the prior
reseller agreements to which 20-20 was a party is "different from
that contemplated in the Hypothetical Agreement."  Doc. No. 293
Ex. A at 4.  Thus, the five of the six prior 20-20 licensing
agreements that Anson describes as reseller or distributor
agreements are not comparable benchmarks.

The only prior 20-20 agreement that Anson does not describe
as strictly a "Re-Seller" or "Distributor" agreement, the

7

"Collaboration and Distribution Agreement between 20-20 and Cadsoft Corporation," is also not a comparable benchmark.  Doc. No. 282-A at 9, Ex. 1.  As Dr. Epstein explains, this is a joint marketing and reseller agreement.  <u>See</u> Doc. No. 282-B at 16-19. Cadsoft and 20-20 arranged to allow data from each company's computer-aided design software program to be used in the other's software and sought to mutually promote each other's products and services.  20-20's agreement with Cadsoft included rights for each company to sell the other company's software and was thus in large part a reseller agreement.  In addition, the parties agreed to share customer lists and use each other's trademarks to promote each other's products.  <u>See</u> Doc. No. 282-A-6 at ¶2.2, ¶7.5-7.6.  The hypothetical agreement between Real View and 20-20 would not be expected to include these terms related to selling and promoting each other's products.  While 20-20 did agree to provide Cadsoft with the "20-20 Design API toolkit and documentation" required to develop software that would allow for the transfer of data between the programs, there was no licensing of 20-20 Design's graphical user interface as would be expected in a hypothetical license between Real View and 20-20.  <u>See</u> <u>id.</u> at ¶1.2.  Thus, the prior agreement between 20-20 and Cadsoft is not a comparable benchmark.

The licensing agreements between various other parties in the software development market that Anson considered are

similarly not comparable benchmarks.  This is because the terms
of these agreements are both over-inclusive and under-inclusive
as compared with the expected terms of a hypothetical license
agreement between Real View and 20-20.

The benchmark agreements that Anson considered are over-
inclusive and not comparable because they include the licensing
of intellectual properties that Real View would not have been
expected to license.  The agreements contain bundles of
intellectual property rights ranging from copyright rights in the
object code and trademark rights to trade secret rights and
source code.  Yet Real View downloaded 20-20 Design to facilitate
producing ProKitchen with a graphical user interface similar to
that of 20-20 Design and did not require all the rights bundled
together in each of the benchmark agreements.  Anson's failure to
adequately take into consideration the fact that these benchmark
agreements license rights that would not have been sought by Real
View renders his conclusions unreliable.

As Dr. Epstein points out, the benchmark agreements that
Anson considered are also under-inclusive and consequently not
comparable because they do not include the licensing of a
graphical user interface.  See Doc. No. 282-B at 19.  Real View
sought to mimic 20-20 Design's user interface, including both the
appearance of the program on the screen and the mechanisms for
manipulating the program.  See Trial Tr. Day 8 at 115.  In this

9

way, users would not need to learn a new program from scratch if they decided to switch from 20-20 Design to Real View's new competitor product.   Thus, a hypothetical agreement between Real View and 20-20 would be expected to include the licensing of 20-20 Design's user interface.   Anson directly acknowledges this lack of comparability with regard to at least one of the benchmark agreements.   <u>See</u> Doc. No. 282-A Ex. B.   Yet Anson fails in either of his reports to address Epstein's concern that the benchmark agreements lack specific mention of user interface use.

Anson also does not adequately explain how he reached his opinion regarding the exact form and compensation terms of a hypothetical license agreement between Real View and 20-20.   For example, Anson concludes the hypothetical agreement would include a royalty on maintenance and support fees of 15%, but he does not explain how he arrived at the 15% figure.   He similarly concludes that the term of a license would have been four years but does not explain how he arrived at this exact time period.[1] Furthermore, Anson does not adequately justify his proposal of a 35% royalty rate on gross license sales.   Anson explains that "[s]ince Real View appears to have had limited financial resources at the time a Hypothetical Agreement would have been

---

[1] The hypothetical license is deemed to have been negotiated at the time of infringement.   <u>See</u> <u>Oracle America, Inc. v. Google</u>, <u>Inc.</u>, No. C 10-03561 WHA, 2012 WL 44485, at *2 (N.D. Cal. Jan. 9, 2012).   Accordingly, the duration of the hypothetical agreement should begin in 2004.

established with 20-20, the royalty rate Real View would have
been expected to pay would have been at the higher end of the
comparable market agreement spectrum." Doc. No. 282-A at 13. He
also notes that "the royalty rates observed in the comparable
market agreements ranged from 3% of sales up to 35% of sales . .
. ." Id. It thus appears that his choice of a 35% royalty rate
on gross license sales comes from matching the highest rate of
what he refers to as the "comparable market agreements."
However, Anson acknowledges in Exhibit 2 of his report that the
"comparable market agreement" with the highest rate is not
comparable in that it is only for distribution and use rights,
not modification or use of the user interface, and was entered
into 25 years ago. See Doc. No. 282-A Ex. 2. Thus, Anson does
not adequately explain how the data he reviewed in the form of
other license agreements support the hypothetical license terms
he proposes.

### **ORDER**

Real View's motion to preclude the testimony of 20-20
damages expert Weston Anson is **ALLOWED** (Doc. No. 279). The court
orders entry of judgment in the amount of $4,200 plus interest at
12 percent from April 2004, the date of the download. 20-20
shall propose a form of judgment within 10 days.

                              /s/ PATTI B. SARIS
                              PATTI B. SARIS
                              United States District Judge